No. 25-1766

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

YA GLOBAL INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP;
YORKVILLE ADVISORS, GP LLC, Tax Matters Partner; YA GLOBAL
INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP; Yorkville
Advisors, LLC, Tax Matters Partner,
*Appellants*

v.

COMMISSIONER OF INTERNAL REVENUE

On Appeal from the United States Tax Court

# BRIEF OF APPELLANTS

HENRY CHENG
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2512

TAMARA L. SHEPARD
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-7959

*Counsel for YA Global Investments, LP, f/k/a Cornell Capital
Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and
YA Global Investments, LP, f/k/a Cornell Capital Partners, LP,
Yorkville Advisors, LLC, Tax Matters Partner*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Third Circuit L.A.R. 26.1.1, YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner makes the following disclosure:

(1)    For non-governmental corporate parties please list all parent corporations:

*None.*

(2)    For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

*None.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court, but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

(4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated: September 18, 2025        s/ Tamara L. Shepard
                                                 TAMARA L. SHEPARD

*Counsel for YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CITATIONS ......................................................... vii

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF ISSUES ...................................................... 1

RELATED CASES ................................................................... 2

INTRODUCTION .................................................................... 2

STATEMENT OF THE CASE ................................................. 7

I.     Relevant Facts ............................................................. 7

    A.     Yorkville. ............................................................. 7

    B.     Yorkville's Agreements with YA Global. ................................. 8

    C.     YA Global and Its Investments .............................................. 9

    D.     YA Global's Tax Advisors and Returns. ............................. 12

    E.     The Examination of YA Global's Returns ........................... 13

        1.     Extensions of the Statute of Limitations .................... 13

        2.     The CCA. ................................................................. 15

II.    Procedural History. ...................................................... 16

    A.     The FPAAs. .......................................................... 16

    B.     The Commissioner's Changing Theories. ............................ 16

    C.     The Trial and the Tax Court's Post-Trial Inquiries. ........... 19

SUMMARY OF ARGUMENT ................................................. 20

ARGUMENT ........................................................................ 26

I.     The Tax Court's Conclusion That YA Global Had Income Effectively Connected with a USTB Based on Yorkville's Activities Must Be Overturned as a Matter of Law. .................... 26

    A.     Standard of Review. ............................................. 26

    B.     Applicable Tax Principles. ................................... 27

# TABLE OF CONTENTS
(continued)

C. The Tax Court's Conclusion That the Fund Had a USTB Providing Personal Services Was Riddled with Legal Errors. ........................................................................ 29

    1. The Tax Court's View of Petitioners' Burden Ensured It Was Impossible to Satisfy. ........................ 31

    2. Unrebutted Evidence Showed Portfolio Companies Paid for Capital Only; the Tax Court's Contrary View Rests on Speculation and Faulty Logic. ........................................................................... 36

    3. The Tax Court's USTB Analysis Conflicts with Its Own View of Agency. .................................................. 42

D. The Tax Court Ignored Undisputed Evidence That the Fund Was an Investor and Therefore Had No USTB. ........ 43

    1. The Pattern of the Fund's Returns Demonstrate That Its Income Was from Investment........................ 45

    2. The Fund Provided Capital to High-Risk "Penny Stock" Companies......................................................... 46

    3. The Fund's Intent Was to Invest. ................................. 47

E. The Tax Court Incorrectly Construed the Section 864(b)(2) Trading Exception. ............................................... 47

F. The Tax Court's Entire Analysis of Effectively Connected Income Rested on Its Misreading of an Accounting Method Rule....................................................... 50

II. The Tax Court Misinterpreted Section 475 to Conclude That YA Global Had Income Subject to Mark-to-Market Rules........... 51

A. Standard of Review. ............................................................. 52

B. The Tax Court's Understanding of Dealing in Securities Is Contrary to the Statute. .................................. 52

# TABLE OF CONTENTS
### (continued)

**Page**

    1.    The Tax Court Excised the Word "Customers" from the Statute. .......................................................... 52

    2.    Under the Tax Court's Atextual Interpretation, Almost Any Business Can Be Deemed a Securities Dealer. ......................................................... 57

C.    Even if the Fund Were a Dealer, Its Securities Were Identified as Held for Investment and Were Therefore Exempt from the Mark-to-Market Rules. ............................. 60

III.    The Tax Court Erred in Imposing Penalties Based on an Illogical Theory the Commissioner Never Raised. ........................ 64

A.    Standard of Review. ............................................................ 64

B.    The Tax Court Drew an Impermissible Inference from the Malpractice Case. ........................................................... 64

C.    The Tax Court Violated the Party-Presentation Principle by Manufacturing This Argument for the Commissioner. ..................................................................... 68

IV.    Statute of Limitations. ................................................................. 70

A.    Standard of Review. ............................................................ 71

B.    YA Global's Filing of Forms 1065 Started the Limitations Period. ............................................................. 71

C.    The Parties' Consents to Extend the Statute of Limitation Did Not Include Section 1446 Withholding Tax. ..................................................................................... 74

CONCLUSION ....................................................................................... 77

ADDENDUM .......................................................................................... 78

Internal Revenue Code (26 U.S.C.). ........................................................ 78

§475. Mark to market accounting method for dealers in securities .............................................................................. 78

§864. Definitions and special rules ............................................... 81

# TABLE OF CONTENTS
(continued)

**Page**

§1236. Dealers in securities. ......................................................... 84

Treasury Regulations (26 C.F.R.) ........................................................... 85

§ 1.475(b)-2  Exemptions—identification requirements .............. 85

§ 1.475(c)-1  Definitions—dealer in securities............................. 85

§ 1.475(d)-1  Definitions—dealer in securities ............................ 87

§ 1.864-2  Trade or business within the United States................ 87

§ 1.864-7  Trade or business within the United States................ 89

§ 1.1236-1 Dealers in securities. .................................................... 90

COMBINED CERTIFICATES OF COMPLIANCE............................... 92

CERTIFICATE OF SERVICE................................................................. 93

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Arcelik A.S. v. El DuPont de Nemours & Co.*,
  2023 WL 3862506 (3d Cir. 2023) ....................................................... 43

*Baird v. Commissioner*,
  438 F.2d 490 (3d Cir. 1970) ........................................................31-34

*Bielfeldt v. Comm'r*,
  76 TCM 776 (1998)........................................................................53

*Cap. One Fin. Corp. v. Comm'r*,
  133 T.C. 136 (2009) ......................................................................38

*Comm'r v. Chelsea Prods.*,
  197 F.2d 620 (3d Cir. 1952) ............................................................33

*Comm'r v. Groetzinger*,
  480 U.S. 23 (1987)..........................................................................28

*Comm'r v. Lane-Wells Co.*,
  321 U.S. 219 (1944)........................................................................72

*Comm'r v. Transp. Mfg. & Equip. Co.*,
  478 F.2d 731 (8th Cir. 1973)............................................................33

*Container Corp. v. Comm'r*,
  134 T.C. 122 (2010)........................................................................29

*Curtis Co. v. Comm'r*,
  232 F.2d 167 (3d Cir. 1956) ............................................................47

*Dagres v. Comm'r*,
  136 T.C. 263 (2011) ..................................................................28-29

*Edward J. Sweeney & Sons, Inc. v. Texaco Inc.*,
  637 F.2d 105 (3d Cir. 1980) ............................................................67

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*Est. of Yaeger v. Comm'r,*
   889 F.2d 29 (2d Cir. 1989) ................................................................ 47

*Evans v. Comm'r,*
   48 T.C. 704 (1967) ............................................................................ 44

*Fed. Home Loan Mortg. Corp. v. Comm'r,*
   125 T.C. 248 (2005) .......................................................................... 37

*Fin Hay Realty Co. v. United States,*
   398 F.2d 694 (3d Cir. 1968) ......................................................... 44-45

*Gov't Emps. Ret. Sys. of the Virgin Islands v. Gov't of the Virgin Islands,*
   995 F.3d 66 (3d Cir. 2021) ................................................................ 27

*Greenlaw v. United States,*
   554 U.S. 237 (2008) .......................................................................... 70

*Higgins v. Comm'r,*
   312 U.S. 212 (1941) .......................................................................... 28

*Historic Boardwalk Hall, LLC v. Comm'r,*
   694 F.3d 425 (3d Cir. 2012) .............................................................. 45

*Hub City Foods v. Comm'r,*
   884 F.2d 320 (7th Cir. 1989) ............................................................. 44

*In re Prince,*
   89 F.2d 681 (2d Cir. 1937) ................................................................ 38

*Inverworld, Inc. v. Comm'r,*
   71 T.C.M. (CCH) 3231 (1996) ........................................................... 49

*Linen Thread Co. v. Comm'r,*
   14 T.C. 725 (1950) ............................................................................ 44

**TABLE OF CITATIONS**
(continued)

**Page(s)**

*Lupyan v. Corinthian Colls. Inc.,*
   761 F. 3d 314 (3d Cir. 2014) ............................................................ 35

*Matter of Am. Biomaterials Corp.,*
   954 F.2d 919 (3d Cir. 1992) ............................................................. 64

*Morgan v. Sundance, Inc.,*
   596 U.S. 411 (2022) .......................................................................... 74

*Mt. Mansfield Co., Inc. v. Comm'r,*
   50 T.C. 798 (1968) ............................................................................ 44

*Murray v. Lichtman,*
   339 F.2d 749 (D.C. Cir. 1964) ......................................................... 41

*N.A. of Life Underwriters, Inc. v. Comm'r,*
   30 F.3d 1526 (D.C. Cir. 1994) ......................................................... 33

*Neptune Mut. Ass'n, Ltd. of Bermuda v. United States,*
   862 F.2d 1546 (Fed. Cir. 1988) ....................................................... 72

*Noteman v. Welch,*
   108 F.2d 206 (1st Cir. 1939) ............................................................ 38

*Pac. First Fed. Sav. & Loan Ass'n v. Comm'r,*
   79 T.C. 512 (1982) ............................................................................ 37

*Phx. Canada Oil Co. v. Texaco, Inc.*
   842 F.2d 1466 (3d Cir. 1988) ........................................................... 43

*Piedmont & Arlington Life-Ins. Co. v. Ewing,*
   92 U.S. 377 (1875) ............................................................................ 35

*Pleasant Summit Land Corp. v. Comm'r,*
   863 F.2d 263 (3d Cir. 1988) ............................................................. 52

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*Pursell v. Comm'r,*
38 T.C. 263 (1962) .............................................................................. 75

*Ripley v. Comm'r,*
103 F.3d 332 (4th Cir. 1996) ............................................................... 75

*Schafer v. Helvering,*
299 U.S. 171 (1936) ............................................................................. 53

*Sheet Metal Workers, Local 19 v. 2300 Grp.,*
949 F. 2d 1274 (3d Cir. 1991) ............................................................. 71

*Slappey Drive Ind. Park v. United States,*
561 F.2d 572 (11th Cir. 1977) ............................................................. 45

*Stange v. United States,*
282 U.S. 270 (1931) ............................................................................. 74

*Streber v. Comm'r,*
138 F.3d 216 (5th Cir. 1998) ............................................................... 67

*TIFD III-E, Inc. v. United States,*
459 F.3d 220 (2d Cir. 2006) ................................................................ 45

*Trans-Atl. Co. v. Comm'r,*
469 F.2d 1189 (3d Cir. 1972) .............................................................. 46

*U.S. v. Midland-Ross Corp.,*
381 U.S. 54 (1965) ............................................................................... 43

*United States v. Boyle,*
469 U.S. 241 (1985) ............................................................................. 64

*United States v. Clarke,*
816 F.3d 1310 (11th Cir. 2016) ........................................................... 32

# TABLE OF CITATIONS
(continued)

**Page(s)**

*United States v. Diamond*,
   788 F.2d 1025 (4th Cir. 1986) ............................................................. 53

*United States v. Dowdell*,
   70 F.4th 134 (3d Cir. 2023) ........................................................... 69-70

*United States v. Edelson*,
   604 F.2d 232 (3d Cir. 1979) ............................................................... 73

*United States v. Hodgekins*,
   28 F.3d 610 (7th Cir. 1994) ................................................................ 75

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ....................................................................... 69-70

*United States v. Wood*,
   943 F.2d 1048 (9th Cir. 1991) ............................................................ 54

*W. Credit Co. v. Comm'r*,
   38 T.C. 979 (1962) ..................................................................... 38, 42

*Whipple v. Comm'r*,
   373 U.S. 193 (1963) ........................................................................... 28

*White v. Samsung Elecs. Am., Inc.*,
   61 F.4th 334 (3d Cir. 2023) .......................................................... 74, 76

*Wilkerson v. Comm'r*,
   70 T.C. 240 (1978) ............................................................................ 38

*YA Global Investments, L.P. v. RSM McGladrey, Inc.*,
   2016 WL 5724900 (N.J. Super. Ct. App. Div. Oct. 4, 2016) ......... 66, 75

# TABLE OF CITATIONS
(continued)

**Page(s)**

**STATUTES**

I.R.C.

§ 162 ................................................................................. 27

§ 475 ........................................................................... *passim*

§ 861 ................................................................................. 30

§ 862 ................................................................................. 30

§ 863 ................................................................................. 30

§ 864 ........................................................................... *passim*

§ 865 ................................................................................. 30

§ 881 ................................................................................. 27

§ 882 ................................................................................. 27

§ 1221 ......................................................................... 27, 53

§ 1441 ............................................................................... 14

§ 1442 ............................................................................... 14

§ 1443 ............................................................................... 14

§ 1444 ............................................................................... 14

§ 1445 ............................................................................... 14

§ 1446 ........................................................................ *passim*

§ 6031 ............................................................................... 72

§ 6226 ................................................................................. 1

§ 6229 ............................................................................... 71

§ 6501 ............................................................................... 70

§ 6651 ............................................................................... 64

§ 7442 ................................................................................. 1

§ 7482 ................................................................................. 1

**RULES & REGULATIONS**

Rev. Rul. 81-160, 1981-1 C.B. 312 ........................................... 39

Tax Ct. R. 142 ...................................................................... 34

# TABLE OF CITATIONS
(continued)

**Page(s)**

Treas. Reg.
§ 1.263(a)-5 .................................................................... 39
§ 1.475(b)-2 .............................................................. 52, 62
§ 1.475(c)-1 ................................................................. 55-56
§ 1.731-2 ....................................................................... 39
§ 1.864-2 ................................................................. 28, 48
§ 1.864-7 .................................................................. 48-49
§ 1.1446-3 ..................................................................... 72

## OTHER AUTHORITIES

I.R.S. Chief Counsel Advice 201501013 (Jan. 2, 2015),
https://www.irs.gov/pub/irs-wd/201501013.pdf ................................... 15

*Black's Law Dictionary* (8th ed. 2004) ..................................................... 30

Gilly Wright, *Corporate FX Awards 2021*, Global Finance Magazine,
https://gfmag.com/award/award-winners/corporate-fx-awards/ ........ 60

H.R. Rep. No. 103-111 (1993) .................................................................. 63

Nike, Inc., Form 10-K (2025), https://www.sec.gov/Archives/edgar/
data/320187/000032018725000047/nke-20250531.htm .................... 59

NYSBA Tax Section, *Report on Certain Fees*, Rept. 1500 (Sep. 13,
2024) ............................................................................................... 40

S. Rep. No. 1707, 89th Cong., 2d Sess. 9 (1966) ..................................... 48

Southwest Airlines Co., Form 10-K (2023), https://www.sec.gov/
Archives/edgar/data/92380/000009238024000027/luv-
20231231.htm ................................................................................ 59

*The Southwest Jet Fuel Hedge Strategy*, Southwest, https://south
west50.com/our-stories/the-southwest-jet-fuel-hedge-strategy/ ........ 59

# TABLE OF CITATIONS
(continued)

**Page(s)**

Ted Reed, *Southwest Airlines Reports Record Quarter with Gains from Fuel Hedging*, Forbes (July 28, 2022, 9:10 AM EDT), https://www.forbes.com/sites/tedreed/2022/07/28/southwest-airlines-reports-record-quarter-with-gains-from-fuel-hedging .........59

William L. McRae & Jonathan Gifford, *YA Global: Customers Come First, Analytically*, 183 Tax Notes 305 (2024).....................................57

## JURISDICTIONAL STATEMENT

The Tax Court had jurisdiction over this case under Sections 6226 and 7442 of the Internal Revenue Code.[1]  After the Tax Court entered a final decision, the parties filed a stipulation with the court, pursuant to Section 7482(b)(2), that venue for appellate review of this case lies in this Court.  JA6573-6575.  This Court has jurisdiction under Section 7482.

## STATEMENT OF ISSUES

1.    Whether the Tax Court properly ignored uncontroverted evidence and instead concluded that YA Global was engaged in a U.S. trade or business ("USTB") based entirely on its own speculation and misapplication of the burden of proof.

2.    Whether the Tax Court properly interpreted Section 475 to nullify the word "customers" and include a wide range of businesses as "dealers in securities."

---

[1]    Citations to "I.R.C." or the "Code" refer to the Internal Revenue Code, Title 26, U.S.C., in effect for the years in issue.  Citations to "Treas. Reg." refer to Treasury regulations, 26 C.F.R., in effect for those years. Relevant portions of the Code and regulations are set forth in the Addendum.

3. Whether the Tax Court correctly determined that YA Global's malpractice suit against its former accountants, filed in 2015, negated its claim that it reasonably relied on those accountants in determining it had no trade or business in 2006-2009.

4. Whether the statute of limitations barred the Commissioner from adjusting YA Global's income and liability for 2006 and 2007.

## RELATED CASES

Petitioners are unaware of any prior appeal of this case or any related case.

## INTRODUCTION

This case should never have gotten this complicated.

YA Global Investments, LP, f.k.a. Cornell Capital Partners, LP ("YA Global" or the "Fund") was in many ways a typical hedge fund, one of several launched and overseen by investment manager Yorkville Advisors, LLC ("Yorkville"). As is common in the industry, Yorkville raised capital from investors for its various funds, including YA Global, and it invested the funds' assets using strategies it developed. In exchange for its efforts, Yorkville charged investors using a typical "2 and

2

20" structure—*i.e.*, 2% of the assets' value and 20% of any profits or gains it generated.

Like most hedge funds, YA Global held securities in publicly traded companies, but its focus was specific to a strategy developed by Yorkville. Yorkville's specialty was in financially troubled "penny stock" companies trading in very low volumes in over-the-counter markets. Yorkville researched these businesses in depth to determine which ones might succeed despite their financial woes, and it invested its funds' capital in those companies.

YA Global purchased various securities from the companies Yorkville vetted for it, including convertible debentures, stock and warrants. Because of the high-risk nature of the investments, the Fund's returns were volatile. It generated outsized profits when a portfolio company's stock price skyrocketed, but much more often it was stuck with hard-to-sell stock in companies that faltered. Gains far exceeded losses in the first part of the period at issue, but the Fund had unsustainable losses in the wake of the 2008 financial meltdown.

The Fund's transactions in securities could get complicated, but its fundamental strategy was straightforward: make bets on public

3

companies that were down on their luck.  That's how YA Global's tax and accounting advisors, including RSM McGladrey, saw it.  RSM told the Fund that its activities did not amount to an active "business" for tax purposes, but rather constituted investing and fell under the Code's provisions for "trading in securities."  RSM prepared the Fund's tax returns on that basis and included statements on the returns that YA Global was taking the position that it was an investor, not engaged in a business.

Things began to get messy when the Commissioner began his audit of YA Global in 2009.  It was lengthy.  The Commissioner sought (and obtained) extensions of time at least seven times over five years; he collected thousands of documents; and he changed his mind about the kind of tax he thought was at issue.  Finally, in September 2014, the Commissioner issued a memorandum explaining his belief that the Fund was not an investor or trader but instead had an active business. Specifically, the Commissioner claimed that YA Global's funding of portfolio companies amounted to "lending" and "underwriting."  Although it was unclear exactly how the Commissioner came to these conclusions, it was clear no one at the IRS had reviewed YA Global's deal documents

4

carefully or done any economic analysis to understand how the Fund actually made (and lost) money.

The Commissioner closed his audit in March 2015, asserting YA Global owed nearly $100 million in withholding tax and penalties. Petitioners[2] filed this case three months later. Over the next 5-1/2 years, the case sprawled. The Commissioner deposed numerous witnesses and demanded that Petitioners produce thousands more pages of documents to supplement (or duplicate) the information he obtained during the audit. Because the Commissioner continued to ignore the Fund's basic economics, Petitioners engaged an expert to review YA Global's transactional data in depth and analyze the nature of its returns. The Commissioner hired his own expert who likened the Fund's financial instruments to those used by investment banks, and Petitioners had to engage yet two more experts to show that his view was based on an inaccurate understanding of the Fund's investments.

Shortly before trial, perhaps because Petitioners' experts had effectively refuted all of his contentions up to that point, the

---

[2] "Petitioners" refers to YA Global, together with Yorkville and Yorkville Advisors, GP LLC.

Commissioner offered an entirely new basis for his belief that YA Global had an active business. The new explanation had nothing to do with the financial instruments YA Global used to invest in portfolio companies. His new claim was that YA Global (through Yorkville as its agent) performed "personal services" to portfolio companies, and such activities "per se" constituted the conduct of a business. The Commissioner did not specify what these personal services were but pointed to certain "fees" received from portfolio companies as evidence of the services.

Ultimately the Tax Court did not determine that YA Global was in the business of lending. Or dealing. Or underwriting. Or acting as an investment bank. Indeed, the undisputed evidence (still) makes clear the Fund did not generate profits from any of these purported businesses. The court did latch onto the Commissioner's personal services idea, though. And despite the fact that courts, Treasury regulations, and IRS and industry guidance all make clear that "fees" *need not* be for services, and despite the fact that multiple witnesses—including portfolio company executives—testified that the fees paid *were not* for any services, the court relied on its own speculation, misreading of statutes and defective logic to conclude that the word "fees" was alone sufficient

6

to prove that YA Global generated _all_ its profits from an active business. Moreover, the court made up its own new theory, one not even the Commissioner had posited, to support its conclusion that YA Global was unreasonable in relying on RSM and other professional advisors in filing returns as an investor and trader.

So here we are, unraveling the Tax Court's winding opinions. Ultimately, though, this case is still simple. YA Global invested in public companies. It had some successes. It had a lot more failures. That's not a business. It's just investing.

## STATEMENT OF THE CASE

## I.   Relevant Facts.

### A.   Yorkville.

Yorkville was in the business of providing investment management services to investors through various hedge funds that it launched. JA30. YA Global, launched in 2001 (JA201 ¶6), was Yorkville's first fund, but it was not the only one. At the beginning of 2006, the first year at issue in this case, Yorkville was managing more than $500 million in assets for four different funds. *See* JA4563, JA4858, JA4869, JA4916. YA Global was the only fund Yorkville managed for the period from July 2006

7

through March 2009, but in April 2009, it launched another new fund. JA31. The private placement memoranda ("PPM"s) Yorkville provided to prospective investors disclosed the conflicts of interest could arise as a result of Yorkville's management of multiple funds. *E.g.*, JA4534.

As was common among hedge funds during the period in issue, Yorkville earned management and incentive fees from the funds it managed under a "2 and 20" structure—*i.e.*, 2% of the assets under Yorkville's management and 20% of any profits or gains generated for each fund it managed. *E.g.*, JA4499. In furtherance of its investment management business, Yorkville employed a team of over 50 people to raise capital from investors, maintain investor relations, identify and source investments, and trade stock (JA30; *e.g.*, JA4559). During the years at issue, Yorkville filed tax returns to report millions of dollars in net income (including during the years when YA Global had losses), and it paid significant wages and employment taxes each year. JA30; JA4939-5231.

### B.     Yorkville's Agreements with YA Global.

Under its investment management agreements with YA Global, Yorkville was engaged to provide a broad spectrum of investment

8

management services, including selection of investments for the Fund, management of the Fund's securities account, and exercising the rights of the Fund with respect to its interests in such investments. JA1407 §1, JA1417-1420 §1. Yorkville was also the Fund's general manager until January 2007. JA202 ¶7. Although the agreements suggested the Fund might "advise" Yorkville about investment restrictions (JA1408 §3, JA1420 §3), they also made clear that Yorkville would make all decisions about buying and selling securities for the Fund. JA1407 §1, JA1425 §13(a). The agreements also provided that Yorkville was an independent contractor and that nothing in the agreements was to be interpreted to create any other relationship between Yorkville and YA Global. JA1414 §12, JA1426 §16.

### C.    YA Global and Its Investments.

YA Global had no offices or employees. JA19. It primarily made private investments in public companies ("PIPEs"). *E.g.*, JA4527. These public companies were high-risk "penny stock" companies traded in over-the-counter ("OTC") markets. JA4495. Their securities were thinly traded and illiquid. JA4531. Their SEC filings frequently included highlighted warnings to investors showing the companies had histories

9

of losses and limited or no liquidity or revenues.  *E.g.*, JA4676; JA5645; JA5716.  Their auditors often expressed doubt as to whether they could even continue as going concerns.  *E.g.*, JA4675; JA5716-17.

The PPMs described the Fund's "principal investment strategies" to include "[p]roviding capital appreciation, rather than seeking a current yield" and "[i]nvesting in companies in troubled or uncertain financial condition."  *E.g.*, JA4494.  Each of the PPMs also stated that "[i]nvestors seeking current income should not invest in the Fund."  *E.g.*, JA4494.

YA Global funded its portfolio companies using convertible debentures, standby equity distribution agreements ("SEDAs") and other securities.  JA26.  The convertible debentures gave YA Global the *right* to convert the debenture into common stock of the company at (i) a fixed price or (ii) a discount to an average market price computed over a specific period preceding the conversion or installment date.  JA27.  With SEDAS, YA Global was *required* to purchase common stock of the company up to a certain dollar amount over a certain period of time. JA26.  SEDAs did not specify a fixed price for the stock purchases, but as with convertible debentures, the price was set at a discount to the market

10

price using a lookback period. *Id.* Portfolio companies often paid "fees" associated with both convertible debentures and SEDAs in the form of "cash" (*i.e.*, deductions from the amounts otherwise advanced to the portfolio companies), warrants (rights to purchase additional shares of stock at a fixed price), or additional stock. JA27.

YA Global's returns on its portfolio companies varied widely. Over 46% of the companies it funded resulted in partial or complete losses. JA2016 ¶136. When it had gains, however, those gains could be quite large; the Fund generated significant returns (in excess of 100%) in 3% of its companies. *Id*. During the first part of the period in issue, the Fund earned significant income from its investments. Beginning in 2009, however, as the Fund began to unwind in the wake of the financial crisis, it lost enormous amounts of money. Its tax returns showed income as follows:

|        | Taxable Income ($) | Financial Statement Income ($) |
|--------|--------------------|--------------------------------|
| 2006   | 99,272,114         | 101,271,746                    |
| 2007   | 124,743,183        | 122,436,157                    |
| 2008   | 48,542,819         | 61,266,616                     |
| 2009   | (125,568,354)      | (21,715,680)                   |
| 2010   | (156,976,398)      | (279,248,970)                  |
| 2011   | (70,271,563)       | (268,071,972)                  |

Forms 1065, Schedule M-3, line 26 (JA223, JA605, JA958, JA993, JA1058, JA1128). As a result of its losses, YA Global ultimately failed. JA6369 at 154:8-20.

### D.   YA Global's Tax Advisors and Returns.

During the period at issue, there was widespread uncertainty among tax professionals as to whether a U.S.-based hedge fund engaged in financing activities was engaged in a USTB. JA143. YA Global had multiple highly qualified tax advisors, however, including public accounting firm RSM McGladrey ("RSM"). JA122-123. RSM and its predecessor firms had extensive information about the Fund as the Fund's tax preparers and auditors (*id*.), including all the information needed to provide advice as to whether it had a USTB. JA139. On the

basis of that information, RSM advised the Fund that it was not engaged in a USTB.  JA137.

YA Global timely filed Forms 1065, U.S. Return of Partnership Income, to report its investment income and losses during the years at issue, and it attached Schedules K-1 to the returns to report its partners' distributive shares of such U.S.-source investment income and losses. JA198 ¶2; JA215-1177.  On the basis of RSM's advice, the K-1s included statements saying, "The Partnership has taken the position that it is an 'investor' and is not engaged in the active conduct of a trade or business." *E.g.*, JA240, JA243, *etc.*; JA625, JA628, *etc.*  YA Global did not file any Forms 8804 to report withholding tax that might have been due under Section 1446 if it had a USTB.

### E.    The Examination of YA Global's Returns.

#### 1.    Extensions of the Statute of Limitations.

The Commissioner began auditing YA Global in 2009.  From January 2010 through July 2014, the Commissioner sought multiple consents from the Fund to extend the statute of limitations on Forms 872-P.  JA203-211 ¶¶14-15, 18-19, 22, 24, 26.  Each form set forth the parties' agreement that the Commissioner could "assess any federal income tax

attributable to the partnership items of [YA Global] against any partner of [YA Global]" for a period beyond the then-existing deadline.   Until February 2012, the forms said nothing more.  *E.g.*, JA1521.  Starting with the extensions signed in February 2012, however, the Commissioner added an asterisk to the end date on each form, with a note that said, "*Including income and/or withholding tax…due on Form 8804 or Form 1042."  *E.g.*, JA1523.

Each time the Commissioner presented the Fund with the Forms 872-P described above, he also sought—and was granted—extensions on Forms 872.   JA204-211 ¶¶16-17, 20-21, 23, 25.   Before February 2012, those forms set forth the parties' agreement that the Commissioner could assess "any Federal withholding tax under sections 1441-1442 due on any return(s) made by or for [YA Global]."  *E.g.*, JA1543.   Like the Forms 872-P, the Commissioner changed the Forms 872 starting with the extensions signed in February 2012.   Beginning then, the Forms 872 were revised to permit assessment of "any Federal withholding tax under sections 1441-*1446* due on any return(s) made by or for [YA Global]."  *E.g.*, JA1545 (emphasis added).

## 2.    The CCA.

In September 2014, the Commissioner issued a Chief Counsel Advice ("CCA")[3] to the Fund in which he denied that YA Global was acting as an investor. Despite the fact that the exam had already continued for more than four years, the CCA did not reflect any analysis of Yorkville's independence as a fund manager, nor did it indicate the Commissioner had done anything at all to analyze the Fund's financial data, the types of companies it invested in, or the substance of its investments to determine how it generated profits and losses. Nevertheless, the CCA stated the Commissioner's conclusion that the Fund's convertible debentures and promissory notes constituted "lending" and that its SEDA transactions amounted to "stock distribution" or "underwriting." CCA at 3-4. This conclusion seemed to be based on the Commissioner's view that the Fund "held itself out to the public" as a lender and underwriter. *Id*. at 3, 21. As a result, according to the CCA, YA Global was engaged in a USTB. It did not mention any withholding tax implications.

---

[3]  The CCA was published in redacted form as CCA 201501013 (Jan. 2, 2015), https://www.irs.gov/pub/irs-wd/201501013.pdf.

## II.    Procedural History.

### A.    The FPAAs.

In March 2015, the Commissioner issued Notices of Final Partnership Administrative Adjustment ("FPAAs") in this case stating that YA Global had a USTB for the years 2006-2009 without describing what the business was.  JA1178-1254.  The FPAAs asserted that, as a result of the USTB, nearly all the Fund's income was ordinary business income.  They also asserted that the Fund was liable for over $67 million in Section 1446 withholding tax that it ought to have collected with respect to income allocations made to its foreign partners and nearly $32 million in penalties for failing to file Forms 8804 and pay the asserted tax. *Id.*

### B.    The Commissioner's Changing Theories.

Because the FPAAs did not explain why YA Global purportedly had a USTB, Petitioners relied on the CCA to discern the bases of the Commissioner's determinations when they petitioned the Tax Court for review in June 2015.  For the next five years the Commissioner's position remained unchanged.  During this five-year period, and despite the lengthy audit that preceded the petition, the Commissioner sought substantial discovery in the case.  In response to his requests, Petitioners

16

provided the Commissioner with thousands of documents.  These discovery efforts resulted in the parties filing two stipulations of fact that amounted to over 150 pages, including 226 paragraphs and nearly 1,600 exhibits.  JA197-214, JA4139-4276.

The Commissioner's position seemed to shift somewhat when one of his experts issued a report in June 2020.  The expert wrote that YA Global's activities generally (including its transactions in convertible debt) amounted to an "investment banking service" (JA1779-1780 ¶37) or an "underwriting service" (JA1771 ¶9b).  His characterizations were based on statements made by Yorkville in news articles and marketing materials rather than an economic analysis of the Fund's investments. *E.g.*, JA1770-1781 ¶¶9a, 35, 36, 38, *et al*.  That is the first time that the Commissioner focused on the word "services" to describe the Fund's purported business, but in any case, the expert's opinion made clear that the services he was referencing amounted to "provid[ing] financing" (JA1770-1771 ¶9a), not personal services.

Because the Commissioner's theories were fluid—and in response to his motion to withdraw one of his responses to Petitioners' Requests for Admission that had helped Petitioners understand his shifting

17

positions (JA1658-1663)—Petitioners sought a definitive statement as to what theories the Commissioner intended to raise at trial. Six weeks before trial, the Commissioner finally agreed in a court-facilitated stipulation that he would only argue that "YA Global was engaged in the business of debt and equity financing of public and private companies," which included lending, underwriting, stock distribution and "any associated services." JA1665-1666 ¶1(a)&1(d). The Commissioner did not describe any particular "associated services" that might be relevant to this case, but the context, along with the history of his filings (including his motion to withdraw his earlier admission), made clear that his theory was that the Fund was in the business of providing financing as a service rather than investing or trading. There was nothing in the stipulation to suggest the Commissioner intended to argue that portfolio companies sought (or paid for) anything from the Fund other than capital. The stipulation further stated that, "[the Commissioner] has not taken, and will not take, the position that YA Global was engaged in a U.S. trade or business other than as stated in this paragraph." JA1666 ¶1.

Perhaps recognizing the weaknesses in his financing services theories, and despite the clear stipulation a month earlier, the Commissioner crafted yet another notion of the Fund's purported business in his pretrial memorandum. He suggested that in addition to providing "direct financing" and engaging in underwriting, the Fund and/or Yorkville earned fees for "personal services" (JA1699), and he indicated that the performance of such services would be "*per se* the conduct of a trade or business in the United States, under Section 864(b)" (JA1711-1712). This new theory was raised just <u>two days</u> before the parties were required to identify and exchange any non-stipulated documents that they intended to use at trial and in the same document in which they were required to identify their witnesses. *See* JA1656-1657.

Petitioners objected both orally and in writing to the Commissioner's raising a new theory. *E.g.*, JA2214-2217 at 30:16-33:18, JA6097-6101.

### C. The Trial and the Tax Court's Post-Trial Inquiries.

The Tax Court held a 10-day trial in October 2020, and the parties' post-trial briefs were completed by March 2021. More than two years

19

later, the court began holding telephonic conferences to discuss the parties' claims.[4]  *E.g.*, JA6206-6211.  At several points during these conferences the court raised legal issues that hadn't been raised by the parties and/or sought evidence outside of the record.  *E.g.*, JA6369-6397 at 154:8-23, 171:2-13, 178:21-179:9, 180:8-24, 181:19-182:3.  The court typically ordered the parties to submit supplemental briefs regarding the issues discussed.  JA6199-6211, JA6402-6408, JA6443-6448, JA6543-6545.  In its October 13, 2022, order, the court asked the parties to brief "the implications [of YA Global's malpractice case against RSM] for YA Global's reasonable cause defense" despite the fact that no party had raised this issue.  JA6407.

## SUMMARY OF ARGUMENT

I.  The Tax Court's determination that YA Global had income effectively connected with a USTB providing services rested on multiple legal defects.  For one thing, the court wrongly understood the burden of proof to require Petitioners to *disprove* that YA Global was engaged in a business of "any sort," including a business that the Commissioner did

---

[4]  Only two of these were transcribed by a court reporter.

not even suggest was plausible until just before trial.  Moreover, the court ignored uncontroverted evidence that the purported business, *i.e.*, providing deal structuring and other personal services to portfolio companies, did not exist.   Instead of crediting the testimony from portfolio company executives and others, who made clear they paid fees solely to secure capital, the court assumed that the mere presence of "fees" demonstrated provision of services.   The invalidity of that assumption is clear from case law, Treasury regulations, IRS guidance, and industry practice.  And the court's related view—that it did not have to identify any particular services that Yorkville was required to provide in order to conclude YA Global had a services business—is wrong as well.

The Tax Court also misapplied agency law.  After determining that Yorkville acted as YA Global's agent because the Fund could restrict Yorkville's *investment* activities, the court went on to erroneously attribute *all* of Yorkville's activities, including the hypothetical personal services, to YA Global.

The Supreme Court has long held that managing one's own investments, even full-time, does not constitute a trade or business.  Here, undisputed evidence shows that YA Global generated its profits—

and huge losses—not from providing services to the portfolio companies, but by investing its capital in them. The patterns of the Fund's returns and the high-risk nature of its portfolio companies demonstrate that YA Global had substantial upside and downside risk in its investments, and the PPMs made clear to investors that they should invest only if they were interested in capital appreciation, not current income. The court ignored all this evidence. It also applied incorrect legal standards under Section 864(b)(2), misclassifying Yorkville as a dependent agent and therefore failing to recognize that all of YA Global's trading activities were exempt from the USTB rules.

Finally, the court's conclusion that *all* of YA Global's income was "effectively connected" with its supposed structuring services business—even if the income had no factual connection to that business—was fundamentally flawed. The court's analysis hinged entirely on its erroneous interpretation of the accounting method rules provided in Section 475. If any step in the court's 475 analysis constitutes reversible error, its "effectively connected" holding must also be overturned.

II. The Tax Court applied Section 475's "mark-to-market" accounting rules to YA Global based on a misreading of that statute's

text, bootstrapping its analysis to its USTB determination. The court nullified the *statutory* requirement that a "dealer in securities" have "customers" by stretching a *regulatory* definition beyond its express scope. In doing so, the court effectively determined that a taxpayer that maintains *any* business and also regularly holds itself out as transacting in securities is a "dealer in securities" for purposes of the Section 475 rules—a presumption that defies the statutory text and would sweep up businesses far beyond those that Congress intended to tax as securities dealers.

Even if YA Global *were* a "dealer" under Section 475, the mark-to-market rules still would not apply to its securities because they satisfied certain statutory identification requirements exempting them from those rules. The Tax Court concluded that they did not by misreading a regulation to require more than Congress intended.

III. The Tax Court also erred in sustaining penalties against YA Global for failure to file withholding tax returns and pay withholding tax in 2006-2009. The court should have applied the statutory "reasonable cause" exception given undisputed facts showing that YA Global reasonably relied on a professional advisor's advice that it was not

23

engaged in a USTB. The court refused to do so based on a malpractice lawsuit that YA Global filed in 2015, but its reasoning is baffling. Just two months after the Commissioner issued the FPAAs, YA Global filed a complaint alleging RSM committed malpractice but also expressly explaining that it was filing to preserve its rights against a possible time bar. The Tax Court reasoned that the malpractice suit reflected that YA Global had at some point suspected it may have received bad advice—yet the court refused to draw the obvious inference that *the 2015 FPAAs themselves* alerted YA Global to that possibility. Instead, the court bizarrely insisted that it was simply impossible to know when YA Global had developed doubts and ruled against it, citing the burden of proof. The Tax Court's illogic is as absurd as it sounds.

It gets worse. The Commissioner did not even raise this argument; the Tax Court injected the malpractice suit into the case, *after* trial. The court's reformulation of the issue that the parties had litigated into a new one of its own making violated the party-presentation principle. That violation prejudiced YA Global: the court's raising this issue sua sponte after the parties had already been heard makes its conclusion about the "burden of proof" even more galling.

24

IV.   The Tax Court erred in allowing the Commissioner to assess withholding tax for 2006 and 2007 against YA Global well after the three-year statute of limitations had closed.  The Tax Court first ruled that YA Global's filing of Forms 1065 had not started the limitations period, taking the view that those forms did not sufficiently advise the Commissioner of any liability that purportedly should have been disclosed on Forms 8804.  That makes no sense: the Commissioner undisputedly computed YA Global's purported liability for withholding tax based solely on the information on the Forms 1065 that YA Global filed.  YA Global did not file Forms 8804 because it did not believe itself to be engaged in a USTB, as the Tax Court itself recognized.  The court's decision to fault YA Global anyway would effectively gut the statute of limitations for any partnership that reasonably but mistakenly believes it does not have a USTB.

The Tax Court's alternative ruling of timeliness based on consent is equally ill founded.  "Consent" here means waiver of a limitations defense, and generally applicable waiver principles require the intentional relinquishment of a known right.  The Tax Court should have applied ordinary contract law principles to discern what a reasonable

25

person would have understood the language in the relevant forms to mean, which makes its hypertechnical analysis of the Code obviously faulty. A reasonable person would not have understood the Forms 872-P, which unambiguously stated that they applied to any *income tax* liability of the *Fund's partners*, to amount to waiver of any limitations defense to the *withholding tax* liability of *the Fund itself*. Any ambiguity would have to be construed against the Commissioner, as drafter, in any event, and the relevant surrounding facts and circumstances make the Tax Court's conclusion even less defensible.

## ARGUMENT

### I.   The Tax Court's Conclusion That YA Global Had Income Effectively Connected with a USTB Based on Yorkville's Activities Must Be Overturned as a Matter of Law.

#### A.   Standard of Review.

The Tax Court framed its determination that the Fund was neither an investor nor a trader in securities—and that it therefore had a USTB—as one of fact, couching its opinion in terms of a failure of proof. JA41; JA48-50. But the essential facts of this case are undisputed. The court reached its faulty conclusion that the Fund had a USTB by misapplying legal concepts—the judicial concept of "investing," the

meaning of Section 864(b) of the Code, and the applicable burdens of proof—to these uncontested facts. This Court therefore reviews the Tax Court's USTB determination de novo. *Gov't Emps. Ret. Sys. of the Virgin Islands v. Gov't of the Virgin Islands*, 995 F.3d 66, 78 (3d Cir. 2021) ("[A]ny mixed questions of fact and law [are reviewed] de novo insofar as the primary facts are undisputed and only ultimate inferences and legal consequences are in contention.") (citation modified).

## B. Applicable Tax Principles.

Foreign individuals and corporations, such as YA Global's foreign partners, are subject to U.S. income tax to the extent they have income that is "effectively connected with the conduct of a trade or business within the United States." I.R.C. §§ 881, 882.

The phrase "trade or business" is used in the Code in multiple contexts. *E.g.*, I.R.C. § 162 (allowing deductions for expenses incurred in carrying on a trade or business); I.R.C. § 1221 (excluding from the definition of capital assets property held in the ordinary course of a trade or business). Despite its frequent use in the Code, the phrase "trade or business" has no comprehensive statutory definition. Section 864(b) does provide rules, however, for non-U.S. taxpayers engaging in two particular

27

types of activities. *First*, the term "trade or business within the United States" includes the performance of "personal services" within the United States except under certain conditions. I.R.C. § 864(b)(1). *Second*, the term does not include "trading in securities or commodities." I.R.C. § 864(b)(2).

If a taxpayer's activities constitute neither personal services nor trading in securities or commodities, determining whether those activities give rise to a USTB depends on the facts and circumstances of the particular case. *E.g.*, *Higgins v. Comm'r*, 312 U.S. 212, 217 (1941); *see also* Treas. Reg. § 1.864-2(e). Courts have distilled some general principles for that inquiry. Relevant here, it is well settled that, although managing *someone else's* investments (as Yorkville did) can be a trade or business (*e.g.*, *Dagres v. Comm'r*, 136 T.C. 263, 284 (2011)), managing one's *own* investments cannot give rise to a trade or business "[n]o matter how...continuous or extended the work required may be." *Higgins*, 312 U.S. at 218; *accord Comm'r v. Groetzinger*, 480 U.S. 23, 31 (1987) ("[C]aring for one's own investments, even though that endeavor is full time" does not constitute carrying on a trade or business); *Whipple v. Comm'r*, 373 U.S. 193, 202 (1963) ("[I]nvesting is not a trade or

28

business[.]"); *Dagres*, 136 T.C. at 281 ("Investors who invest their own funds in public companies or in privately held companies earn investment returns; they are investing, not conducting a trade or business, even when they make their entire living by investing.").

Even if a taxpayer has a USTB, its passive income (*e.g.*, interest, dividends, capital gains) is generally not "effectively connected" with that business unless the income meets certain tests designed to ensure it is factually linked to the business.  I.R.C. § 864(c)(2).  In contrast, other types of income are automatically deemed effectively connected with the USTB.  I.R.C. § 864(c)(3).

### C.    The Tax Court's Conclusion That the Fund Had a USTB Providing Personal Services Was Riddled with Legal Errors.

The Tax Court recognized that "YA Global provided funding to portfolio companies in the form of convertible debentures, standby equity distribution agreements (SEDAs), and other securities."  JA26.  Of course, providing capital is not itself a "personal service."  *Cf. Container Corp. v. Comm'r*, 134 T.C. 122, 135 (2010), *aff'd*, 2011 WL 1664358 (5th Cir. May 2, 2011) (for purposes of the source of income rules set forth in

Sections 861-863,[5] loan guarantee fees are not fees for personal services because "'labor or personal services' implies the continuous use of human capital") (citing *Black's Law Dictionary* 890,1180 (8th ed. 2004)). Providing capital may, in some circumstances, give rise to a trade or business in financing services. For example, banks and brokerage firms are generally engaged in financing services businesses. Until he filed his pretrial brief, the Commissioner's position was that YA Global was in a financing services business. The Tax Court did not determine that the Fund was in a financing services business, however, nor could it have. Rather, it determined that portfolio companies received <u>more</u> than just capital from the Fund. JA42-43. Specifically, it suggested that the portfolio companies paid for Yorkville's "identifying, sourcing and negotiating transactions, conducting due diligence, and structuring and managing the transactions" (*id.*), *i.e.*, personal services, and that these service activities were attributable to YA Global. In fact, the court rested

---

[5] Sections 861-865 comprise the part of the Code that defines "Source Rules and Other General Rules Relating to Foreign Income." As discussed above, Section 864, which is within that part, defines the phrase "trade or business within the United States."

its opinion that the Fund had a USTB *entirely* on its view that "[t]he record does not support petitioners' claim that the fees paid by the portfolio companies were simply additional payments for the use of capital." JA41.

The Tax Court concluded the Fund provided personal services by imposing an improper burden on petitioners, ignoring the record, drawing an improper inference, and misapplying agency law.

### 1. The Tax Court's View of Petitioners' Burden Ensured It Was Impossible to Satisfy.

After years of insisting YA Global had a business providing financing services, the Commissioner drafted his personal services theory in his pre-trial brief. In a case analogous to this one, this Court made clear that the Commissioner may not surprise taxpayers with new theories of liability that deprive them of meaningful opportunities to defend themselves, even if the new theories are technically within the bounds of a notice of tax liability. In *Baird v. Commissioner*, 438 F.2d 490 (3d Cir. 1970) (as amended Jan. 27, 1971), the Commissioner took the position that certain stock that was transferred by an unrelated party to the taxpayer's foundation should be treated as compensation to the

taxpayer. *Id*. at 493. The notice of deficiency[6] sent to the taxpayer was worded broadly, without stating any particular reason for the Commissioner's claim. *Id*. Throughout the Tax Court proceedings, the Commissioner repeatedly articulated his view that the stock was paid to the foundation in lieu of a finder's fee payable to the taxpayer. *Id*. In post-trial briefing, however, the Commissioner came up with a new idea, indicating that the stock was paid as a fee for services provided by the taxpayer. *Id*. at 493 n.3. This Court acknowledged that the wording of the deficiency notice was broad enough to include the Commissioner's new theory but stated, "that is not the end of the matter." *Id*. at 493. Rather, the Commissioner was required to make clear to the taxpayer _why_ he believed the stock should be treated as income so that the taxpayer could provide proof to the contrary. This Court explained—

> [W]e think the taxpayer was reasonably warranted in assuming that at the trial his burden of proof was to show that he received no finder's fee…[I]t would be patently unfair to decide this case on a theory of which taxpayer was unaware and thus did not have an opportunity to meet at the evidentiary stage.

---

6  The FPAAs in this case are equivalent to notices of deficiency. *E.g.*, *United States v. Clarke*, 816 F.3d 1310, 1313 n.2 (11th Cir. 2016).

*Id.*; *see also Comm'r v. Transp. Mfg. & Equip. Co.*, 478 F.2d 731, 735-736 (8th Cir. 1973) ("The taxpayer works at an extreme disadvantage in trying to invalidate deficiency assessments if he does not specifically know why the Commissioner is challenging the taxpayer") (citing *Comm'r v. Chelsea Prods.*, 197 F.2d 620, 624 (3d Cir. 1952)).

Petitioners were similarly prejudiced here.  As discussed in the subsections below, there is sufficient uncontroverted testimony in the record to prove that portfolio companies neither sought nor received personal services from the Fund.  Still, had Petitioners been on notice that this was an issue, they could have provided more, including testimony from even more portfolio company executives, documents showing no personal services were ever expected or provided in the deals, and additional evidence from experts and/or industry reports showing that "fees" are a common component of investment deals.

Under these circumstances, the Tax Court committed reversible error by entertaining the personal services theory at all.[7]  *N.A. of Life*

---

[7]  In *Baird*, this Court remanded the case to the Tax Court so that it could decide whether to allow the Commissioner to produce evidence of his new theory of liability.  438 F.2d at 494.  Here, the Commissioner

*Underwriters, Inc. v. Comm'r*, 30 F.3d 1526, 1531 (D.C. Cir. 1994) (citing *Baird*, 438 F.2d at 493). At a minimum, under its own rules, the Tax Court should have placed the burden of proof regarding the personal services theory on the Commissioner. Tax Court Rule 142(a) provides that the burden of proof shall generally be on the taxpayer "except that, in respect of any new matter…it shall be upon the [Commissioner]."

Not only did the Tax Court entertain the Commissioner's personal services theory without shifting the burden of proof, it went even further. The court asserted that "the issue defined by the pleadings is whether YA Global was engaged in a trade or business—of any sort—during the taxable years in issue." JA49. Insisting that Petitioners prove a negative, *i.e.*, that the Fund was not engaged in _any_ sort of business the Commissioner (or the Tax Court) might imagine, imposes on them an unattainable goal. As this Court has pointed out, "The law has long

changed theories before trial and thus *already* had the opportunity to produce all the evidence he could to suggest that portfolio companies paid the Fund fees for personal services. The resulting record— despite the last-minute change impeding Petitioners' ability to fully develop it—leaves no doubt that the Fund was an investor with no USTB, making remand unnecessary.

recognized that such an evidentiary feat is next to impossible." *Lupyan v. Corinthian Colls. Inc.*, 761 F. 3d 314, 322 (3d Cir. 2014) (quoting *Piedmont & Arlington Life-Ins. Co. v. Ewing*, 92 U.S. 377, 380 (1875) ("While it may be easy enough to prove the affirmative of [a] question[], it is next to impossible to prove the negative") (alterations in original)). Even the Tax Court recognized the difficulty Petitioners faced:

> THE COURT: All right. If YA Global is in a trade or business, have you—are you able to tell me or tell [Petitioners' counsel] what is the nature of the income it receives if it is [in] a U.S. trade or business?
>
> MS. KINDEL [Commissioner's counsel]: I'm not sure I understand when you mean by "nature."
>
> THE COURT: Well, if it's income from trading within the meanings of the safe harbor, then, again, we all go home.
>
> MS. KINDEL: Right. It's ordinary business income.
>
> THE COURT: Well, from practicing orthodontics?
>
> MS. KINDEL: From lending and underwriting.

JA4041 at 1849:10-25. This exchange makes the error in the Tax Court's opinion especially puzzling. Petitioners' burden should have been limited to disproving theories that the Commissioner actually raised in a timely manner.

35

### 2. Unrebutted Evidence Showed Portfolio Companies Paid for Capital Only; the Tax Court's Contrary View Rests on Speculation and Faulty Logic.

Although Petitioners were unable to fully develop the record to disprove the Commissioner's personal services theory, multiple witnesses who were already slated to testify were questioned about the topic. Every one of them confirmed that the portfolio companies paid Yorkville and/or the Fund in order to secure *capital*, not in exchange for negotiating services, or structuring services, or anything of the sort.

For example, both Mr. Angelo (Yorkville's CEO) and Mr. Schinik (Yorkville's CFO) declined to agree with the government's suggestions that portfolio companies paid fees as compensation for something other than funding, instead explaining that fees were negotiated along with other components of a deal, such as warrant coverage, to ensure that the Fund was paid for the risk it undertook with its capital. JA2453 at 268:1-13; JA2795-2799 at 609:15-611:20, 612:20-613:2. And Mr. Wright, the CEO of one of the Fund's portfolio companies, explained that SEDA fees were merely a "transaction cost" for "trying to get capital." JA2903 at 717:6-12. Both Mr. Wright and the CEO of another portfolio company, Mr. Kreisler, made clear multiple times that they received no services

from the Fund or Yorkville. JA2886-2893 at 700:4-20, 705:5-707:13; JA3366-3367 at 1177:17-1178:15.

In its opinion, the Tax Court quoted the testimony of several witnesses on this issue, including that of Messrs. Kreisler and Wright (JA28-29), without doubting their credibility. Nevertheless, it inexplicably ignored all this testimony and instead relied on its observation that the Fund's deals with portfolio companies included "fees" to conclude that Yorkville's activities were provided for the benefit of the portfolio companies. The court's analysis was neatly summarized when it quoted the Commissioner, saying, "Taxpayers engaged merely in trading and investment simply do not earn income designated as fees." JA48 n.33. Other than this fee "designation," the court did not point to **_any_** evidence—and there was none—suggesting that Yorkville provided personal services to portfolio companies.

The court's conclusion that fees necessarily imply services is a legal error. Courts have unambiguously determined that "fees" may represent payments for capital. *E.g.*, *Fed. Home Loan Mortg. Corp. v. Comm'r*, 125 T.C. 248, 261-263 (2005) ("commitment fees" earned by Freddie Mac were properly treated as premium for selling put options); *Pac. First Fed. Sav.*

37

*& Loan Ass'n v. Comm'r*, 79 T.C. 512, 520 (1982) (a "loan origination fee" was additional interest, not a charge for services).  Rather than relying on labels, the key to determining whether a fee is paid in exchange for services or for the use of capital is whether the charge compensates the investor for "specifically stated services" it provides "to and for the benefit of the [recipient of the funds]" beyond the provision of money.  *Cap. One Fin. Corp. v. Comm'r*, 133 T.C. 136, 159 (2009), *aff'd,* 659 F.3d 316 (4th Cir. 2011); *accord Wilkerson v. Comm'r*, 70 T.C. 240, 253 (1978), *rev'd on other grounds*, 655 F.2d 980 (9th Cir. 1981) ("What constitutes compensation paid for the use or forbearance of money is controlled by the facts, not terminology.").  Where charges relate to activities the funder undertakes for its own benefit, they are part of the cost of capital to the recipient of the funds.  *See Noteman v. Welch*, 108 F.2d 206, 211-213 (1st Cir. 1939) (charges labeled as covering lender's various expenses were paid for borrowers' use of funds, not for any services, where the borrower received nothing but "the use of the money"); *In re Prince*, 89 F.2d 681, 682 (2d Cir. 1937); *W. Credit Co. v. Comm'r*, 38 T.C. 979, 987-988 (1962).

Treasury regulations also recognize that fees of the sort collected here can and do arise solely from investment activities. For example, an "investment partnership" does not lose its non-trade-or-business status based on "the receipt of commitment fees, break-up fees, guarantee fees, director's fees, or similar fees that are customary in and incidental to any activities of the partnership as an investor, trader, or dealer in such assets[.]" Treas. Reg. § 1.731-2(e)(3)(i). Similarly, many activities performed by a taxpayer investing in a business entity are treated as incident to the investment itself, including "[s]tructuring the transaction," "negotiating the structure of the transaction" and "[p]reparing and reviewing the documents that effectuate the transaction." Treas. Reg. § 1.263(a)-5(e). Although these regulations are not directly on point here, they do demonstrate that the existence of "fees" in the Fund's deals cannot serve as a basis for the Tax Court's conclusion that Yorkville's activities "had value to the portfolio companies." JA43.

IRS rulings have also concluded that fees may be included as part of the cost of obtaining capital. *E.g.*, Rev. Rul. 81-160, 1981-1 C.B. 312 (a commitment fee is "an expenditure that results in the acquisition of a property right" and is "similar to the cost of an option"). And the New

York State Bar Association, recognizing the Tax Court's stark departure in this case from the weight of authority, issued a report reiterating just how common fees are in funding transactions. NYSBA Tax Section, *Report on Certain Fees*, Rept. 1500 (Sep. 13, 2024) (describing various fees involved in investment and lending transactions).

Here, the Tax Court did not even attempt to identify any particular services that portfolio companies were entitled to receive in exchange for the fees listed in the transaction documents. To the contrary, the court declared, without citing any authority, "Concluding that the fees paid by portfolio companies were for benefits other than their receipt of capital does not depend on identifying specific services that the relevant agreements required Yorkville Advisors to provide." JA43. But it does depend on exactly that.

To justify its reliance on nothing but the word "fees" to conclude that the portfolio companies received services from Yorkville, the Tax Court engaged in its own strange logic. For example, it asserted that "[i]t makes sense that the portfolio companies saw value in Yorkville Advisors' activities." JA44. It does not. As the executives of the portfolio companies made clear, Yorkville's activities were not performed for the

40

benefit of the portfolio companies at all. In fact, Yorkville negotiated _against_ the portfolio companies. JA2886-2890 at 700:14-16, 703:12-17, 704:2-16; JA3366 at 1177:7-16. The court also asserted—

> There would have been no apparent need for an agreement to impose on Yorkville Advisors the obligation to negotiate, structure, and document the transaction to which the agreement related. By the time the parties executed the agreement, the negotiating and structuring of the transaction would have been complete.

JA43. In addition to having no basis in law (_e.g._, _Murray v. Lichtman_, 339 F.2d 749, 752 n.5 (D.C. Cir. 1964) ("It is, of course, well settled that past consideration is no consideration.")), the Tax Court's hypothesis— that portfolio companies agreed to pay for services they had already received—makes no economic sense. Equally illogical is the court's suggestion that "[i]f...Yorkville Advisors' activities were limited to managing YA Global's investments, the portfolio companies should have been unwilling to cover any of the costs of those activities." JA43. In order for the Fund to be willing to provide capital to the portfolio companies, it had to generate returns sufficient to compensate it for the risks associated with its transactions _and_ the costs of the activities required to deploy its capital (_i.e._, of paying Yorkville). If a company were unwilling to cover those costs, it could not get capital from the Fund. _Cf._

41

*W. Credit Co.*, 38 T.C. at 987-988 ("We do not think the mere fact that the contract designates certain uses to which the funds will be put makes the charge any less a fee paid by the borrower for use of the lender's money[.]")

In sum, the use of fees in investment deals is commonplace, and their existence is not sufficient to demonstrate provision of services. The Tax Court's contrary inference cannot justify its complete disregard of the testimony provided by every witness that was questioned about the topic.

### 3.    The Tax Court's USTB Analysis Conflicts with Its Own View of Agency.

Pursuant to the investment management agreements, YA Global appointed Yorkville "as the [Fund's] Agent and attorney-in-fact with full power and authority to buy, sell, or otherwise deal with the [Fund's] account." JA20 (citation modified). And the Tax Court's basis for concluding Yorkville was YA Global's agent was because YA Global could purportedly impose investment restrictions on its account under Section 3 of the investment management agreements. JA23. Nothing in the management agreements, nor anything else in the record, suggests that

YA Global authorized Yorkville to provide personal services to portfolio companies—or to anyone—on its behalf.

As this Court has made clear, "[an] agency relationship does not create blanket liability for all conduct of the agent—an agency relationship may exist for one subset of actions but not another." *Arcelik A.S. v. El DuPont de Nemours & Co.*, 2023 WL 3862506, at \*4 (3d Cir. 2023) (citing *Phx. Canada Oil Co. v. Texaco, Inc.* 842 F.2d 1466, 1476-77 (3d Cir. 1988)). To the extent Yorkville acted as YA Global's agent, then, it was only for purposes of investing and trading in securities. Any provision of personal services would fall outside the scope of the agency relationship and could not be attributed to the Fund as a matter of law.

### D. The Tax Court Ignored Undisputed Evidence That the Fund Was an Investor and Therefore Had No USTB.

A taxpayer that generates income from deploying capital may have a trade or business if the taxpayer profits from other ventures' mere use of its funds, as a lender or a dealer in securities does. *Cf. U.S. v. Midland-Ross Corp.*, 381 U.S. 54, 57 (1965) (original issue discount is ordinary income because it is compensation for the use of money). But where a taxpayer's profits and losses are tied to the successes and failures of the ventures that it funds, the taxpayer is an investor or a trader and thus

does not have a USTB. *Cf. Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968) (equity investment is risk capital "subject to the fortunes of the corporate venture").

In determining the nature of the Fund's profits, it is critical to look at its transactions as a whole. *Cf. Hub City Foods v. Comm'r*, 884 F.2d 320, 323 (7th Cir. 1989) (a wholesaler of grocery items that used its own fleet of trucks for deliveries was not in the business of furnishing transportation services); *Mt. Mansfield Co., Inc. v. Comm'r*, 50 T.C. 798, 800-801 (1968), *aff'd*, 409 F.2d 845 (2d Cir. 1969) (operator of skiing facilities was not in the transportation business by virtue of operating a ski lift); *Evans v. Comm'r*, 48 T.C. 704, 708 (1967), *aff'd*, 413 F.2d 1047 (9th Cir. 1969) (trailer park operator was not in the business of furnishing utility services merely because it supplied electricity to residents); *Linen Thread Co. v. Comm'r*, 14 T.C. 725, 736-737 (1950) (Court looked to the taxpayer's income as a whole rather than isolated transactions in determining whether it was engaged in a USTB). Undisputed evidence in this case makes clear that the Fund was, on the whole, an investor and trader.

### 1.   The Pattern of the Fund's Returns Demonstrate That Its Income Was from Investment.

In a variety of contexts, courts are more likely to find a taxpayer has an investment in the equity of a business if it has both upside risk and downside risk. *See*, *e.g.*, *Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 459-460 (3d Cir. 2012) ("meaningful downside risk" and "meaningful upside potential" used to determine whether contributions to a partnership were bone fide investment); *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 233-236 (2d Cir. 2006) (same); *Slappey Drive Ind. Park v. United States*, 561 F.2d 572, 581 (11th Cir. 1977) ("shareholders place their money at the risk of the business") (citation modified); *Fin Hay Realty Co.*, 398 F.2d at 697 (similar). Here, the Fund's investments left it with demonstrably sizeable risk in both directions.

During the first part of the period in issue, YA Global earned significant income from its investments. Beginning in 2009, however, as it began to unwind in the wake of the financial crisis, it lost enormous amounts of money. (See pp. 11-12, *supra*.) The Tax Court failed to take these numbers into account. In fact, the court described the composition of these figures in detail for 2006, 2007 and 2008—the years there were gains—but it did not mention them at all for 2009, 2010 and 2011—the

45

loss years.[8]  JA52.  Even without more, the high highs and low lows are a strong indicator that the Fund's fortunes rose and fell as an investor bearing market risk.

Looking at the Fund's returns in a more granular way further demonstrates that its profits and losses were from investment.  The returns generated on a company-by-company basis varied widely.  (See p. 11, *supra*.)  The fact that YA Global's profits (when it had profits) were generated from a few strong successes offsetting many failures indicates that its income was from investing.  The Tax Court noted the wide variability in the Fund's returns (*see* JA31) but then ignored it completely in its analysis.

### 2.    The Fund Provided Capital to High-Risk "Penny Stock" Companies.

In determining whether the provision of capital is akin to an equity investment, one of the most important factors is the economic condition of the receiving company.  *E.g.*, *Trans-Atl. Co. v. Comm'r*, 469 F.2d 1189,

---

[8]  In a later opinion, the Tax Court concluded that the Fund had taxable income rather than a taxable loss in 2009 for reasons that YA Global disputed but does not appeal.  JA159, JA161.

1194 (3d Cir. 1972). The risks of funding YA Global's portfolio companies were enormous. (See pp. 9-10, *supra*.) The Tax Court found that "YA Global invested primarily in microcap and low-priced public companies traded in over-the-counter public markets" (JA63), but it inexplicably ignored the undisputed evidence showing their weak financial condition.

### 3. The Fund's Intent Was to Invest.

In determining whether a taxpayer purchases assets as an investor or as part of a trade or business, courts weigh the taxpayer's intent. *E.g.*, *Curtis Co. v. Comm'r*, 232 F.2d 167, 169 (3d Cir. 1956). That investing was the YA Global's raison d'être is obvious from its name, "YA Global *Investments*, LP." Moreover, the Fund's investment objective, capital appreciation, was clearly and consistently articulated to prospective investors in its PPMs. (See p. 10, *supra*.) The Tax Court mentioned some of these statements (JA31) but disregarded them in its analysis.

### E. The Tax Court Incorrectly Construed the Section 864(b)(2) Trading Exception.

Because in most contexts trading in securities is a trade or business for tax purposes, courts have frequently had to distinguish between investors (who generally seek long-term asset growth) and traders (who seek short-term profits from market movements). *See, e.g., Est. of Yaeger*

47

*v. Comm'r*, 889 F.2d 29, 32-33 (2d Cir. 1989).  Congress, however, acting out of concern that foreign investment in the United States not be inhibited (*see* S. Rep. No. 1707, 89th Cong., 2d Sess. 9 (1966)), enacted Section 864(b)(2) to exempt non-U.S. taxpayers who are trading in securities from the USTB rules.  Under the associated Treasury regulations, "trading in stocks or securities" includes a broad range of security and transaction types that encompass all YA Global's transactions here.  Treas. Reg. § 1.864-2(c)(2)(i)(*c*).

Section 864(b)(2) provides two separate exceptions.  Under the first, a USTB does not include trading in stocks and securities "through a resident broker…or other independent agent" so long as the trading is not done through an "office or other fixed place of business in the United States."  I.R.C. § 864(b)(2)(A)(i) and (C).  For purposes of applying the effectively connected income rules in Section 864(c), the regulations provide that an office of an independent agent is not treated as the office of his principal.  Treas. Reg. § 1.864-7(d)(2).  They also provide that an independent agent is one with "an independent status acting in the ordinary course of his business in that capacity," and that common control between the agent and principal has no bearing on whether the

agent is independent. *Id*. at (d)(3). Although Section 1.864-7(d) by its terms applies to Section 864(c), not 864(b), the Tax Court has used it as "a proper framework for interpreting the term 'independent agent'" for both sections. *Inverworld, Inc. v. Comm'r*, 71 T.C.M. (CCH) 3231, 3237 (1996).

Here, it is clear that Yorkville had its own business as a service provider to YA Global and other funds it managed and that it was therefore an independent agent. *Supra*, pp. 7-8. The Tax Court concluded otherwise based on its observation that, for 33 months, the only fund Yorkville managed was YA Global. *See* JA71. The court further claimed that no other facts supported classifying Yorkville as independent. *Id*. Once again, the court's conclusion was detached from the law and undisputed evidence. The Regulations clearly provide for the possibility that agents with only one principal may nevertheless be independent. Treas. Reg. § 1.864-7(d)(3)(iii). Moreover, Yorkville began its existence in 2001, and it managed other funds both before and after the 33-month period the court referenced. There is also significant other undisputed evidence showing Yorkville had its own business independent of YA Global. *Supra*, pp. 7-8. Because Yorkville acted as an

49

independent agent of the Fund with respect to its securities transactions, the Fund's activities are covered by Section 864(b)(2)(A)(i), and it had no USTB.

Even if Yorkville could somehow be properly treated as the Fund's *dependent* agent, the second trading exception would apply here. A taxpayer does not have a USTB as a result of trading "for the taxpayer's own account, whether by the taxpayer or his employees or through…[an] agent," so long as the taxpayer is not a dealer in securities. I.R.C. § 864(b)(2)(A)(ii). The Tax Court did not—and could not—determine that YA Global had a business as a dealer.[9] This second safe harbor therefore applies, and the Fund had no USTB.

### F. The Tax Court's Entire Analysis of Effectively Connected Income Rested on Its Misreading of an Accounting Method Rule.

Even if YA Global had a USTB providing personal services, the Tax Court's determination that <u>all</u> the Fund's income was effectively connected with that USTB was fundamentally flawed. The linchpin for

---

[9] As discussed in Section II, *infra*, the court's determination that YA Global was a dealer for purposes of an accounting method was also erroneous.

the court's conclusion was its holding that the Fund was required to recognize its unrealized gains as ordinary income under Section 475. JA73. As discussed in Section II, *infra*, that holding has no basis in the statute's text for two independent reasons. Nevertheless, the court leveraged that holding, reasoning that because, in its view, Section 475 required ordinary income treatment, Sections 64 and 65 mandated that the Fund's securities were not capital assets. *Id*. From *that* determination, the court concluded that Section 864(c)(3), rather than Section 864(c)(2), was controlling and that, as a result, all the Fund's income was effectively connected to its purported USTB "without regard to the specific factual connection between the income and [the] business." JA72-73. The court's analysis rests upon layers of error. If either step of the court's 475 analysis is wrong (and as discussed below, they both are), its decision to sweep the Fund's income from securities trading into its purported structuring services business cannot stand.

## II. The Tax Court Misinterpreted Section 475 to Conclude That YA Global Had Income Subject to Mark-to-Market Rules.

Section 475 requires a "dealer in securities" to use the "mark-to-market" method of accounting for its securities, recognizing any unrealized gain or loss on a security on the last day of the taxable year.

I.R.C. § 475(a). But any securities that are "held for investment" are exempt from the mark-to-market rules if they are identified as such in the dealer's records before the close of the day they are acquired. I.R.C. § 475(b); Treas. Reg. § 1.475(b)-2(a).

## A.    Standard of Review.

This Court's review of the Tax Court's construction of the Code is plenary. *Pleasant Summit Land Corp. v. Comm'r*, 863 F.2d 263, 268 (3d Cir. 1988).

## B.    The Tax Court's Understanding of Dealing in Securities Is Contrary to the Statute.

Section 475(c) defines a "dealer in securities," for purposes of Section 475, as a taxpayer who either—

(A) regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or

(B) regularly offers to enter into, assume, offset, assign, or otherwise terminate positions in securities with customers in the ordinary course of a trade or business.

I.R.C. § 475(c)(1).

### 1.    The Tax Court Excised the Word "Customers" from the Statute.

Both prongs of Section 475 require that a taxpayer enter into securities transactions with "customers" to be a dealer. YA Global's sales

of securities to anonymous buyers in public securities markets were not "customer" transactions. *E.g.*, *United States v. Diamond*, 788 F.2d 1025, 1028 (4th Cir. 1986) ("[T]hose who sell securities on an exchange have no 'customers[.]'") (citation modified). Whether YA Global was a dealer for purposes of Section 475, then, depends on whether the portfolio companies sold securities to the Fund in their capacity as its "customers."

A long line of cases under Section 1221(a)(1)[10] and its predecessors makes clear that those who transact with dealers are "customers" by virtue of the fact that dealers act as middlemen between buyers and sellers, generating profits as a result of their role as market makers. *E.g.*, *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) ("The meaning of 'dealer in securities'…is limited to one who, as a merchant, buys and sells securities to customers for the profit thereon.") (citation modified). Dealers generate profits by executing transactions, and the success of their businesses depends on the volume of buying and selling they do. *Cf. Bielfeldt v. Comm'r*, 76 TCM 776, 782 (1998), *aff'd*, 231 F.3d 1035 (7th

---

[10] Section 1221(a)(1) excludes from the definition of "capital asset" "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

Cir. 2000) ("Dealers try to be available regularly to satisfy customer requests," and "they seldom fail to respond to a customer request to do a transaction or to make a market.")  As a result, dealers are generally indifferent to whether the value of the securities they sell go up or down in value. *E.g.*, *United States v. Wood*, 943 F.2d 1048, 1051 (9th Cir. 1991). In contrast, taxpayers who hope to generate profits by virtue of changes in the market value of the securities they buy and sell are not dealers. *Id.*

Taxpayers are not "dealers," then—and their counterparties are not customers—if they are selective about which transactions they engage in, when they engage in them, and with whom they engage.  Under this longstanding view, YA Global's portfolio companies were not customers. The Fund did not invest in just any company that sought funding.  In fact, the Tax Court specifically found that "YA Global did not hold itself out to any and all potential customers who sought financing.  Instead, it targeted what might be referred to as a niche market."  JA74.  More important, Yorkville vetted prospective investments and only recommended YA Global fund those whose stocks were expected to

54

appreciate. That should have been conclusive: YA Global did not have "customers," so the Fund was not a "dealer."

The Tax Court determined otherwise by misreading the Treasury regulations to write "customers" out of the statute entirely. The regulation the Tax Court relied on provides—

> For purposes of section 475(c)(1)(B), the term dealer in securities includes…a taxpayer that, in the ordinary course of the taxpayer's trade or business, regularly holds itself out as being willing and able to enter into either side of a transaction enumerated in section 475(c)(1)(B).

Treas. Reg. § 1.475(c)-1(a)(2). The regulation then provides three examples, which demonstrate that it is aimed at situations where a taxpayer is *indifferent* to which side of the transaction it is called upon to take (*e.g.*, being willing to enter into either side of positions in a foreign currency). YA Global clearly does not fall into that category.

The Tax Court seemed to recognize that if Section 475 applies to YA Global at all, it is only via Section 475(c)(1)(**A**). Nevertheless, it concluded that because the regulation applicable to Section 475(c)(1)(**B**) does not use the word "customers," that word must also be surplusage in Section 475(c)(1)(A). According to the court, Section 475 embodies a general principle that a taxpayer's customers are merely "those with

whom the taxpayer does what it 'regularly holds itself out' to do."  JA58. Therefore, because YA Global held itself as being willing and able to provide capital to portfolio companies, the portfolio companies must be YA Global's customers, and YA Global must therefore be a dealer under Section 475(c)(1).  *Id.*

The Tax Court's view that there is "no grounds for giving the term 'customers' a different meaning for purposes of section 475(c)(1)(A) than for section 475(c)(1)(B)" (*id.*) reveals a fundamental misunderstanding of what it means to be a dealer.  Where a taxpayer holds itself out as being willing to take *either side* of a transaction, as in Section 475(c)(1)(B), the taxpayer is providing a traditional market-making function, and it makes sense that the counterparties to these transactions are inherently "customers."  Where, however, a taxpayer is merely buying or selling securities, as in Section 475(c)(1)(A), it is critical to determine whether those on the other side of the transactions are customers or merely counterparties to the buy/sell transactions.  It is no surprise, then, that regulation Section 1.475(c)-1(a)(2), by its terms, applies to Section 475(c)(1)**(B)** *only*.

Although the Tax Court apparently did not understand the implications of importing a regulation designed for Section 475(c)(1)(B) into 475(c)(1)(A), it has caused alarm among commentators. *E.g.*, William L. McRae & Jonathan Gifford, *YA Global: Customers Come First, Analytically*, 183 Tax Notes 305 (2024) (noting that the Tax Court's opinion "leaves open the possibility that any taxpayer known as a regular purchaser of securities qualifies as a dealer, even if it is purchasing securities solely as an investment"). The court committed legal error by misusing a regulation in a manner inconsistent with the language of the statute and the regulation itself.

### 2. Under the Tax Court's Atextual Interpretation, Almost Any Business Can Be Deemed a Securities Dealer.

The result of the Tax Court's construction of Section 475 is that a taxpayer is treated a dealer in securities for purposes of the mark-to-market rules so long as it has *some* sort of business and *also* regularly purchases securities. Under this approach, there is no requirement that buying and/or selling securities *be* the taxpayer's business. Rather than reading the statute as a whole, the court broke its analysis into three separate steps:

- *First*, the Tax Court determined that YA Global had a business providing personal services to portfolio companies, such as negotiating deals, engaging in due diligence, structuring transactions, *etc.*  *See* Section I.C., *supra*.

- *Next*, the court used that determination as a bootstrap to check the box on Section 475's "ordinary course of...business" requirement, noting that YA Global regularly purchased securities from portfolio companies and stating, "We have already concluded that those purchases occurred in the ordinary course of a trade or business." JA57-58.

- *Finally*, as an entirely separate step, the court determined that the portfolio companies were the Fund's customers "[b]ecause YA Global regularly held itself out as being willing and able to purchase stock and debentures" from them.  JA58-59 (citation modified).

By interpreting the statute in this piecemeal way and nullifying the customer requirement, the court took the phrase "in the ordinary course of a trade or business" out of the context of the statute, reading it as a

standalone requirement and, in effect, construing it to mean "in the ordinary course of [*any*] trade or business."

The court's logic could ensnare almost any business into Section 475. For example, an airline that purchases futures to hedge against rising fuel prices would be a securities dealer so long as the airline "regularly held itself out" as buying fuel futures.[11] So too would an international company of any sort that "regularly" makes it known that it uses derivatives to curb foreign currency risks.[12] This reading of the

---

[11] *E.g.*, Southwest Airlines has highlighted its use of fuel hedging, explaining in the first section of its annual report that it "enters into fuel derivative contracts to manage its risk associated with significant increases in fuel prices." Southwest Airlines Co., Form 10-K (2023), p. 6, https://www.sec.gov/Archives/edgar/data/92380/000009238024000 027/luv-20231231.htm. This strategy has also been publicized in news articles (https://www.forbes.com/sites/tedreed/2022/07/28/southwest-airlines-reports-record-quarter-with-gains-from-fuel-hedging/) and on the company's website (https://southwest50.com/our-stories/the-southwest-jet-fuel-hedge-strategy/).

[12] *E.g.*, Nike, Inc. includes an entire section in its annual public filings entitled "Foreign Currency Exposures and Hedging Practices" (Nike, Inc., Form 10-K (2025), p. 44, https://www.sec.gov/Archives/edgar/data/320187/000032018725000047/nke-20250531.htm), and the

statute is absurd. YA Global purchased securities, but that did not render it a securities dealer.

## C. Even if the Fund Were a Dealer, Its Securities Were Identified as Held for Investment and Were Therefore Exempt from the Mark-to-Market Rules.

Even if YA Global could be characterized as a dealer for purposes of Section 475, the securities it held would fall within Section 475(b), which states that the mark-to-market rules shall not apply to—

(A) any security held for investment,

(B) any [evidence of indebtedness] which is acquired (including originated) by the taxpayer in the ordinary course of a trade or business of the taxpayer and which is not held for sale, and

(C) any security which is a hedge with respect to [certain other assets].

I.R.C. § 475(b)(1). The statute further provides—

A security shall not be treated as described in subparagraph (A), (B), or (C) of paragraph (1), as the case may be, unless such security is clearly identified in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe).

---

company won Global Finance magazine's award for "Best Corporate for Use of FX Options" (https://gfmag.com/award/award-winners/corporate-fx-awards/).

I.R.C. § 475(b)(2).   It is undisputed that the YA Global's SEDA agreements consistently stated—

> The securities are being purchased by the Investor [*i.e.*, YA Global] for its own account, for investment purposes.

JA51.  And the agreements by which it purchased convertible debentures consistently stated that the Fund was acquiring them—

> for its own account for investment only and not with a view towards, or for resale in connection with, the public sale of distribution thereof.

*Id.*   Thus, the Fund's securities met the identification requirement of Section 475(b)(2).

The statutory identification requirement is clear on its face.   It requires that the security include language that identifies it as either (a) held for investment, or (b) if it is a debt security, not held for sale, or (c) a hedge.   The statute authorizes Treasury to promulgate regulations regarding *when* the identification need be made, but it does not authorize any additional regulatory requirements.   And the associated regulations, when interpreted correctly, fall within the statutory mandate.   As relevant here, they provide—

An identification of a security as exempt from mark to market does not satisfy section 475(b)(2) if it fails to state whether the security is described in—

(1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or

(2) The third subparagraph thereof (identifying a security as a hedge).

Treas. Reg. § 1.475(b)-2(a). Properly read, the statute and regulation together require only that a taxpayer describe a security as being either (1) held for investment or not held for sale, or (2) a hedge. YA Global's securities clearly meet that standard.

Rather than give the statute and regulations their most obvious meaning, the Tax Court determined that the regulation as requiring something more than the statute. Specifically, the court concluded that the regulations require "writing the words 'section 475'" on a security in order for it to be exempt from the mark-to-market rules. JA60 (citation omitted). The court's interpretation is inconsistent with the legislative history of the statute. The House Report explains that a security is sufficiently identified as being described within an exception "if all of securities of the taxpayer that are not so described are clearly identified

in the dealer's records as not being described in such exception."  H.R.

Rep. No. 103-111 at 664, n. 41 (1993).  The report further provides:

> For example, assume that, in the ordinary course of its trade or business, a bank originates loans that are sold if the loans satisfy certain conditions.  In addition, assume that (1) the bank determines whether a loan satisfies the conditions within 30 days after the loan is made, and (2) if a loan satisfies the conditions for sale, the bank records the loan in a separate account on the date that the determination is made.  For purposes of the bill, the bank is a dealer in securities with respect to the loans that it holds for sale.  In addition, by identifying these loans as held for sale the bank is considered to have identified all other loans as not held for sale.  Consequently, the loans that are not held for sale are not subject to the mark-to-market rules.

*Id.*  It is plain from the example that the "identification" of the securities

not held for sale does not include the words "section 475," or any words

at all, for that matter.  The court's conclusion that the regulations require

something more cannot stand.

Because YA Global's securities were all clearly marked as held for

investment, they were not subject to mark-to-market accounting *even if*

the Tax Court's construction of the phrase "dealer in securities" for

purposes of Section 475 could be upheld.

## III.   The Tax Court Erred in Imposing Penalties Based on an Illogical Theory the Commissioner Never Raised.

### A.    Standard of Review.

The Commissioner imposed penalties on YA Global for failure to file withholding tax returns and pay Section 1446 withholding tax.  Such penalties cannot be imposed, however, for failures "due to reasonable cause and not due to willful neglect." I.R.C. § 6651(a)(1)-(2).  The Tax Court's conclusion that the reasonable cause exception was inapplicable here is reviewed de novo.  *Matter of Am. Biomaterials Corp.*, 954 F.2d 919, 921 (3d Cir. 1992).  The factual findings that formed the basis of its conclusion are reviewed for clear error.  *Id.* at 922.

### B.    The Tax Court Drew an Impermissible Inference from the Malpractice Case.

Courts have long held that reasonable reliance on a tax advisor's substantive advice, even if erroneous, amounts to reasonable cause.  *E.g.*, *United States v. Boyle*, 469 U.S. 241, 246-47 (1985).  Here, the Tax Court found that "RSM advised YA Global that it was not engaged in a U.S. trade or business, advice that, if accurate, would have meant that the partnership was not required to file Forms 8804 or pay section 1446 withholding tax." JA137.  The court also found that "YA Global provided RSM with necessary and accurate information" to provide that advice.

64

JA139 (citation modified).   Neither the court nor the Commissioner questioned RSM's qualifications to provide relevant advice, and even the Commissioner acknowledged that, at the time RSM furnished the advice, there was a "widely held understanding [in] the industry" that "whether a U.S.-based hedge fund engaged in financing activities was a U.S. trade or business was fraught with uncertainty."  JA143.

The Tax Court's factual findings clearly show that, in the face of unclear rules, YA Global solicited and relied upon competent, professional advice in determining it had no USTB.  Nevertheless, the court concluded that, because YA Global filed a malpractice claim against RSM in May 2015, the Fund's reliance on RSM's advice in 2006-2010 could not have been reasonable.  JA144.  The court inferred from the malpractice claim that "at some point, YA Global came to believe that RSM had been negligent in providing the [relevant] advice," and the court determined that YA Global failed to prove that point did not arrive by the time the relevant returns were filed.  *Id.*  The court erred badly in its analysis.

As the Tax Court found, RSM advised YA Global that it had no USTB before the Fund's 2006 returns were filed.  JA137.  It was at least

65

8 years later, in March 2015, that the Commissioner issued the FPAAs in this case, asserting that YA Global *was* engaged in a USTB and could be liable for nearly $100 million plus interest. JA1178-1248. The Fund filed its malpractice complaint against RSM in May 2015, two months after it received the FPAAs. JA126. In the malpractice case, YA Global told the New Jersey court that it commenced the action "without knowing the accuracy or adequacy of defendants' advice" and that the complaint was filed because of the pending expiration of the applicable statute of limitations. (JA6406, quoting *YA Global Investments, L.P. v. RSM McGladrey, Inc.*, 2016 WL 5724900, at \*1 (N.J. Super. Ct. App. Div. Oct. 4, 2016).) YA Global then moved to stay the malpractice case pending resolution of this case in the Tax Court. JA6406.

The obvious inference from these facts is that the Commissioner's issuance of the FPAAs in 2015 was the trigger for YA Global's lawsuit against RSM two months later and that, even at the time the lawsuit was filed, YA Global's only reason for questioning whether RSM was negligent was because the FPAAs said as much. Nevertheless, despite acknowledging all the relevant facts, the Tax Court came to the opposite conclusion.

This Court has made clear that lower courts may infer factual conclusions "only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *See*, *e.g.*, *Edward J. Sweeney & Sons, Inc. v. Texaco Inc.*, 637 F.2d 105, 116 (3d Cir. 1980), *cert. denied*, 451 U.S. 911 (1981). That standard was not met here. The Tax Court's conclusion that YA Global had reason to believe RSM was negligent in 2006 because it filed a malpractice case in 2015 is totally illogical.[13]  It was not until the court rendered its November 2023 opinion that YA Global could even assert RSM's legal advice was erroneous, let alone negligent. *Cf. Streber v. Comm'r*, 138 F.3d 216, 221 n.10 (5th Cir. 1998) (a malpractice lawsuit filed by taxpayers after obtaining advice was irrelevant to the question of their negligence where the advice questioned was sound under the circumstances when given).

The Tax Court's attempt to couch its nonsensical view as a failure of Petitioners to meet their burden of proof cannot cure its legal error.

---

[13] The court's conclusion is also counter to its assertion in another context that, when the Fund filed its 2006 return, "YA Global did not believe itself to be engaged in a [USTB]."  JA84.

JA144.  Requiring that Petitioners prove what they did _not_ know in 2006 is akin to requiring them to prove the Fund was not in _any_ sort of business, a problem discussed above.  Section I.C.1., _supra_.  The court's demand for evidence that Petitioners did not know about RSM's malpractice 8+ years before they filed a malpractice case in 2015 is legally erroneous for the same reasons.

### C.  The Tax Court Violated the Party-Presentation Principle by Manufacturing This Argument for the Commissioner.

The Tax Court's insistence that Petitioners provide affirmative evidence of their "non-knowledge" about RSM's supposed malpractice is particularly problematic in light of the way the issue was raised.  The only mention of the malpractice case during the trial was when, in response to a question from Government counsel, Mr. Yager, YA Global's auditor at RSM, acknowledged that there was a pending lawsuit between YA Global and RSM.  JA2624 at 439:13-23.  He stated, however, that he "[was] not in the position to describe [the lawsuit]," and he was able to provide only the most cursory information about it.  JA2625 at 440:1-6.

Neither Petitioners nor the Commissioner so much as mentioned the existence of the lawsuit in their post-trial briefs.  Apparently,

however, Mr. Yager's remark piqued the curiosity of the Tax Court, which proceeded to research the New Jersey filings and to issue an order in October 2022 (long after the case was fully submitted) requiring the parties to file supplemental briefs to "address the implications for YA Global's reasonable cause defense" of the malpractice action.  JA6405.  Even in response to the Tax Court's order, the Commissioner was hard pressed to explain how the malpractice case might be relevant.  JA6408-6402.  Certainly he made no argument that the 2015 lawsuit could be used as evidence that Petitioners were aware of RSM's negligence when they filed their 2006 returns.  *Id.*  Undaunted, the Tax Court proceeded to make its illogical inference to uphold penalties against the Fund.

The Tax Court's actions were in clear violation of the party-presentation principle.  That principle, which this Court has described as "the bedrock of our adversarial system" (*United States v. Dowdell*, 70 F.4th 134, 145 (3d Cir. 2023)), ensures that courts decide "only those issues argued by interested and motivated litigants."  *Id*. (citing *United States v. Sineneng-Smith*, 590 U.S. 371 (2020)).  Although courts sometimes depart from the party-presentation principle, "the justification has usually been to protect a *pro se* litigant's rights."

69

*Dowdell*, 70 F.4th at 141 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  No such departure is warranted here, where the Tax Court crafted its own argument in support of the Government.  In fact, as this Court has noted, departing from the party-presentation principle where the Government is a party may undermine the separation of powers doctrine.  *Id.* at 146.  The Tax Court's self-initiated effort went "well beyond the pale" and was an abuse of discretion.  *Sineneng-Smith*, 590 U.S. at 375, 380.

## IV.   **Statute of Limitations.**

The IRS generally has three years from the filing of "the return required to be filed by the taxpayer" to assess any tax imposed by the Code.  I.R.C. § 6501(a).  The taxpayer and the Commissioner may extend that period by written agreement before it expires.  *Id.* at (c)(4).  If no return was filed, the tax at issue may be assessed at any time.  *Id.* at (c)(3).

YA Global filed its 2006 and 2007 partnership income tax returns (Forms 1065) on October 15, 2007, and on September 29, 2008, respectively.  (JA198 ¶2.)  Thus, the normal three-year limitations periods for assessment of tax against the Fund had long expired when

the FPAAs in this case were issued on March 6, 2015[14] unless the periods were properly extended.

The Tax Court concluded that the Commissioner was not time-barred from assessing withholding tax for 2006 and 2007 against YA Global because either (a) the Fund did not file a return, or (b) if it did, it consented to extend the limitations period. The court erred on both counts as a matter of law.

### A. Standard of Review.

This Court exercises plenary review of the Tax Court's conclusions regarding the statute of limitations. *Sheet Metal Workers, Local 19 v. 2300 Grp.*, 949 F. 2d 1274, 1278 (3d Cir. 1991). The Tax Court's construction of the Forms 882-P is also a question of law subject to de novo review. *Cf. id*. at 1279.

### B. YA Global's Filing of Forms 1065 Started the Limitations Period.

The Supreme Court has held that a taxpayer does not start the statute of limitations running by filing one return when a different return

---

[14] The Commissioner's issuance of an FPAA suspended the limitations period for assessment. I.R.C. § 6229(d) (repealed as of 2018).

is required if the return filed is "insufficient to advise the Commissioner that any liability exist[s]" for the tax that should have been disclosed on the other return. *See Comm'r v. Lane-Wells Co.*, 321 U.S. 219, 223 (1944). *Cf. Neptune Mut. Ass'n, Ltd. of Bermuda v. United States*, 862 F.2d 1546, 1555 (Fed. Cir. 1988) ("[T]he law holds that if a taxpayer files an incorrect return, but the return sets forth all the data necessary to compute the taxes owed, the statute of limitations begins to run."). Here, YA Global timely filed income tax Forms 1065 pursuant to Section 6031(a) (JA87), and the Commissioner undisputedly computed YA Global's purported liability for withholding tax based entirely on the numbers included in the Forms 1065. The Tax Court should therefore have concluded that the statute of limitations was triggered.

The court acknowledged that *Lane Wells* governs this case, but it nevertheless deemed it necessary for the Fund to *also* file Forms 8804 under Section 1.1446-3(d)(1)(iii) in order to start the limitations period, reasoning that the Forms 1065 were insufficient because they did not disclose to the Commissioner that the "fact" that the Fund had a USTB. JA97. The court's reasoning is nonsensical. As the court noted, "YA Global did not believe itself to be engaged in a [USTB]," so of course it did

72

not make such a claim. JA84. Under the Tax Court's view, partnerships that reasonably believe they do not have a USTB can *never* get repose. The court suggested that YA Global "might have been able" to trigger the statute of limitations if it had filed Forms 8804 reporting zero liability and also "describing its activities and explaining the grounds for its belief that it was not engaged in a [USTB]." JA101. But Form 8804 does not require a taxpayer to describe all the reasons it believes its tax positions are correct—no return does. Form 8804 is a two-page document requiring only that a taxpayer make computations using numbers that come directly from its Form 1065 and the attached Schedules K-1. Moreover, had the Fund filed a Form 8804 showing zeroes, it may not have been accepted as a valid return at all. *Cf. United States v. Edelson*, 604 F.2d 232, 234 (3d Cir. 1979).

It is, of course, unreasonable to expect the Commissioner to be diligent in collecting unpaid taxes if he has not received any information from a taxpayer indicating that an assessment might be warranted. But the Commissioner did receive relevant information here. YA Global's Forms 1065 included not only all the data required to compute withholding tax, but also statements on its included Schedules K-1 that

said, "The Partnership *has taken the position* that it is an 'investor' and is not engaged in the active conduct of a trade or business."  JA240, JA243, *etc.*; JA625, JA628, *etc.* (emphasis added).  That statement of the Fund's "position," made 119 times on its 2006 return and 110 times on its 2007 return, was sufficient to notify the Commissioner of potential liability.

## C. The Parties' Consents to Extend the Statute of Limitation Did Not Include Section 1446 Withholding Tax.

A consent to extend the period for assessment of tax is a unilateral and voluntary waiver of a defense by the taxpayer, not a contract.  *E.g.*, *Stange v. United States*, 282 U.S. 270, 276 (1931).  The Supreme Court has recently articulated a "general rule for waiver" that federal courts should apply across contexts:  waiver occurs where a party has "intentional[ly] relinquish[ed] or abandon[ed]... a known right."  *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 339 (3d Cir. 2023) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022)).  A court analyzing waiver "focuses on the actions of the person who held the right" and "seldom considers the effects of those actions on the opposing party."  *Morgan*, 596 U.S. at 417.  The dispositive question here, then, is whether

74

the Fund intentionally and knowingly gave up its right to a statute of limitations defense.  Principles of contract interpretation are instructive. *See, e.g.*, *Pursell v. Comm'r*, 38 T.C. 263, 278 (1962), *aff'd*, 315 F.2d 629 (3d Cir. 1963).  Those principles hold that the Fund's intent in signing the Forms 872-P is embodied in their plain language.  *See United States v. Hodgekins*, 28 F.3d 610, 614 (7th Cir. 1994) (citing cases).

The Tax Court concluded that the Forms 872-P, which at the time unambiguously stated that they applied to any *income tax* liability of the *Fund's partners*, were valid to extend the statute of limitations for *withholding tax* liability of *YA Global*.  That was as illogical as it sounds. The court rested its conclusion on a hyper-technical analysis of the Code and Treasury regulations that is hard to parse (JA108-109) and, more importantly, a distraction from the relevant question—what the plain language in the consent forms would mean to a reasonable person under the circumstances.  *Cf. Hodgekins*, 28 F.3d at 614 (rejecting the Commissioner's argument that the terms of a consent should extend beyond the plain meaning of the words used).

Any ambiguity in the language of the Forms 872-P must be resolved against the Commissioner as the drafter of the form.  *Ripley v. Comm'r*,

103 F.3d 332, 337 (4th Cir. 1996) (citing cases).  Moreover, this Court has made clear that determining whether a party intended to waive a right "is informed by the circumstances and context" of the case.  *White*, 61 F.4th at 339-340 (citation modified).    Here, the Commissioner consistently sought extensions with respect to income tax via the Forms 872-P alongside simultaneous extensions with respect to withholding tax against YA Global itself on Forms 872.    Coupling these forms with seemingly distinct purposes makes it even clearer that YA Global would not reasonably have understood the Forms 872-P to apply to assessments of withholding tax, nor would it have reasonably guessed the forms' reference to YA Global's "partners" included a reference to itself.    The Commissioner's asterisks and updates to the forms beginning in February 2012 indicate that even he realized the earlier forms were inadequate.

The consent agreements mean what they say.  Because they did not include Section 1446 withholding tax until after the applicable limitations periods had expired, the Commissioner is time-barred from assessing the tax against YA Global for 2006 and 2007.

# CONCLUSION

For the foregoing reasons, the judgment of the Tax Court should be reversed in its entirety.

Dated: September 18, 2025      Respectfully submitted,

s/ Tamara L. Shepard

TAMARA L. SHEPARD
 MA BAR NO. 568785
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-7959

HENRY CHENG
 CA BAR NO. 267578
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2512

*Counsel for YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner*

# ADDENDUM

## Internal Revenue Code (26 U.S.C.)

### §475. Mark to market accounting method for dealers in securities

(a) **General rule**
Notwithstanding any other provision of this subpart, the following rules shall apply to securities held by a dealer in securities:

    (1) Any security which is inventory in the hands of the dealer shall be included in inventory at its fair market value.

    (2) In the case of any security which is not inventory in the hands of the dealer and which is held at the close of any taxable year—

        (A) the dealer shall recognize gain or loss as if such security were sold for its fair market value on the last business day of such taxable year, and

        (B) any gain or loss shall be taken into account for such taxable year.

Proper adjustment shall be made in the amount of any gain or loss subsequently realized for gain or loss taken into account under the preceding sentence. The Secretary may provide by regulations for the application of this paragraph at times other than the times provided in this paragraph.

(b) **Exceptions**

    (1) **In general**
Subsection (a) shall not apply to—

        (A) any security held for investment,

      (B)  any [evidence of indebtedness] which is acquired (including originated) by the taxpayer in the ordinary course of a trade or business of the taxpayer and which is not held for sale…and

      (C)  any security which is a hedge with respect to [certain other assets]…

  (2)  **Identification required**
A security shall not be treated as described in subparagraph (A), (B), or (C) of paragraph (1), as the case may be, unless such security is clearly identified in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe).

…

(c)  **Definitions**
For purposes of this section—

  (1)  **Dealer in securities defined**
The term "dealer in securities" means a taxpayer who—

      (A)  regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or

      (B)  regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business.

  (2)  **Security defined**
The term "security" means any—

      (A)  share of stock in a corporation;

(B) partnership or beneficial ownership interest in a widely held or publicly traded partnership or trust;

(C) note, bond, debenture, or other evidence of indebtedness;

(D) interest rate, currency, or equity notional principal contract;

(E) evidence of an interest in, or a derivative financial instrument in, any security described in subparagraph (A), (B), (C), or (D), or any currency, including any option, forward contract, short position, and any similar financial instrument in such a security or currency; and

(F) position which—

(i) is not a security described in subparagraph (A), (B), (C), (D), or (E),

(ii) is a hedge with respect to such a security, and

(iii) is clearly identified in the dealer's records as being described in this subparagraph before the close of the day on which it was acquired or entered into (or such other time as the Secretary may by regulations prescribe).

…

## §864. Definitions and special rules

(a)  …

(b)  **Trade or business within the United States**
For purposes of this part, part II, and chapter 3, the term "trade or business within the United States" includes the performance of personal services within the United States at any time within the taxable year, but does not include—

(1)  **Performance of personal services for foreign employer**
The performance of personal services—

(A)  for a nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States, or

(B)  for an office or place of business maintained in a foreign country or in a possession of the United States by an individual who is a citizen or resident of the United States or by a domestic partnership or a domestic corporation,

by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of 90 days during the taxable year and whose compensation for such services does not exceed in the aggregate $3,000.

(2)  **Trading in securities or commodities**

(A)  **Stocks and securities**
(i)  **In general**
Trading in stocks or securities through a resident broker, commission agent, custodian, or other independent agent.

(ii) **Trading for taxpayer's own account**
Trading in stocks or securities for the taxpayer's own account, whether by the taxpayer or his employees or through a resident broker, commission agent, custodian, or other agent, and whether or not any such employee or agent has discretionary authority to make decisions in effecting the transactions. This clause shall not apply in the case of a dealer in stocks or securities.

(B) **Commodities**
[…]

(C) **Limitation**
Subparagraphs (A)(i) and (B)(i) shall apply only if, at no time during the taxable year, the taxpayer has an office or other fixed place of business in the United States through which or by the direction of which the transactions in stocks or securities, or in commodities, as the case may be, are effected.

(c) **Effectively connected income, etc.**
…

(2) **Periodical, etc., income from sources within United States—factors**
In determining whether income from sources within the United States of the types described in section 871(a)(1), section 871(h), section 881(a), or section 881(c), or whether gain or loss from sources within the United States from the sale or exchange of capital assets, is effectively connected with the conduct of a trade or business within the United States, the factors taken into account shall include whether—

(A) the income, gain, or loss is derived from assets used in or held for use in the conduct of such trade or business, or

(B) the activities of such trade or business were a material factor in the realization of the income, gain, or loss.

In determining whether an asset is used in or held for use in the conduct of such trade or business or whether the activities of such trade or business were a material factor in realizing an item of income, gain, or loss, due regard shall be given to whether or not such asset or such income, gain, or loss was accounted for through such trade or business.

(3) **Other income from sources within United States**
All income, gain, or loss from sources within the United States (other than income, gain, or loss to which paragraph (2) applies) shall be treated as effectively connected with the conduct of a trade or business within the United States.

(4) **Income from sources without United States**
[…]

(5) **Rules for application of paragraph (4)(B)**
For purposes of subparagraph (B) of paragraph (4)—

(A) in determining whether a nonresident alien individual or a foreign corporation has an office or other fixed place of business, an office or other fixed place of business of an agent shall be disregarded unless such agent (i) has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation and regularly exercises that authority or has a stock of merchandise from which he regularly fills orders on behalf of such individual or foreign corporation, and (ii) is not a general commission agent, broker, or other agent of independent status acting in the ordinary course of his business…

## §1236. Dealers in securities.

    (a) **Capital gains**
Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless—

        (1) the security was, before the close of the day on which it was acquired (or such earlier time as the Secretary may prescribe by regulations), clearly identified in the dealer's records as a security held for investment; and

        (2) the security was not, at any time after the close of such day (or such earlier time), held by such dealer primarily for sale to customers in the ordinary course of his trade or business.

…

## Treasury Regulations (26 C.F.R.)

### § 1.475(b)-2  Exemptions—identification requirements

(a) **Identification of the basis for exemption.** An identification of a security as exempt from mark to market does not satisfy section 475(b)(2) if it fails to state whether the security is described in—

   (1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or

   (2) The third subparagraph thereof (identifying a security as a hedge).

### § 1.475(c)-1  Definitions—dealer in securities

(a) **Dealer-customer relationship**
Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances.

   (1) [Reserved]

   (2) Transactions described in section 475(c)(1)(B)—

   (i) **In general**
   For purposes of section 475(c)(1)(B), the term dealer in securities includes, but is not limited to, a taxpayer that, in the ordinary course of the taxpayer's trade or business, regularly holds itself out as being willing and able to enter into either side of a transaction enumerated in section 475(c)(1)(B).

(ii) **Examples**

The following examples illustrate the rules of this paragraph (a)(2). In the following examples, B is a bank and is not a member of a consolidated group:

### Example 1.

B regularly offers to enter into interest rate swaps with other persons in the ordinary course of its trade or business. B is willing to enter into interest rate swaps under which it either pays a fixed interest rate and receives a floating rate or pays a floating rate and receives a fixed rate. B is a dealer in securities under section 475(c)(1)(B), and the counterparties are its customers.

### Example 2.

B, in the ordinary course of its trade or business, regularly holds itself out as being willing and able to enter into either side of positions in a foreign currency with other banks in the interbank market. B's activities in the foreign currency make it a dealer in securities under section 475(c)(1)(B), and the other banks in the interbank market are its customers.

### Example 3.

B engages in frequent transactions in a foreign currency in the interbank market. Unlike the facts in Example 2, however, B does not regularly hold itself out as being willing and able to enter into either side of positions in the foreign currency, and all of B's transactions are driven by its internal need to adjust its position in the currency. No other circumstances are present to suggest that B is a dealer in securities for purposes of section 475(c)(1)(B). B's activity in the foreign currency does not qualify it as a dealer in securities for purposes of section

475(c)(1)(B), and its transactions in the interbank market are not transactions with customers.

…

## § 1.475(d)-1  Definitions—dealer in securities

### (a) Dealer-customer relationship
Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances.

…

## § 1.864-2  Trade or business within the United States

…

### (c) Trading in stocks or securities
For purposes of paragraph (a) of this section—

#### (1) In general
The term "engaged in trade or business within the United States" does not include the effecting of transactions in the United States in stocks or securities through a resident broker, commission agent, custodian, or other independent agent. This subparagraph shall apply to any taxpayer, including a broker or dealer in stocks or securities, except that it shall not apply if at any time during the taxable year the taxpayer has an office or other fixed place of business in the United States through which, or by the direction of which, the transactions in stocks or securities are effected. The volume of stock or security transactions effected during the taxable year shall not be taken into account in determining under this subparagraph whether the taxpayer is engaged in trade or business within the United States.

#### (2) Trading for taxpayer's own account—

(i) In general. The term "engaged in trade or business within the United States" does not include the effecting of transactions in the United States in stocks or securities for the taxpayer's own account, irrespective of whether such transactions are effected by or through—

(a) The taxpayer himself while present in the United States,

(b) Employees of the taxpayer, whether or not such employees are present in the United States while effecting the transactions, or

(c) A broker, commission agent, custodian, or other agent of the taxpayer, whether or not such agent while effecting the transactions is (1) dependent or independent, or (2) resident, nonresident, or present, in the United States, and irrespective of whether any such employee or agent has discretionary authority to make decisions in effecting such transactions. For purposes of this paragraph, the term "securities" means any note, bond, debenture, or other evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing; and the effecting of transactions in stocks or securities includes buying, selling (whether or not by entering into short sales), or trading in stocks, securities, or contracts or options to buy or sell stocks or securities, on margin or otherwise, for the account and risk of the taxpayer, and any other activity closely related thereto (such as obtaining credit for the purpose of effectuating such buying, selling, or trading). The volume of stock of security transactions effected during the taxable year shall not be taken into account in determining under this

subparagraph whether the taxpayer is engaged in trade or business within the United States.

…

## § 1.864-7  Trade or business within the United States

…

(d) **Agent activity**

(1)  …

(2) **Independent agents.**
The office or other fixed place of business of an independent agent, as defined in subparagraph (3) of this paragraph, shall not be treated as the office or other fixed place of business of his principal who is a nonresident alien individual or a foreign corporation, irrespective of whether such agent has authority to negotiate and conclude contracts in the name of his principal, and regularly exercises that authority, or maintains a stock of goods from which he regularly fills orders on behalf of his principal.

**(3) Definition of independent agent.**

(i) In general.  For purposes of this paragraph, the term "independent agent" means a general commission agent, broker, or other agent of an independent status acting in the ordinary course of his business in that capacity. Thus, for example, an agent who, in pursuance of his usual trade or business, and for compensation, sells goods or merchandise consigned or entrusted to his possession, management, and control for that purpose by or for the owner of such goods or merchandise is an independent agent.

(ii) Related persons. The determination of whether an agent is an independent agent for purposes of this paragraph shall be made without regard to facts indicating that either the agent or the principal owns or controls directly or indirectly the other or that a third person or persons own or control directly or indirectly both. For example, a wholly owned domestic subsidiary corporation of a foreign corporation which acts as an agent for the foreign parent corporation may be treated as acting in the capacity of independent agent for the foreign parent corporation. The facts and circumstances of a specific case shall determine whether the agent, while acting for his principal, is acting in pursuance of his usual trade or business and in such manner as to constitute him an independent agent in his relations with the nonresident alien individual or foreign corporation.

(iii) Exclusive agents. Where an agent who is otherwise an independent agent within the meaning of subdivision (i) of this subparagraph acts in such capacity exclusively, or almost exclusively, for one principal who is a nonresident alien individual or a foreign corporation, the facts and circumstances of a particular case shall be taken into account in determining whether the agent, while acting in that capacity, may be classified as an independent agent.

## § 1.1236-1 Dealers in securities.

…

(d) Identification of security in dealer's records.

(1) A security is clearly identified in the dealer's records as a security held for investment when there is an accounting

separation of the security from other securities, as by making appropriate entries in the dealer's books of account to distinguish the security from inventories and to designate it as an investment and by (i) indicating with such entries, to the extent feasible, the individual serial number of, or other characteristic symbol imprinted upon, the individual security, or (ii) adopting any other method of identification satisfactory to the Commissioner.

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of the Court's Order dated September 4, 2025 (Dkt. No. 25) because it contains 14,981 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: September 18, 2025          s/ Tamara L. Shepard
                                   TAMARA L. SHEPARD

## CERTIFICATE OF SERVICE

I, Tamara L. Shepard, counsel for YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner, certify that, on September 18, 2025, I electronically filed the foregoing Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Pursuant to Local Appellate Rule 31.1, as amended by the Order, dated April 29, 2013, 7 copies of this brief were sent to the Clerk of the Court for delivery.

Dated: September 18, 2025          s/ Tamara L. Shepard
                                   TAMARA L. SHEPARD