# No. 25-1766

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

**YA GLOBAL INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP; YORKVILLE ADVISORS, GP LLC, Tax Matters Partner; YA GLOBAL INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP; YORKVILLE ADVISORS, LLC, Tax Matters Partner,**

Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE,**

Appellee.

_____

## ON APPEAL FROM THE DECISION OF
## UNITED STATES TAX COURT

_____

## BRIEF FOR THE APPELLEE

_____

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

JENNIFER M. RUBIN                    (202) 307-0524
KATHLEEN E. LYON                    (202) 307-6370
  *Attorneys*
  *Tax Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents.............................................................i
Table of authorities ......................................................v
Glossary .....................................................................xiii
Statement of subject matter and appellate jurisdiction ..........1
Statement of the issues ...................................................2
Statement of related cases and proceedings ..........................2
Statement of the case ....................................................2

      A.    Factual Background......................................3

          1.    YA Global and Yorkville Advisors .......................3

          2.    2005 and 2007 investment management agreements....................................................4

          3.    Yorkville's activities on YA Global's behalf..........5

          4.    YA Global's returns .............................................7

          5.    The FPAAs ...........................................................8

          6.    Tax Court proceedings...........................................9

Summary of argument ...........................................................11
Argument:

    I.    The Tax Court correctly upheld the Commissioner's liability determinations .......................................14

       Statement of the standard or scope of review.......................14

      A.    YA Global was engaged in a U.S. trade or business ...15

          1.    Legal background ................................................15

          2.    Yorkville's activities are attributable to YA Global ...............................................................17

**Page**

3.   YA Global engaged in a U.S. trade or business and is not subject to any exception......21

   a.   YA Global, through Yorkville, engaged in continuous, regular, profit-making activities beyond simple investment .........21

   b.   Petitioners' claim that the portfolio companies paid only for capital is meritless......................................................24

   c.   YA Global did not qualify for the judicial exception for purely investment activities......................................................28

   d.   YA Global did not qualify for the statutory safe harbors ...............................33

      i.   YA Global waived any arguments regarding the statutory safe harbors................................................33

      ii.   The safe harbors do not apply in any event.......................................................35

         a.   YA Global was not a trader in stocks or securities for purposes of §864(b)(2)(A) ......................................35

         b.   The safe harbor in §864(b)(2)(A)(i) does not apply....................................37

         c.   The safe harbor in §864(b)(2)(A)(ii) does not apply.........41

   e.   The Commissioner did not raise a new theory in his pre-trial brief ........................42

**Page**

B.   YA Global was a "dealer in securities" under
§475, and thus, its income was subject to the
mark-to-market accounting rules ................................ 46

   1.   Introduction ........................................................ 46

   2.   YA Global was a "dealer in securities" for
purposes of §475(a) ............................................. 48

   3.   The mark-to-market exceptions do not apply
because YA Global did not properly identify
its securities under §475(b)(2) ............................ 54

C.   All of YA Global's taxable income was effectively
connected with its U.S. business and it therefore
was liable for §1446 withholding tax ........................... 58

II.   The FPAAs for 2006 and 2007 were timely issued .............. 59

Statement of the standard or scope of review ....................... 59

A.   The assessment limitations periods never
commenced ................................................................ 60

B.   YA Global's tax matters partner agreed to extend
assessment for tax years 2006 and 2007 .................... 65

III.   YA Global failed to satisfy its burden to establish
reasonable cause for its failure to timely file required
returns and timely pay taxes owed ....................................... 71

Statement of the standard or scope of review ....................... 71

A.   YA Global's failures were not excused by
reasonable cause ......................................................... 72

B.   The Tax Court did not violate the party-
presentation principle .................................................. 76

**Page**

Conclusion ................................................................................ 78
Certificate of bar membership ............................................. 79
Certificate of compliance ..................................................... 80
Statutory Addendum ............................................................. 81

# TABLE OF AUTHORITIES

**Cases:**                                                 **Page(s)**

*Adda v. Commissioner*,
10 T.C. 273 (1948),
*aff'd*, 171 F.2d 457 (4th Cir. 1948) (per curiam) .......................... 18

*Amesbury Apartments, Ltd. v. Commissioner*,
95 T.C. 227 (1990) ..................................................................... 66

*Anderson v. Commissioner*,
698 F.3d 160 (3d Cir. 2012) ....................................................... 14

*Bachner v. Commissioner*,
81 F.3d 1274 (3d Cir. 1996) ....................................................... 59

*Badaracco v. Commissioner*,
464 U.S. 386 (1984) ................................................................... 60

*Baird v. Commissioner*,
438 F.2d 490 (3d Cir. 1970) ....................................................... 44

*Bielfeldt v. Commissioner*,
231 F.3d 1035 (7th Cir. 2000) .................................................... 36

*Bielfeldt v. Commissioner*,
T.C. Memo. 1998-394, 1998 WL 774132,
*aff'd*, 231 F.3d 1035 (7th Cir. 2000) ........................................... 52

*Bradley v. Att'y Gen.*,
603 F.3d 235 (3d Cir. 2010) ........................... 15, 19, 59, 62, 68, 72

*Bufferd v. Commissioner*,
506 U.S. 523 (1993) ................................................................ 60-61

*Burbank Liquidating Corp. v. Commissioner*,
39 T.C. 999 (1963) ..................................................................... 19

*Cabirac v. Commissioner*,
120 T.C. 163 (2003), *aff'd*, No. 03-3157,
2004 WL 7318960 (3d Cir. Feb. 10, 2004) .................................. 65

*Commissioner v. Groetzinger*,
480 U.S. 23 (1997) ....................... 14, 16, 21, 25, 28, 43

*Commissioner v. Lane-Wells Co.*,
321 U.S. 219 (1944) ................................................................ 62-64

*Crescent Holdings, LLC v. Commissioner*,
141 T.C. 477 (2013). ................................................................. 17

**Cases (cont'd):**                                              **Page(s)**

*De Amodio v. Commissioner,*
    34 T.C. 894 (1960), *aff'd*, 299 F.2d 623 (3d Cir. 1962) ................. 18

*Dunitz v. Commissioner,*
    7 T.C. 672 (1946), *aff'd*, 167 F.2d 223 (6th Cir. 1948)................. 42

*E. Wind Indus., Inc. v. United States,*
    196 F.3d 499 (3d Cir. 1999)...................................................... 71

*E.I. DuPont de Nemours & Co. v. Rhone*
    *Poulenc Fiber & Resin Intermediates, S.A.S.,*
    269 F.3d 187 (3d Cir. 2001) ..................................................... 17

*Evans v. Commissioner,*
    48 T.C. 704 (1967), *aff'd*, 413 F.2d 1047 (9th Cir. 1969).............. 32

*Farr v. Commissioner,*
    4 B.T.A. 683 (1941) ................................................................ 54

*Fed. Home Loan Mortg. Corp. v. Commissioner,*
    125 T.C. 248 (2005).................................................................. 25

*G.L. v. Ligonier Valley Sch. Dist. Auth.,*
    802 F.3d 601 (3d Cir. 2015) ..................................................... 50

*Greenberg v. Commissioner,*
    10 F.4th 1136 (11th Cir. 2021) ................................................. 45

*Holof v. Commissioner,*
    872 F.2d 50 (3d Cir. 1989)........................................................ 70

*Hub City Foods v. Commissioner,*
    884 F.2d 320 (7th Cir. 1989) .................................................... 32

*InverWorld, Inc. v. Commissioner,*
    T.C. Memo. 1996-301, 1996 WL 352998................................38-39

*Jessup v. Commissioner,*
    T.C. Memo. 1977-289, 1977 WL 3580........................................ 29

*Kemon v. Commissioner,*
    16 T.C. 1026 (1951)................................................................. 41

*Lewenhaupt v. Commissioner,*
    20 T.C. 151 (1953), *aff'd*, 221 F.2d 227 (9th Cir. 1955).......... 16, 18

*Linen Thread Co. v. Commissioner,*
    14 T.C. 725 (1950)................................................................32-33

*Lloyd v. HOVENSA,*
    369 F.3d 263 (3d Cir. 2004).......................................21, 26, 53, 59

**Cases (cont'd):** Page(s)

*Marprowear Profit-Sharing Tr. V. Commissioner,*
  74 T.C. 1086 (1980),
  *aff'd*, 673 F.2d 1300 (3d Cir. 1981) ............................................. 73

*Morgan v. Sundance, Inc.,*
  596 U.S. 411 (2022) ....................................................................... 69

*Mt. Mansfield Co., Inc. v. Commissioner,*
  50 T.C. 798 (1968), *aff'd*, 409 F.2d 845 (2d Cir. 1969) ................. 32

*Murrin v. Commissioner,*
  158 F.4th 527 (3d Cir. 2025) ........................................................ 55

*North Wall Holdings, LLC v. Commissioner,*
  165 T.C. No. 9, 2025 WL 2985729 (2025) .................................... 69

*Pac. First Fed. Sav. & Loan Ass'n v. Commissioner,*
  79 T.C. 512 (1982) ......................................................................... 25

*Panzarella v. Navient Sols., Inc.,*
  37 F.4th 867 (3d Cir. 2022) .......................................................... 76

*Paschall v. Commissioner,*
  137 T.C. 8 (2011) ........................................................................... 62

*Pursell v. Commissioner,*
  38 T.C. 263 (1962), *aff'd*, 315 F.2d 629 (3d Cir. 1963) .......... 66, 70

*Reynolds v. Wagner,*
  128 F.3d 166 (3d Cir. 1997) .......................................................... 34

*Rhone-Poulenc Surfactants & Specialties,*
  *L.P. v. Commissioner,*
  114 T.C. 533 (2000) ....................................................................... 61

*Schafer v. Helvering,*
  299 U.S. 171 (1936) ....................................................................... 51

*Schiff v. United States,*
  942 F.2d 348 (6th Cir. 1991) ........................................................ 31

*Serot v. Commissioner,*
  T.C. Memo. 1994-532, 1994 WL 579941,
  *aff'd*, 74 F.3d 1227 (3d Cir. 1995) ............................................... 29

*Shea v. Commissioner,*
  112 T.C. 183 (1999) ....................................................................... 45

*Springfield vs. United States,*
  88 F.3d 750 (9th Cir. 1996) .......................................................... 62

**Cases (cont'd):**                                                               **Page(s)**

*Stange v. United States,*
    282 U.S. 270 (1931) .................................................................. 66

*Trans-Atl. Co. v. Commissioner,*
    469 F.2d 1189 (3d Cir. 1972) ................................................ 29

*Trest v. Cain,*
    522 U.S. 87 (1997) .................................................................. 77

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,*
    508 U.S. 439 (1993) ................................................................ 77

*United States v. Boyle,*
    469 U.S. 241 (1985) ........................................................ 71-73

*United States v. Hodgekins,*
    28 F.3d 610 (7th Cir. 1994) .................................................. 70

*United States v. Hoffecker,*
    530 F.3d 137 (3d Cir. 2008), *superseded on other
    grounds, Rad v. Att'y Gen. United States*, 983 F.3d 651
    (3d Cir. 2020) ........................................................................ 35

*United States v. Penn,*
    870 F.3d 164 (3d Cir. 2017)............................................ 26, 68

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ................................................................ 76

*United States v. Wood,*
    943 F.2d 1048 (9th Cir. 1991) .............................................. 23

*White v. Samsung Elecs. Am., Inc.,*
    61 F.4th 334 (3d Cir. 2023) .................................................. 69

**Statutes:**

Internal Revenue Code (26 U.S.C.):

    § 166 ............................................................................................ 29
    § 475 .......................................... 10, 13, 37, 46, 48, 51-53, 55-57, 59
    § 475(a) .......................................................................... 2, 46, 48
    § 475(a)(2) ...................................................................... 46-47
    § 475(b)(1) ........................................................................ 47, 54-57
    § 475(b)(1)(A) .................................................................. 47, 54-56
    § 475(b)(1)(B) .................................................................. 47, 54-56

**Statutes (cont'd):**                                            **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 475(b)(1)(B) ............................................................... 47, 54-56
§ 475(b)(1)(B)(i) ................................................................... 51
§ 475(b)(1)(C) ....................................................................... 54, 56
§ 475(b)(2) .............................................. 13, 47, 49, 54-58
§ 475(c)(1) .............................................. 12, 35, 48, 51
§ 475(c)(1)(A) ....................................................... 12, 49-53
§ 475(c)(1)(B) ....................................................... 49-50, 53
§ 475(c)(2) ............................................................................. 48
§ 475(c)(2)(A) ........................................................................ 48
§ 475(c)(2)(C) ................................................................. 47-48, 51
§ 475(c)(2)(E) ........................................................................ 48
§ 475(d)(3)(A) ....................................................................... 47
§ 701 ..................................................................................... 15
§ 731(c) ................................................................................. 26
§ 864 ............................................................. 16-17, 36, 48
§ 864(b) ............................................ 2, 11, 15-16, 18-19, 26
§ 864(b)(1) ............................................................................ 43
§ 864(b)(2) .................................................... 16, 33, 36
§ 864(b)(2)(A) .................................................... 10, 34-35
§ 864(b)(2)(A)(i) .............................. 33-34, 37-38, 40-41
§ 864(b)(2)(A)(ii) .................................... 33-35, 41
§ 864(b)(2)(C) ....................................................................... 40
§ 864(c) .................................................................... 13, 59
§ 881(a) ................................................................................. 16
§ 1221 ....................................................................... 51, 54
§ 1221(a)(1) .............................................................. 41, 51
§ 1441-64 .............................................................................. 16
§ 1446 ................................. 2, 7-11, 13, 43, 58, 60-64, 67-70, 74
§ 1446(a) ..................................................................... 58, 68
§ 1446(a)(1) ........................................................................... 15
§ 1446(a)(2) ........................................................................... 15
§ 1446(c) ................................................................... 15, 38, 58
§ 1461 ................................................................................... 15
§ 6011 ................................................................................... 62

**Statutes (cont'd):**                                                    **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 6031(a) ............................................................................... 62

§ 6221-6233 ......................................................................... 69

§ 6226(a) ................................................................................. 1

§ 6226(f) ................................................................................. 1

§ 6226(g) ................................................................................. 1

§ 6229 .................................................................................... 60

§ 6229(a) ............................................................................... 69

§ 6229(b) ....................................................................... 61, 66

§ 6231(a)(2) .......................................................................... 67

§ 6501 .................................................................................... 61

§ 6501(a) ........................................................................59-61

§ 6501(c)(3) .......................................................................... 61

§ 6501(c)(4) .......................................................................... 61

§ 6651 ................................................................ 14, 71-72, 74

§ 6651(a)(1) ............................................................. 8, 11, 72

§ 6651(a)(2) ............................................................. 8, 11, 72

§ 6655 ...................................................................................... 8

§ 7482 ...................................................................................... 2

§ 7491 .................................................................................... 42

§ 7491(c) ............................................................................... 72

28 U.S.C. §2111 .............................................................43-44

Revenue Act of 1932 § 23(a) ........................................... 16

**Regulations and Regulatory Materials:**

Treasury Regulations (26 C.F.R.):

§ 1.263(a)-5(e) ...................................................................... 26

§ 1.263(a)-5(e) ...................................................................... 26

§ 1.475(b)-1(a) ...................................................................... 47

§ 1.475(b)-2(a) ................................................................56, 58

## Regulations and Regulatory Materials (cont'd):          Page(s)

Treasury Regulations (26 C.F.R.) (cont'd):

§ 1.475(c)-1(a)........................................................49-50
§ 1.475(c)-(1)(a)(2)....................................................49
§ 1.475(c)-1(a)(2)(i)...................................................49
§ 1.475(c)-1(a)(2)(ii)..................................................53
§ 1.475(c)-1(c)(1)(i)...................................................51
§ 1.731-2(e)(3)(i).....................................................26-27
§ 1.864-2(a)...........................................................36
§ 1.864-2(c)...........................................................36
§ 1.864-2(c)(1)........................................................37
§ 1.864-2(c)(2)(i)(c)...............................................33-34, 37
§ 1.864-2(c)(2)(iv)..................................................41, 48
§ 1.864-2(e)...........................................................16
§ 1.864-7..............................................................38
§ 1.864-7(d)(3)........................................................38
§ 1.864-7(d)(3)(iii)................................................38, 40
§ 1.1446-1(a)..........................................................15
§ 1.1446-3(d)(1)(iii)..................................................61
§ 1.1446-3(e)..........................................................15

IRS CCA 201501013 (Jan. 2, 2015)......................................15

Rev. Rul. 97-39, 1997-2 C.B. 62.......................................56

## Rules:

Federal Rules of Appellate Procedure:
13(a)(1)(A)............................................................2

Tax Court Rules:
142(a)............................................................17, 42, 44

**Miscellaneous:** **Page(s)**

H.R. Rep. No. 103-111 (1993) ............................................. 57

New York State Bar Ass'n Tax Section, *Report on Certain Fees*, Rept. 1500 (Sep. 13, 2024)..................................... 25

Restatement (Third) of Agency § 1.01 .......................... 17-18

-xiii-

# GLOSSARY

| Abbreviation | Definition |
| --- | --- |
| Commissioner | Commissioner of Internal Revenue |
| Cornell | Cornell Capital Partners, LP, predecessor to YA Global |
| I.R.C. | Internal Revenue Code (26 U.S.C. |
| Petitioners | YA Global Investments, LP, f.k.a. Cornell Capital Partners, LP; Yorkville Advisors, LLC, tax matters partner; Yorkville Advisors, GP LLC, tax matters partner |
| TEFRA | Tax Equity and Fiscal Responsibility Act, Pub. L. No. 97-248, § 402, 96 Stat. 324, *codified at* 26 U.S.C. §§ 6221-6234 (2000), *repealed by* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101, 129 Stat. 584, 625 (repeal effective for partnership taxable years beginning after 2017) |
| Treas. Reg. | Treasury Regulations (26 C.F.R.) |
| YA Global | YA Global Investments, LP, formerly known as Cornell Capital Partners, LP |
| Yorkville | Yorkville Advisors, LLC, tax matters partner of YA Global for the 2006 tax year, general partner of YA Global in 2006 and early 2007, and investment manager of YA Global during the tax years at issue |
| Yorkville GP | Yorkville Advisors GP, LLC, tax matters partner of YA Global for the 2007 through 2011 tax years and general partner of YA Global from early 2007 through 2011 |

-1-

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

On March 6, 2015, the Commissioner of Internal Revenue issued

to YA Global Investments, LP ("YA Global"), notices of final partnership

administrative adjustment ("FPAAs") for the 2006-2009 tax years.

(JA1178-1248.)[1]  On June 24, 2015, Yorkville Advisors, LLC and

Yorkville Advisors, GP LLC (collectively, "petitioners"), YA Global's tax

matters partners during the relevant tax years, filed a timely petition

(subsequently amended) in Tax Court seeking redetermination of the

adjustments.  (JA1615-55.)  *See* I.R.C. §6226(a) (2015).  The Tax Court

had jurisdiction pursuant to I.R.C. §§6226(f) (2015) and 7442.

On February 6, 2025, the Tax Court issued a decision upholding

most of the adjustments in the FPAAs.  (JA5-12.)  The decision resolved

all issues as to all parties and was final and appealable.  *See* I.R.C.

§6226(g).  On April 17, 2025, petitioners timely filed a notice of appeal.

---

[1] "JA" refers to the joint appendix filed by petitioners.  "SA" refers to the supplemental appendix submitted by the Commissioner.  "Br." refers to petitioners' opening brief.

Unless otherwise indicated, statutory and regulatory references are to the Internal Revenue Code of 1986 (26 U.S.C.) ("I.R.C." or "the Code") and Treasury Regulations (26 C.F.R.) ("Treas. Reg."), respectively, in effect during the time in question.

(JA1-4.)  Fed. R. App. P. 13(a)(1)(A).   This Court has jurisdiction pursuant to 26 U.S.C. §7482.

## STATEMENT OF THE ISSUES

1.    Whether the Tax Court correctly held that YA Global was engaged in a U.S. trade or business within the meaning of I.R.C. §864(b) during tax years 2006-2009 and, consequently, that it was liable for withholding tax under I.R.C. §1446 on the portion of its taxable income effectively connected with that trade or business allocable to foreign partners.

2.    Whether YA Global was a dealer in securities under I.R.C. §475(a).

3.    Whether the FPAAs were timely issued.

4.    Whether petitioners failed to establish reasonable cause for their failure to timely file required returns and timely pay taxes owed.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel for the Commissioner is unaware of any related cases or proceedings.

## STATEMENT OF THE CASE

In March 2015, the Commissioner issued FPAAs adjusting partnership items reported by YA Global for tax years 2006-2009.

Petitioners challenged the FPAAs in Tax Court.  The Tax Court issued a decision upholding most of the adjustments.  (JA5-12; *see also* JA13-145, JA146-96 (opinions)).  Petitioners appeal the decision as it relates to tax years 2006-2009.

## A.    Factual Background

### 1.    YA Global and Yorkville Advisors

YA Global (formerly Cornell Capital Partners, L.P. ("Cornell")),[2] was formed as a Delaware limited partnership in 2001 and, in January 2007, registered as a Cayman Islands limited partnership.  (JA201 ¶6.) YA Global was treated as a partnership for tax years 2006-2011. (JA198 ¶1.)

Until January 14, 2007, Yorkville Advisors, LLC ("Yorkville"), a Delaware company, was YA Global's sole general partner, and also was YA Global's tax matters partner for the 2006 tax year.  (JA202 ¶8.) Yorkville was YA Global's investment manager throughout tax years 2006-2011.  (JA2364.)

---

[2] We refer to YA Global unless the context requires referring to Cornell.

On January 15, 2007, Yorkville Advisors GP, LLC ("Yorkville GP"), a Delaware company, became YA Global's sole general partner and was its tax matters partner for tax years 2007-2011.  (JA202 ¶9.)

### 2.   2005 and 2007 investment management agreements

In a 2005 Amended and Restated Investment Management Agreement ("2005 Agreement"), YA Global retained Yorkville to manage its securities investment account.  (JA1407 §1.)  In August 2007, YA Global and Yorkville entered into a substantially similar amended agreement ("2007 Agreement").  (JA1417 §1.)

In both agreements, YA Global granted Yorkville broad authority to act on its behalf relating to its account and granted "full power and authority to do and perform every act necessary and proper to be done in the exercise of the foregoing powers as fully as [YA Global] might or could do personally."  (JA1407-08 §§1-2; JA1417-20 §§1-2.)  YA Global retained authority to "advise the Investment Manager of any specific investment restrictions relating to the Account."  (JA1408 §3; JA1420 §3.)

Yorkville was compensated based on a percentage of YA Global's assets and its profits.  (JA1408-10 §§4-5; JA2240.)  Under both

agreements, Yorkville would receive compensation from YA Global's investment portfolio ("portfolio companies") in the form of fees, including due diligence, structuring, and commitment fees.  (JA1408 §4(a), (d), §5; JA1420 §4(a).)  The fees could be paid in cash, stock, or other forms of compensation.  (JA1410 §5, JA1420 §4(a).)

### 3.    Yorkville's activities on YA Global's behalf

YA Global provided funding to portfolio companies through several financing structures, which Yorkville developed and directly negotiated on YA Global's behalf.  (SA63.)  YA Global and Yorkville claimed a "competitive edge" of identifying, sourcing, negotiating, structuring, and managing transactions and conducting due diligence for the transactions.  (SA56, SA60-61, SA67.)

Through Standby Equity Distribution Agreements ("SEDAs"), portfolio companies had the right to sell stock to YA Global through periodic draw-downs over a fixed period.  (JA1457.)  YA Global purchased the stock at a discount, sold it to the public at market price, and generally earned a spread on each share sold, plus fees from the portfolio company.  (JA1457.)  Marketing materials and due diligence questionnaires to investors stated that SEDAs carried little or no

market risk, typically did not require significant capital, and generated "business type income." (SA63; *see* SA18, SA34, SA65.)

YA Global lent money to portfolio companies through convertible debentures or promissory notes. With convertible debentures, YA Global had the right to convert outstanding principal on the loan and interest into shares of common stock of the company under certain conditions, acquiring the shares at a discount. (JA1458; SA72, SA21; *see* JA27-29.)

Yorkville typically received due diligence, structuring, and commitment fees from portfolio companies. (JA29, JA1325 §2.8, JA1410 §5, JA1420 §4, JA1462-63.) Due diligence fees are non-refundable and cover the cost of evaluating proposed transactions; structuring fees pay for various professional services performed by Yorkville or third parties. (JA1386 §2.8(b).) Generally, Yorkville received the cash portion of fees and remitted the excess to YA Global after paying expenses. (JA 1325, JA1445, JA4315.) YA Global received non-cash portions of fees, e.g., a portfolio company's securities. (JA1325, JA1420 §4(a).) With a SEDA, portfolio companies typically paid structuring and commitment fees upon execution, additional

structuring fees upon each funds advance, and warrants allowing YA Global to purchase additional stock at a set price. (JA27; JA4659 §12.4; JA4166 ¶66.) With convertible debentures, portfolio companies paid structuring and transactional fees and one-time "[b]anker's fee[s]," and issued warrants to YA Global. (JA28, JA2796, JA3366-67, SA7.)

During tax years 2006-2011, YA Global entered into 126 SEDAs, acquired 481 convertible debentures, and acquired over 200 promissory notes. (SA75-76 ¶¶148, 254; SA77-78 ¶¶319-25; SA92-93 ¶¶148, 254; SA94 ¶¶319-25.)

### 4.    YA Global's returns

YA Global filed Forms 1065 (U.S. Return of Partnership Income) for tax years 2006-2011. (JA198-99 ¶2; JA215-1177.) On Schedule K-1s submitted with the Forms 1065, YA Global stated that it was not engaged in a U.S. trade or business. (JA240, JA635, JA978.) YA Global did not file Forms 8804 (Annual Return for Partnership Withholding Tax (Section 1446)) for the relevant tax years. (JA199 ¶3.)

YA Global's tax matters partner and the Commissioner executed several Forms 872–P (Consent to Extend the Time to Assess Tax Attributable to Partnership Items) for each of the relevant tax years,

agreeing to extend until March 31, 2015, the limitation period for

assessing "any federal income tax attributable to the partnership items

of the partnership ... against any partner." (JA203-11 ¶¶14, 18, 22;

JA1515-28 (2006), JA1563-72 (2007), JA1603-08 (2008).)

### 5.    The FPAAs

On March 6, 2015, the Commissioner issued FPAAs for 2006-2009

determining that YA Global had net ordinary business income

effectively connected to a U.S. trade or business and, therefore, was

liable for withholding tax under §1446 for the portion of that income

allocable to foreign partners. (JA1178-96, JA1197-1212, JA1213-1231,

JA1232-48.)[3] The FPAAs also determined that YA Global was liable for

failure-to-file and failure-to-pay additions to tax (I.R.C. §6651(a)(1), (2))

and failure to pay estimated taxes (I.R.C. §6655). The Commissioner

later conceded other penalties asserted in the FPAAs. (JA17-18.)

---

[3] The Commissioner issued FPAAs for the partnership's 2010 and
2011 taxable years but made no adjustments. (JA200 ¶5; JA12 n.1.)
The parties stipulated that, if YA Global engaged in a U.S. trade or
business in 2006-2009, it also engaged in that U.S. trade or business in
2010-2011. (JA4161 ¶¶54-55.)

### 6.    Tax Court proceedings

YA Global's tax matters partners challenged the FPAAs in Tax Court.  (JA1615-55.)  In 2018, the Tax Court held that liability stemming from a partnership's duty to withhold tax under §1446 was a partnership item properly before the court in this proceeding.  (JA86, JA108.)  Petitioners do not appeal that holding.

After a trial (JA2184-4138) and multiple rounds of briefing, the Tax Court issued an opinion holding that YA Global was engaged in a U.S. trade or business during tax years 2006-2008 and that its taxable income was effectively connected to that business.  (JA13-145.) Accordingly, YA Global was liable for paying withholding tax under §1446 on the portion of its income allocable to foreign partners.  (JA74-75, JA5-12.)

Although it did not have its own employees, YA Global engaged in a U.S. trade or business if Yorkville's activities are attributable to it. (JA19.)  The Tax Court found that Yorkville's activities were attributable to YA Global because they had an agency relationship. (JA22-26.)

-10-

The court also held that YA Global engaged in a U.S. trade or business because Yorkville's activities on its behalf were sufficiently continuous and regular, and it engaged in these activities primarily to generate profit.  (JA40-41.)  The court also concluded that neither a judicially-created exception for activities limited to investment nor two trading safe harbors in I.R.C. §864(b)(2)(A) applied.  (JA41-48.)

The Tax Court determined that YA Global was a "dealer in securities" under I.R.C. §475 and, therefore, must recognize gain and loss on its securities based on their fair market value at the end of the year, and must treat such gains and losses as ordinary income or loss under the mark-to-market accounting rules.  (JA50-63.)  It also concluded that all of YA Global's taxable income was effectively connected to its U.S. business for purposes of §1446.  (JA63-75.)

The Tax Court found that the 2006 and 2007 FPAAs were timely issued because YA Global failed to file required Forms 8804 and, thus, the assessment limitations period never commenced.  It alternatively found that YA Global's tax matters partners and the Commissioner agreed to extend the assessment period.  (JA85-110.)

The court sustained failure-to-file and failure-to-pay additions to tax under §6651(a)(1) and (a)(2), rejecting YA Global's claim of reasonable cause.  (JA110-45.)

The Tax Court subsequently issued an opinion holding, *inter alia*, that YA Global was liable for §1446 withholding tax for tax year 2009 for the same reasons as in tax years 2006-2008.  (JA146-96.)  It then issued a decision determining YA Global's liabilities for all years.  (JA5-12.)

## SUMMARY OF ARGUMENT

Under §1446, a partnership must pay, and is liable for, a withholding tax on the portion of its taxable income that is effectively connected to a U.S. trade or business and allocable to foreign partners. The Tax Court correctly held that YA Global was liable for that withholding tax for the 2006-2009 tax years.  It further correctly held that the FPAAs were timely issued, and upheld the imposition of failure-to-file and failure-to-pay additions to tax.

1.a.   The Tax Court correctly determined that YA Global was engaged in a U.S. trade or business under §864(b), which applies for purposes of §1446.  The court properly attributed Yorkville's activities

to YA Global, which retained sufficient control of Yorkville to create an agency relationship. Yorkville's activities on YA Global's behalf constituted a U.S. trade or business because they were continuous and regular and primarily directed at income or profit. The court reasonably determined that YA Global did not qualify for the judicially-created exception for purely investment activities, and that statutory safe harbors do not apply because YA Global was not a trader in securities. Petitioners waived any arguments regarding the safe harbors, which do not apply in any event because the portfolio companies paid Yorkville and YA Global for services and benefits beyond the use of capital.

b.    The Tax Court correctly determined that the amount of YA Global's taxable income for 2006-2009 was subject to adjustment under the mark-to-market accounting rules because it was a "dealer in securities" under I.R.C. §475(c)(1). As relevant here, under §475(c)(1)(A) a dealer in securities is a taxpayer who "regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business." The Tax Court reasonably concluded that a dealer's customers are "those with whom the taxpayer

does what it 'regularly holds itself out' to do." (JA58 (citation omitted).)
Because YA Global (through Yorkville) regularly held itself out as
willing to purchase stock and debt securities from portfolio companies,
YA Global was a dealer in securities under §475. In all events, YA
Global's portfolio companies are the "customers" of YA Global's business
activities. No exception to applying the mark-to-market rules applied
because YA Global failed to clearly identify the securities as held for
investment, as required by §475(b)(2).

c.     Finally, all of YA Global's income was effectively-connected
with its U.S. trade or business. Making no argument pursuant to
§864(c) regarding effectively connected income in the Tax Court,
petitioners failed to carry their burden of showing otherwise.

2.     The Commissioner timely issued the 2006 and 2007 FPAAs.
Because YA Global never filed required Forms 8804 returns, the Tax
Court held the assessment limitations periods never commenced. The
Forms 1065 filed by YA Global, which denied material elements of
§1446 liability, did not show the facts on which that liability would be
predicated. Moreover, the assessment limitations period remained open

when the FPAAs were issued because YA Global and the Commissioner agreed in writing to extend the time for assessment.

3.     The Tax Court correctly sustained §6651 penalties. Petitioners seek to rely on advice that it received from its accountants to establish reasonable cause for their failures to timely file required returns and to pay taxes owed.  Because the record was silent regarding when YA Global became aware that its advisor's advice may have been negligent, petitioners failed to carry their burden on an issue they conceded was "critical" to its defense.

## ARGUMENT

## I.

## The Tax Court correctly upheld the Commissioner's liability determinations

### Statement of the standard or scope of review

This Court reviews the Tax Court's legal conclusions de novo and its factual findings for clear error.  *Anderson v. Commissioner*, 698 F.3d 160, 164 (3d Cir. 2012).  Whether a taxpayer is engaged in a trade or business is a question of fact reviewable for clear error.  *Commissioner v. Groetzinger*, 480 U.S. 23, 36 (1997).

## A.     YA Global was engaged in a U.S. trade or business

### 1.     Legal background

Although generally not subject to U.S. tax on its income, I.R.C. §701, a partnership must pay, and is liable for, withholding tax on the portion of any "effectively connected taxable income" allocable to a foreign partner.[4]  I.R.C. §1446(a)(1)-(2).  "'[E]ffectively connected taxable income' means the taxable income of the partnership which is effectively connected (or treated as effectively connected) with the conduct of a trade or business in the United States," computed with certain adjustments (not relevant here).  I.R.C. §1446(c); Treas. Reg. §§1.1446-1(a), 1.1446-3(e).  The partnership is directly liable for the taxes if it fails to withhold them on income allocable to foreign partners. I.R.C. §1461.

Neither the Code nor regulations provide a comprehensive definition of the term "trade or business [with]in the United States." I.R.C. §864(b), however, provides that "the term 'trade or business within the United States' includes the performance of personal services

---

[4] Petitioners waive any challenge to the holding regarding amounts allocable to foreign partners by not addressing it in their brief. (JA75-85.)  *Bradley v. Att'y Gen.*, 603 F.3d 235, 243 n.8 (3d Cir. 2010).

within the United States," and excludes (as relevant here) "[t]rading in stocks or securities," I.R.C. § 864(b)(2).  *See* Part I.A.3.d, *infra*.[5] Otherwise, the U.S.-trade-or-business determination under §864(b) is made based on each case's facts and circumstances.  Treas. Reg. §1.864-2(e); *Lewenhaupt v. Commissioner*, 20 T.C. 151, 162 (1953), *aff'd*, 221 F.2d 227 (9th Cir. 1955).  In general, a person engages in a U.S. trade or business if its activities are continuous, regular, and primarily directed at income or profit.  *Groetzinger*, 480 U.S. at 35; *Lewenhaupt*, 20 T.C. at 162 (interpreting statutory predecessor of §§864 and 881(a)).

*Groetzinger* recognized an exception to that rule for taxpayers whose activities are limited to investment.  480 U.S. at 30.  The Supreme Court accepted "that full-time market activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business' [in § 23(a) of the Revenue Act of 1932] and that salaries and other expenses incident to the operation are not deductible as having been paid or incurred in a trade or business."  *Id.*

---

[5] Section 864(b) applies "for purposes of . . . chapter 3" of the Code, which includes the I.R.C. §§1441-64 withholding rules.  (JA32 n.18.)

The Commissioner's determinations in FPAAs are presumed
correct; the petitioner has the burden of proving otherwise.  Tax Court
R. 142(a); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485
(2013).  (*See* Br. 32 n.6.)

### 2.    Yorkville's activities are attributable to YA Global

Although YA Global had no employees, it engaged in a U.S. trade
or business under §864 because Yorkville's activities were attributable
to it.  (JA19.)  The Tax Court concluded that Yorkville and YA Global
had an agency relationship, such that Yorkville's activities on behalf of
YA Global are attributable to the partnership for purposes of §864.
(JA25-26.)  Whether an agency relationship exists is a "fact-intensive
inquiry."  *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber &
Resin Intermediates, S.A.S.*, 269 F.3d 187, 198-99 (3d Cir. 2001).

Under Restatement (Third) of Agency § 1.01 ("Restatement"),
agency requires mutual assent that the agent act on behalf of the
principal and subject to the principal's control.  In Sections 1 and 2 of
both agreements, YA Global granted Yorkville authority to engage in a
broad range of activities related to its account.  (JA20; JA1407-08;
JA1417-20.)  Further, the Tax Court correctly held that YA Global had

sufficient control over Yorkville under the Restatement because Section

3 of the Agreements granted YA Global the right to advise Yorkville of

"specific investment restrictions relating to the account" (JA1408,

JA1420), which constituted the "right to give interim instructions or

directions to the agent once their relationship is established."

Restatement §1.01 cmt. f.  (JA23-24; *see also* JA1411 §6(a)(ii), JA1423

§10(a)(ii) (referring to restrictions that "have been or may be disclosed"

by YA Global to Yorkville Advisors "as contemplated by Section 3"))

Restatement §3.12 cmt. b.[6]

---

[6] The Commissioner argued below for a different standard for agency, which the Tax Court declined to apply.  (JA22, JA23 n.8.)  In general, for §864(b) purposes, agency can arise where a person is interacting with other parties on the taxpayer's behalf or for the taxpayer's account, in whole or part, to provide an economic benefit to the taxpayer (i.e., not solely for the agent's benefit).  *See, e.g., De Amodio v. Commissioner*, 34 T.C. 894, 906 (1960), aff'd, 299 F.2d 623 (3d Cir. 1962); *Lewenhaupt*, 20 T.C. at 163.  This prevents a taxpayer from avoiding U.S. tax simply by using local agents.  *See, e.g., Adda v. Commissioner*, 10 T.C. 273, 277-78 (1948), *aff'd*, 171 F.2d 457 (4th Cir. 1948) (per curiam).  Courts have held that a person granted authority to manage a nonresident's assets and to enter into transactions with third parties on the nonresident's behalf is an agent of that nonresident, even where the principal did not control the agent's conduct.  *Id.*; *Lewenhaupt*, 20 T.C. 151 at 153, 163.  Here, because YA Global retained sufficient control over Yorkville to create an agency relationship under the Restatement, Yorkville's activities therefore are properly attributable to it under either standard.

On appeal, petitioners largely abandon their argument that Yorkville's activities were not attributable to YA Global, only challenging (Br. 42-43) the Tax Court's holding on the ground that any provision of "personal services" by Yorkville to the portfolio companies fell outside the authority granted in the 2005 and 2007 Agreements. They therefore waived all other challenges to that holding.  (JA19-26.) *Bradley*, 603 F.3d at 243 n.8.  Although I.R.C. §864(b) contains a *per se* rule regarding "personal services," *see supra* pp. 15-16, the Tax Court did not explicitly rely on that rule in holding that YA Global engaged in a U.S. trade or business.[7]  Moreover, petitioners did not argue below that, if Yorkville was YA Global's agent, any personal services fell outside the scope of the agency relationship.  (Br. 43.)

In any event, the activities petitioners identify as "personal services"— "negotiating deals, engaging in due diligence, structuring

---

[7] The Tax Court also did not rely on the Commissioner's argument that YA Global engaged in a U.S. trade or business because it provided lending and underwriting services. *See generally Burbank Liquidating Corp. v. Commissioner*, 39 T.C. 999 (1963) (bank provided services, not just money, to customers when it originated loans).  If this Court were to disagree with the Tax Court's reasoning, it should remand for a determination whether YA Global engaged in a U.S. trade or business under these alternative grounds.

transactions, etc." (Br. 58; Br. 21, 30)—fall within the scope of the agency relationship under the 2005 and 2007 Agreements.  YA Global granted Yorkville authority to engage in a broad range of activities related to its account.  (JA1407, JA1417-20.)  As the Tax Court found (JA20), Section 2 of the agreements provides that, in order for Yorkville to "exercise fully its discretion and authority as provided in Section 1," YA Global "constitute[d] and appoint[ed]" Yorkville as its "Agent and attorney-in-fact with full power to buy, sell, and otherwise deal in Securities and contracts relating to same for the Account."  (JA1407-08, JA1420.)  Both agreements expressly address due diligence, structuring, and commitment fees paid by portfolio companies to Yorkville and YA Global.  (JA1410 §5; JA1420 §4.)  These provisions establish that both parties understood these activities to be within the scope of Yorkville's authority as YA Global's agent.  If Yorkville performed those services solely in furtherance of its own business—and not on behalf of YA Global, there would be no reason to pay any fees to YA Global.   Yet Yorkville *did* pay over part of the fees to YA Global.  (JA1445.)

### 3.   YA Global engaged in a U.S. trade or business and is not subject to any exception

#### a.   YA Global, through Yorkville, engaged in continuous, regular, profit-making activities beyond simple investment

The Tax Court correctly held that Yorkville's activities on behalf of YA Global were continuous, regular, and directed at income or profit. (JA41.)  During the relevant timeframe, Yorkville devoted numerous employees to work for YA Global, which intended to generate profits through those activities.  (JA30; JA1441; SA38.)  Petitioners did not dispute in Tax Court that YA Global's activities were sufficiently continuous, regular, and profit-oriented, waiving any challenge to that determination.  *Lloyd v. HOVENSA*, 369 F.3d 263, 272–73 (3d Cir. 2004). (JA41.)

YA Global did not qualify for the investment exception in *Groetzinger*, 480 U.S. at 30, because its activities, through Yorkville, were not limited to investment.  As the Tax Court found, the record did not support petitioners' claim that fees paid by portfolio companies were simply additional payments for the use of capital.  (JA41.)

Indeed, YA Global and Yorkville received fee income from portfolio companies beyond returns on capital.  The portfolio companies paid at

least market rates for capital provided by YA Global, but also paid fees for Yorkville's activities in identifying, sourcing, and negotiating transactions, conducting due diligence, and structuring and managing transactions.  (JA42-43.)  Typically, Yorkville received cash fees, and YA Global received non-cash fees.  (JA29; *see* JA1325 §2.8; JA1410 §5; JA1420 §4; JA1462-63; JA4296; JA4315.)  A SEDA typically required the portfolio company to pay Yorkville and YA Global fees upon execution, and additional fees upon each advance of funds.  (JA27; JA4659 §12.4.)  The Tax Court correctly concluded that payment of certain fees did not depend on YA Global putting capital at risk because those fees were payable upon execution of the SEDAs, before any advances.  (JA41.)

Portfolio companies also paid fees in connection with at least some convertible debenture transactions.  (JA28.)  Kevin Kreisler testified that his company paid transaction and structuring fees when it issued convertible debentures to YA Global.  (JA28, JA3367.)  Yorkville described convertible debentures as involving a one-time "[b]anker's fee," plus "warrant coverage" and interest.  (JA28, SA7.)

Further, under the 2007 Partnership Agreement, certain cash fees "may be used to pay the salaries or other compensation of employees of [Yorkville] who perform the due diligence, structuring, and/or monitoring services for which the Fees From Portfolio Companies are paid." (JA1386.) A 2006 Private Placement Memo stated that a portion of structuring fees were paid to attorneys employed by Yorkville "in exchange for structuring transactions." (JA4315.)

On this record, the Tax Court reasonably concluded that payment of fees to Yorkville indicated that the companies received value from Yorkville "above and beyond the capital they received from YA Global." (JA42.) As the court found, if the fees were simply compensation for additional capital, the fees "should have been paid entirely to YA Global," which provided the capital. (JA41-42.)

Moreover, Yorkville's activities on behalf of YA Global can be "meaningfully distinguished from those of a typical investor." (JA44.) "[A]n investor 'makes purchases for capital appreciation and income' and, unlike a trader, 'usually does so without regard to short-term developments that would influence prices on the daily market.'" *United States v. Wood*, 943 F.2d 1048, 1052 (9th Cir. 1991) (citation omitted).

But where a capital provider arranges and structures transactions, the issuer "realizes a benefit beyond the receipt of capital" and reasonably pays for that benefit.  (JA44.)

That is what happened here.  "YA Global's mere showing up on a portfolio company's doorstep with capital in hand would not have allowed the company to use that capital in its business.  More had to be done."  (JA44.)  That "something more ... was done by Yorkville." (JA44.)  Indeed, Yorkville touted to potential YA Global investors that Yorkville had a competitive "edge" as a one-stop shop for identifying, sourcing, negotiating, performing due diligence on, structuring, and managing deals through which companies received capital.  (JA30; SA67; SA14.)  Due diligence questionnaires likewise tout YA Global's "competitive edge" based on these activities, carried out by Yorkville. (SA56, SA58, SA60-61.).

> **b.     Petitioners' claim that the portfolio
> companies paid only for capital is meritless**

Petitioners (Br. 36-37) complain that the Tax Court ignored testimony that the compensation to Yorkville and YA Global was part of the transaction costs of securing capital.  The Tax Court's determination that the portfolio companies compensated Yorkville for

"something of value ... above and beyond the capital they received from YA Global" (JA42) is a finding of fact amply supported in the record, and thus, not clear error.  (JA26-31.)  *See Groetzinger*, 480 U.S. at 36. The court was not required to expressly discredit testimony before finding other evidence persuasive.

Contrary to petitioners' assertions (Br. 37-42), the Tax Court did not hold that fees could not, for tax purposes, represent capital payments; it simply determined that, under these facts, the fees were not paid for capital.  Petitioners' cited authorities (*id.*) are inapt. Several cases involved taxpayers engaged in lending as a business, whose income therefore was treated as ordinary business income.  *See, e.g.*, *Fed. Home Loan Mortg. Corp. v. Commissioner*, 125 T.C. 248, 261-263 (2005); *Pac. First Fed. Sav. & Loan Ass'n v. Commissioner*, 79 T.C. 512, 515 (1982).  Here, petitioners seek to avoid treating their income as ordinary business income.   And the cited bar association report acknowledges that fees *can* be compensation for services.  New York State Bar Ass'n Tax Section, *Report on Certain Fees*, Rept. 1500, at 3 (Sep. 13, 2024).

Moreover, the Tax Court expressly rejected petitioners' argument below that the SEDA commitment fees were premiums for put options. (JA45-47.)  Although petitioners refer to options (Br. 37, 39), they develop no argument, and thus, waived any challenge to that holding. *See United States v. Penn*, 870 F.3d 164, 169 (3d Cir. 2017).

Petitioners (Br. 39) also rely on Treasury Regulations (not cited below) to raise an argument (not made below) that the fees here were merely "incidental" to the SEDA, convertible debenture, and promissory loan transactions.  This argument, too, is waived.  *See Lloyd,* 369 F.3d at 272-73.  The cited regulations are inapposite in any event.  Treasury Regulation §1.263(a)-5(e) denies as a current deduction expenses incurred to improve or acquire a capital asset lasting longer than a year.  But establishing that a fee is not currently deductible has no bearing on whether the taxpayer engaged in a trade or business. Treasury Regulation §1.731-2(e)(3)(i) provides that receipt of various fees will not cause an "investment partnership" to be a trade or business for purposes of I.R.C. §731(c).  Even if SEDA commitment fees are the sort of fees contemplated in that regulation, §864(b) does not contain the limitation found in that regulation.  Further, the Tax Court

did not find that mere receipt of fees established that YA Global engaged in a U.S. trade or business.  Instead, it found that, based on the terms of the SEDAs, payment of the commitment fees did not depend on YA Global putting capital at risk.  (JA41-42.)  The other fees listed in Treas. Reg. §1.731-2(e)(3)(i) are related to the purchase price of capital or are stewardship expenses, and petitioners have not shown that the fees are otherwise "customary in and incidental to any activities of the partnership" as an "investor, trader, or dealer."

Petitioners (Br. 41) also erroneously criticize the determination (JA43) that the various agreements did not need to spell out Yorkville's obligations to provide specific services to conclude that portfolio companies received benefits beyond capital.  The agreements required the companies to pay fees to Yorkville for negotiating, conducting due diligence, and structuring and managing transactions.  That was sufficient to conclude that they paid to receive benefits beyond capital.

Finally, petitioners incorrectly claim (Br. 41-42) that the fees reflected only the amount necessary to compensate YA Global for "the costs of the activities required to deploy its capital (*i.e.*, of paying Yorkville)."  Cornell represented to potential investors that structuring

and legal fees were "Revenue Centers" (SA34), generating "significant fee income from Companies" (SA24).  Indeed, revenue from cash fees were so great that, in late 2005, Yorkville began remitting excess fees to YA Global after paying expenses.  (JA1445.)  Cornell also informed investors that returns "are generated through the execution of [financing structures including SEDAS and convertible instruments], by exercising warrants, and through the collection of Investment Banking and Legal fees from Issuers." (SA10; *see also* SA24, SA33-34, SA44.)  In sum, YA Global anticipated that Yorkville's activities would generate income beyond market returns.

### c.    YA Global did not qualify for the judicial exception for purely investment activities

The Tax Court held that Yorkville's activities on behalf of YA Global were not limited to management of investments and, thus, YA Global did not qualify for the judicially-created investment exception in *Groetzinger.  See supra* pp. 21-24.

Petitioners' counterarguments fail.  They incorrectly claim (Br. 45-46) that the volatility of returns on YA Global's capital extended to portfolio companies demonstrates that it was merely an investor, appearing (Br. 43-47) to equate the terms "investor" and "invest" with

putting capital at risk.  Yet an entity that puts its capital at risk by
making loans on a regular, continuous, and substantial basis is treated
as engaged in a trade or business.  *Serot v. Commissioner*, T.C. Memo.
1994-532, 1994 WL 579941, at *9-11, *aff'd*, 74 F.3d 1227 (3d Cir. 1995)
(addressing I.R.C. §166 business bad debt deduction); *Jessup v.
Commissioner*, T.C. Memo. 1977-289, 1977 WL 3580 (same).  The Tax
Court correctly looked to the nature of the activities on YA Global's
behalf—and not to profits and losses—to determine whether it was
engaged in a U.S. trade or business.

Petitioners' claim that providing capital to "penny stock"
companies demonstrates that YA Global was only an investor also fails.
*Trans-Atl. Co. v. Commissioner*, 469 F.2d 1189 (3d Cir. 1972) (cited Br.
46-47) does not support this proposition, as it addressed the distinction
between equity investments and debt, and not whether an entity's
activities constitute a trade or business.[8]  In any event, the Tax Court
did not need to determine that YA Global's provision of capital was in
the nature of equity or debt.  It was enough for the court to find that the

---

[8] Petitioners accepted below that YA Global's promissory notes
and convertible debentures were debt, not equity, for general tax
purposes.  (SA103-04.)

activities conducted on behalf of YA Global, for which it received
compensation, were not limited to investment.

Furthermore, contrary to petitioners' claims about the allegedly
"enormous" (Br. 47) risks that it bore, the evidence regarding risk was
not one-sided.  For example, Cornell promoted itself as being able to
earn stable returns without exposure to market risk.  (*See, e.g.*, SA18,
SA21, SA24, SA34.)  Cornell also asserted that equity in any public
company "can be structured to bear little downside risk to an investor"
and claimed that it had "developed and perfected over time several
structured equity transactions which provide an inexpensive cost of
capital to an issuer, while providing significant principle [sic] protection
to the equity sponsor."  (SA44; SA49 (same), SA51 (same), SA53
(substantially similar text).)

Cornell held itself out as a specialist in dealing with thinly-traded
companies (*see* Br. 9), suggesting that risks were mitigated by its
expertise in a niche market.  (SA45, SA49, SA53.)  Even as it warned of
possible losses, Cornell emphasized that it had some control over a key
factor influencing its returns, *i.e.*, "deal flow—the number of issuers
Cornell Capital is able to attract to its financings."  (SA45.)  It

minimized concerns regarding returns in down markets, stating that "the Fund has found that companies have been attracted to Cornell Capital's structures regardless of the market environment," and that "[a] dramatic liquidity crisis in the public markets" or a "credit crunch" may "drive more issuers to Cornell Capital and in fact improve the Fund's pipeline of investments." (SA45; SA49 (same), SA54 (same).)

Contrary to Petitioners' complaint (Br. 47), the Tax Court did address YA Global's stated investment intent. (*See* JA41 n.27.) Nor did the court err in finding that the 2005 Private Placement Memo's description of YA Global's "investment objective" as achieving "superior-risk adjusted returns" simply "confirm[s] the obvious point that the partnership sought to earn positive returns for its limited partners." (JA41 n.27; *see* JA1441, JA4494).) "[C]ourts must look beyond labels and self-serving declarations when applying Federal tax law." *Schiff v. United States*, 942 F.2d 348, 352 (6th Cir. 1991) (citation omitted). And YA Global's stated intent does not change the fact that Yorkville's activities on its behalf were not limited to investments.

Finally, although petitioners (Br. 44) argue that the "nature" of YA Global's profits indicate that YA Global was solely an investor, the

cases they cite actually reinforce the correctness of the Tax Court's focus on Yorkville's activities to determine that YA Global was engaged in a U.S. trade or business. In three of the cases, there was no dispute that the taxpayer was engaged in at least one trade or business—only whether certain activities were part of a distinct, separate trade or business for purposes of an investment tax credit. *See Hub City Foods v. Commissioner*, 884 F.2d 320, 323 (7th Cir. 1989); *Mt. Mansfield Co., Inc. v. Commissioner*, 50 T.C. 798, 800-801 (1968), *aff'd*, 409 F.2d 845 (2d Cir. 1969); *Evans v. Commissioner*, 48 T.C. 704, 708 (1967), *aff'd*, 413 F.2d 1047 (9th Cir. 1969).

In *Linen Thread Co. v. Commissioner*, 14 T.C. 725, 736-37 (1950), the Tax Court held that two isolated sales and shipments of a foreign corporation's product into the United States were insufficient to show the continuity and regularity required to qualify as a trade or business within the United States. But Petitioners do not dispute that YA Global's activities through Yorkville *were* sufficiently continuous and regular. (JA32, JA41.) And as in *Hub City*, *Mt. Mansfield*, and *Evans*, the Tax Court in *Linen Thread* found that "[t]he character of the activities" of the taxpayer's U.S. office in *Linen Thread* also was

"determinative" of whether the taxpayer was engaged in a U.S. trade or business. *Id.* at 736.

### d. YA Global did not qualify for the statutory safe harbors

#### i. YA Global waived any arguments regarding the statutory safe harbors

The term "trade or business within the United States" does not include "[t]rading in stocks or securities" (1) "through a resident broker, commission agent, custodian, or other independent agent," or (2) "for the taxpayer's own account, whether by the taxpayer or his employees or through a resident broker, commission agent, custodian, or other agent," unless the taxpayer is a "dealer in stocks or securities." I.R.C. §§864(b)(2)(A)(i), (ii).[9]  For both of these safe harbor provisions, the taxpayer must be "trading in stocks or securities." *Id.*

The Tax Court held that YA Global failed to qualify for the trading safe harbor under §864(b)(2) as a threshold matter because the income YA Global earned from portfolio companies went beyond returns on invested capital, distinguishing YA Global from both investors and

---

[9] A security includes "any note, bond, debenture, or other evidence of indebtedness." Treas. Reg. §1.864-2(c)(2)(i)(c).

traders. (JA47-48.) It also held that Yorkville's activities on YA

Global's behalf for which it was compensated by portfolio companies did

not meet the regulatory definition for trading in securities. (JA48 n.33.)

Accordingly, the Tax Court did not address the more specific

requirements in §864(b)(2)(A)(i) and (ii).

Petitioners (Br. 47-50) do not adequately address the threshold

holding that YA Global was not engaged in trading in stocks or

securities for purposes of §864(b)(2)(A). (JA47-48.) Their assertion that

"[u]nder the associated Treasury Regulations, 'trading in stocks or

securities' includes a broad range of security and transaction types that

encompass all YA Global's transactions here" is conclusory, found solely

in petitioners' introduction to the statutory and regulatory scheme, and

lacks development. (Br. 48 (citing Treas. Reg. § 1.864-2(c)(2)(i)(c).)

Arguments consisting of no more than conclusory assertions are waived.

*Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997). Accordingly, this

Court need not address petitioners' specific arguments regarding

§864(b)(2)(A)(i) and (ii).

Similarly, petitioners waived any argument regarding the safe

harbor in §864(b)(2)(A)(ii), providing only two conclusory sentences:

"The Tax Court did not—and could not—determine that YA Global had a business as a dealer. This second safe harbor therefore applies, and the Fund had no USTB." (Br. 50.)[10] The Tax Court "did not ... determine" (*id.*) that YA Global was a dealer in securities under §864(b)(2)(A)(ii) because it held that YA Global was not engaged in trading in stocks or securities at all—a determination for which petitioners waived any challenge. Petitioners' entire argument regarding §864(b)(2)(A)(ii) is "skeletal" at best and is therefore waived. *United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008), *superseded on other grounds*, *Rad v. Att'y Gen. United States*, 983 F.3d 651, 668 n.13 (3d Cir. 2020).

### ii. The safe harbors do not apply in any event

#### a. YA Global was not a trader in stocks or securities for purposes of §864(b)(2)(A)

Beyond petitioners' waiver of the issue, the Tax Court's threshold holding that YA Global was not engaged in trading in stocks or securities was correct in any event. YA Global failed to qualify for the

---

[10] A footnote include in this quote (Br. 50 n.9) is irrelevant because it addresses the definition for "dealer in securities" in I.R.C. §475(c)(1).

trading safe harbor under §864(b)(2) because Yorkville's activities on behalf of YA Global were not limited to trading in stocks or securities. (JA47-48.)  Although neither §864 nor the regulations define "trading in stocks or securities," it is well-established in the tax context that "the trader's income is based not on any service he provides but rather on, precisely, fluctuations in the market value of the securities or other assets that he transacts in…." *Bielfeldt v. Commissioner*, 231 F.3d 1035, 1037 (7th Cir. 2000) (citing cases).  Yorkville and YA Global received compensation, unaffected by market fluctuations, "for benefits that went beyond the use of invested capital." (JA48.)  *See supra* pp. 21-24.

The Tax Court also correctly concluded that, even if a taxpayer need not be exclusively engaged in trading in stocks or securities to qualify for the safe harbors, YA Global still would not qualify.  For both safe harbors, Treas. Reg. §1.864-2(a) provides that being "'engaged in trade or business within the United States' does not include" trading in stocks or securities as set forth in Treas. Reg. §1.864-2(c).  In turn, the term "engaged in trade or business within the United States" does not include "effecting of transactions ... in stocks or securities," which

includes "buying, selling ... , or trading in stocks, securities, or

contracts ... for the account and risk of the taxpayer, and any other

activity closely related thereto (such as obtaining credit for the purpose

of effectuating such buying, selling, or trading)."[11]  Treas. Reg. §1.864-

2(c)(1), (c)(2)(i)(c).   The Tax Court found that Yorkville's activities in

identifying, sourcing, and negotiating transactions did not meet this

definition—in which activities are undertaken solely for the taxpayer's

benefit (JA48 n.33)—because they provided benefit to the portfolio

companies.  Further, petitioners made no argument below that the

activities for which the portfolio companies compensated Yorkville and

YA Global beyond the use of capital—*e.g.*, negotiating and structuring

the transactions and performing due diligence—were "closely related" to

buying, selling, or trading in stocks or securities.  (JA48 n.33.)

### b.    The safe harbor in §864(b)(2)(A)(i) does not apply

Moreover, YA Global does not qualify for the §864(b)(2)(A)(i) safe

harbor, which excludes from "trade or business within the United

---

[11] While YA Global is considered to have purchased securities within the meaning of §475, it did much more than that through its negotiation and structuring activities.

States" trading in stocks or securities "through a[n] ... independent agent." The Tax Court determined that Yorkville was not an "independent agent" under Treas. Reg. §1.864-7 as part of its separate discussion regarding whether YA Global's income was effectively-connected income under I.R.C. §1446(c). (JA64, JA71.)

The Tax Court properly applied *InverWorld, Inc. v. Commissioner*, T.C. Memo. 1996-301, 1996 WL 352998, at *26, to determine that Yorkville was not an independent agent under Treas. Reg. §1.864-7. *InverWorld* concluded that a U.S. subsidiary of a foreign parent was not an independent agent of its parent, and that the parent's activities therefore did not qualify for the safe harbor in §864(b)(2)(A)(i). Because the subsidiary acted "almost exclusively for one principal," it reviewed the facts and circumstances as required in Treas. Reg. §1.864-7(d)(3)(iii), holding that the subsidiary was not an independent agent. 1996 WL 352998, at *27.

The Tax Court correctly held that the Yorkville was not an "independent agent" of YA Global under §1.864-7(d)(3) and *InverWorld*. (JA71; JA67.) Contrary to petitioners' suggestion (Br. 49), the court acknowledged that an agent who acts "exclusively, or almost

exclusively" for one principal *can* be independent. (JA66.) But it correctly found no other facts or circumstances supporting independent agent status here. Yorkville devoted most of its activities to YA Global from 2006 to 2009. (JA71; *see* JA30-31.) At the beginning of 2006, Yorkville managed YA Global (Cornell) and three "affiliated funds" whose assets were "considerably smaller" than YA Global's assets. (JA30-31; *see* JA1442, JA 1464-65; SA95.) Over 93% of Yorkville's fee income in 2006, and at least 78% of its fee income in 2007, was generated by its activities for YA Global. (SA79-81 ¶¶506-11; *see* SA95-96 ¶¶506-11.) By July 2006, the affiliated funds merged into YA Global or terminated, and Yorkville devoted its activities exclusively to YA Global until April 2009. (JA31.) And as in *InverWorld*, 1996 WL 352998, at *27, the record provides no evidence that Yorkville marketed investment management services to unrelated funds. (JA71.)

Petitioners (Br. 49) fault the Tax Court for focusing on the 33-month period in which Yorkville's activities were devoted exclusively to YA Global. But even considering the entire 2006 through 2009 period, Yorkville's activities were "exclusively, or almost exclusively" devoted to YA Global during those years. *InverWorld*, 1996 WL 352998, at *27;

Treas. Reg. §1.864-7(d)(3)(iii). The Tax Court properly took into account "the facts and circumstances," as required in the regulation. (JA71.)

Yorkville's remaining arguments are irrelevant. Neither Yorkville's founding in 2001 nor its management of affiliated funds before 2006 address whether it was an independent agent in 2006-2009. (Br. 49.) The number of Yorkville's employees in 2006 (Br. 49; Br. 7-8) does not show it was an independent agent, as their activities were devoted "exclusively, or almost exclusively" to YA Global's interests in 2006-2009. Treas. Reg. §1.864-7(d)(3)(iii).

YA Global also does not qualify for the §864(b)(2)(A)(i) safe harbor because it "ha[d] an office or other fixed place of business in the United States" during each taxable year at issue "through which or by the direction of which the transactions in stocks or securities … are effected." I.R.C. §864(b)(2)(C). YA Global's (and Cornell's) "principal office" was 101 Hudson Street, Suite 3700, Jersey City, New Jersey. (JA1348 §1.2; SA4-5.) Yorkville and Yorkville Advisors GP were located at the same address. (JA1348, JA1379-80; *see also* JA1436, SA4.) Transactions were effected through that office as evidenced by transactional agreements. (*See, e.g.*, JA4603, JA4629, JA4663, JA4164-

65 ¶62, JA 4658, JA4166 ¶66; SA68-70.)  Accordingly, even if Yorkville

was an independent agent, YA Global would not qualify for the

§864(b)(2)(A)(i) safe harbor.

### c. The safe harbor in §864(b)(2)(A)(ii) does not apply

YA Global also does not qualify for the trading safe harbor in

§864(b)(2)(A)(ii). YA Global meets the classic test for being a dealer, *i.e.*,

a merchant in securities who has a better source of supply than the

people to whom it sells the securities. Treas. Reg. §1.864-2(c)(2)(iv) ("a

dealer … is a merchant … regularly engaged … in purchasing stocks or

securities and selling them to customers with a view to the gains and

profits that may be derived therefrom," but does not include "[p]ersons

who buy and sell, or hold, stocks or securities for investment or

speculation, irrespective of whether such buying or selling constitutes

… a trade or business").  YA Global used SEDAs and convertible

debentures to acquire stock in portfolio companies for resale on the

market.  In cases decided under I.R.C. § 1221(a)(1) and its statutory

predecessor, taxpayers acted as dealers where, like YA Global, they

regularly served as a middleman between the issuer of stocks or

securities and the marketplace.  *See, e.g., Kemon v. Commissioner*, 16

T.C. 1026, 1032-1033 (1951); *Dunitz v. Commissioner*, 7 T.C. 672, 685 (1946), *aff'd*, 167 F.2d 223 (6th Cir. 1948).

### e.    The Commissioner did not raise a new theory in his pre-trial brief

Finally, the Tax Court did not commit reversible error in its treatment of a purportedly new theory raised by the Commissioner.

**(1)**    Tax Court Rule 142(a) places the burden of proof on the petitioner, unless otherwise provided by statute or as determined by the Tax Court,[12] "except ... in respect to any new matter, ... and affirmative defenses, pleaded in the answer, it shall be upon the [Commissioner]." The Tax Court held that the Commissioner did not raise any new matter that would shift the burden to him.  (JA49-50.)   Petitioners (Br. 31-35) contend that the Commissioner made a new argument in his pre-trial brief that the fees paid by portfolio companies represented compensation for "personal services" performed by Yorkville within the U.S. on YA Global's behalf.  (*See* JA1697-99, JA1711-12, JA1714, JA1718-19, JA1746.)  Petitioners' claim fails.

---

[12] Petitioner did not argue below that I.R.C. §7491 shifted the burden to the Commissioner.   (JA49 n.34.)

First, this complaint is irrelevant because the Tax Court did not rely on the *per se* rule in §864(b)(1) that a taxpayer performing "personal services" within the United States is engaged in a U.S. trade or business.  Rather, the Tax Court found that Yorkville's activities on behalf of YA Global were not limited to investment for purposes of the investment exception in *Groetzinger*, such that the portfolios compensated Yorkville and YA Global for more than capital.  (JA41-49.) *See supra* pp. 21-24.

Further, the Commissioner did not raise a new theory in his pre-trial brief.  The Commissioner argued below that YA Global (through Yorkville) performed personal services *as part of its lending and underwriting business*, and not separately from YA Global's funding transactions.  (JA1711-12; SA84-85, SA86-89; *see* Br. 19, 31.)  The Commissioner informed YA Global in IRS CCA 201501013 (Jan. 2, 2015) that lending and underwriting (including fees related to those services were at issue, and, informed it in the FPAAs, that § 1446 withholding tax was at issue (*see, e.g.*, JA1189, JA1194).

Even if the Commissioner *had* raised a new theory in his pre-trial brief, petitioners (Br. 31-34) did not establish prejudice.  *See* 28 U.S.C.

§2111.  They assert (Br. 31) that they lacked a "meaningful opportunit[y] to defend themselves," but also say that "there is sufficient uncontroverted testimony in the record that portfolio companies neither sought nor received personal services from" YA Global.  (Br. 33; Br. 36.)  They double down by contending that "despite the [Commissioner's alleged] last-minute change impeding petitioners' ability to fully develop" its argument that no personal services were provided, "[t]he resulting record . . . leaves no doubt that [YA Global] was an investor with no [U.S. trade or business]."  (Br. 33-34 n.7.)  Their rejection of a remand to present additional evidence underscores the meritlessness of their argument.  (Br. 33-34 n.7.)

*Baird v. Commissioner*, 438 F.2d 490 (3d Cir. 1970), does not help petitioners.  (Br. 31-33.)  *Baird* addressed a theory raised for the first time after trial, preventing the taxpayer from providing contrary proof.  In contrast, as petitioners concede (Br. 30), they were aware of the Commissioner's theory no later than the pre-trial memo, giving them the opportunity (unlike in *Baird*) to provide counter-evidence at trial.

In any event, the Commissioner's argument relating to personal services was not a "new matter" under Rule 142(a) even if it was newly-

raised in his pre-trial brief. "'A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence,'" but not if it "'merely clarifies or develops the original determination….'" *Shea v. Commissioner*, 112 T.C. 183, 191 (1999) (citation omitted); *Greenberg v. Commissioner*, 10 F.4th 1136, 1172 (11th Cir. 2021) (same). Petitioners do not assert that different evidence was necessary, just "even more" of the same. (Br. 33.)

(2)    Petitioners erroneously assert that the Tax Court improperly required them to "prove a negative, *i.e.*, that the Fund was not engaged in *any* sort of business the Commissioner (or the Tax Court) might imagine." (Br. 34.) Petitioners acknowledged below that they had "the burden of proving a negative in these cases, *i.e.*, that YA Global was *not* engaged in a U.S. trade or business" and that they "must prove, therefore, that YA Global was *not* in the business of lending and that Yorkville was *not* YA Global's agent." (SA102.) Petitioners did not dispute that Yorkville's activities on YA Global's behalf were, in fact, continuous, regular, and directed primarily at income or profit. Accordingly, to carry its burden of demonstrating that YA Global was

not engaged in a U.S. trade or business, petitioners had to show that
YA Global qualified for the investment exception or that it satisfied one
of the statutory safe harbors.

Based on its careful review of the record in light of relevant
precedent, the Tax Court held that YA Global had not shown compelling
facts to establish that it qualified for the investment exception or either
trading safe harbor provision.  Petitioners' burden was not "impossible
to satisfy"—they just failed to satisfy it.  (Br. 31.)

## B.    YA Global was a "dealer in securities" under §475, and thus, its income was subject to the mark-to-market accounting rules

### 1.    Introduction

The Tax Court correctly held that the amount of its taxable
income for 2006-2009 was subject to adjustment under the I.R.C. §475
mark-to-market accounting rules.  (JA57-63.)  Under I.R.C. §475(a), a
"dealer in securities" must use the mark-to-market method of
accounting for its securities.  As relevant here, §475(a)(2) requires
dealers in securities to recognize gain or loss on a non-inventory
security as if the security were sold for its fair market value on the last
day of the taxable year.  In general, any gain or loss recognized under

§475(a)(2) or upon disposition of securities during the taxable year is treated as ordinary income or loss.  I.R.C. §475(d)(3)(A).

Section 475(b)(1) provides exceptions to the mark-to-market rules for "(A) any security held for investment, (B)(i) any security described in subsection (c)(2)(C) [*i.e.*, a note, bond, debenture, or other evidence of indebtedness] which is acquired (including originated) by the taxpayer in the ordinary course of a trade or business of the taxpayer and which is not held for sale, … and (C) any security which is a hedge [of certain instruments]."[13]  To qualify for one of the exceptions in §475(b)(1)(A), (B), or (C), a security must be "clearly identified as such in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe)."  I.R.C. §475(b)(2).

---

[13] "[A] security is held for investment (within the meaning of section 475(b)(1)(A)) or not held for sale (within the meaning of section 475(b)(1)(B)) if it is not held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business."  Treas. Reg. §1.475(b)-1(a).

### 2. YA Global was a "dealer in securities" for purposes of §475(a)

Section 475(c)(1) defines a "dealer in securities" as "a taxpayer who—(A) regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or (B) regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business."[14]  For purposes of §475, "security" includes "any … share of stock in a corporation," "note, bond, debenture, or other evidence of indebtedness," and warrant to acquire stock.  I.R.C. §475(c)(2)(A), (C), (E).

Petitioners did not dispute that the stock, debt instruments, and warrants YA Global held were "securities" under §475(c)(2) or that YA Global regularly purchased those securities from portfolio companies. (JA57-58.)  Petitioners contended only that YA Global was not a "dealer in securities" under §475(a) because it did not have "customers" and that, in any event, YA Global satisfied the identification requirement in

---

[14] This definition is similar, but not the same as, the definition of "dealer in securities" for purposes of §864.  *See* Treas. Reg. §1.864-2(c)(2)(iv); *see also supra* pp. 33-34, 41-42.

§475(b)(2) to except its securities from mark-to-market treatment as held for investment.  (JA6091-94, JA6121-24; SA97-99.)

"Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances."  Treas. Reg. §1.475(c)-1(a).  To determine whether the portfolio companies with which YA Global transacted were YA Global's "customers"—and therefore whether YA Global was a "dealer in securities" for purposes of §475(c)(1)(A)—the Tax Court reasonably looked to Treas. Reg. §1.475(c)-(1)(a)(2).  (JA58.)  That regulation defines a "dealer in securities" as including a taxpayer who "regularly holds itself out as being willing and able to enter into" either side of a transaction enumerated in §475(c)(1)(B), *i.e.*, to enter into specified positions in securities with customers in the ordinary course of a trade or business.  Treas. Reg. §1.475(c)-1(a)(2)(i).  The court reasonably concluded that, for purposes of §475(c)(1)(B), a taxpayer's "customers" therefore are "those with whom the taxpayer does what it 'regularly holds itself out' to do." (JA58.)  The same standard should apply in §475(c)(1)(A) because both subparagraphs similarly use the term "customers."  (JA58.)  "'[I]dentical words and phrases within the same statute should normally be given

-50-

the same meaning.'" *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d

601, 617 (3d Cir. 2015) (citation omitted).  Section 475(c)(1)(A) and (B)

differ only in the type of action the taxpayer takes with respect to

"customers in the ordinary course of a trade or business."

Reviewing the record, the Tax Court found "no doubt" (JA58) that

YA Global regularly held itself out as being willing and able to purchase

stock and debt securities from portfolio companies, as evidenced by its

activities (through Yorkville) in cultivating a reputation that led

portfolio companies to contact it directly, by introductions and referrals

it received, and by press recognition it garnered.  (JA58; *see* JA 51-52.)

Consequently, the court correctly concluded that the portfolio

companies were YA Global's customers, and YA Global therefore is a

dealer in securities under §475(c)(1)(A).  *See* Treas. Reg.  §1.475(c)-1(a).

Petitioners (Br. 53-56) contend that a taxpayer is only a "dealer in

securities" with "customers" when it is "indifferent to which side of the

transaction it is called upon to take," and that a taxpayer is not a

dealer, and their counterparties are not "customers," if they are

"selective about which transactions they engage in, when they engaged

in them, and with whom they engage."  But §475(c)(1)(A) does not

require that a dealer be "indifferent" to which side of the transaction he
participates on; a dealer need only regularly purchase securities from
"or" sell securities to customers in the ordinary course of its business.
Thus, under § 475, one can be a "buy-side" dealer without being a "sell-
side" dealer, or vice versa. Petitioners (Br. 53 & n.10) err in relying on
precedent interpreting I.R.C. § 1221[15] insofar as that precedent defines
a "dealer in securities" differently, as one who both buys and sells
securities to customers. *See, e.g.*, *Schafer v. Helvering*, 299 U.S. 171,
174 & n.1 (1936).

As one example: under §475(c)(1)(A), a taxpayer may be a dealer
in securities if it regularly originates loans (*i.e.*, the purchase of
securities) to borrowers (*i.e.*, customers) in the ordinary course of a
trade or business. Loans are securities for purposes of §475(c)(1).
I.R.C. §475(c)(2)(C). Loan origination is considered a purchase of the
security for purposes of §475. *See* I.R.C. §475(b)(1)(B)(i); Treas. Reg.
§1.475(c)-1(c)(1)(i). And loan originators generally are not "indifferent"

---

[15]  Under I.R.C. § 1221(a)(1), "property held by the taxpayer
primarily for sale to customers in the ordinary course of his trade or
business" is excluded from treatment as a capital asset, and gains or
losses produced by its sale or exchange are treated as ordinary income.

-52-

to which side of a transaction they enter or with whom they transact.

Rather, they are §475 dealers that may be very "selective about which

transactions they engage in, when they engage in them, and with whom

they engage." (Br. 54.) YA Global regularly originated loans with

portfolio companies in the ordinary course of its trade or business

through promissory notes and convertible debentures for which it

received compensation through interest income and fees. Under

§475(c)(1)(A), these loan originations are purchases of securities from

customers by YA Global.

Nor does *Bielfeldt v. Commissioner*, T.C. Memo. 1998-394, 1998

WL 774132, at *7, *aff'd*, 231 F.3d 1035 (7th Cir. 2000), stand for the

proposition that dealers are open to every potential customer. (Br. 53-

54). The opinion describes the function of "primary dealers"—*i.e.*, "the

35 to 40 firms . . . recognized as such by the Fed to deal with it directly

in the Treasury securities market," 1998 WL 774132, at *2—in a

government debt market. *See id.* at *7. That YA Global served a

narrower market does not mean that it did not "regularly hold[ ] itself

out" (JA58) to portfolio companies in that market as purchasing stocks

and debt in the ordinary course of its business under §475(c)(1)(A). The

-53-

Tax Court found that it had (JA58-59), and the record supports that finding.  (*See* pp. 49-50, *supra*.)

Finally, petitioners incorrectly claim (Br. 57-60) that almost any business could be "ensnare[d]" (Br. 58) into §475's mark-to-market rules.  Insofar as petitioners assert (Br. 58-59) that the Tax Court incorrectly held that YA Global purchased securities from customers "in the ordinary course of ... business," I.R.C. §475(c)(1)(A), it is waived as newly-raised.  *Lloyd*, 369 F.3d at 272-73.  Petitioners disputed below only that YA Global had "customers" for purposes of §475(c)(1)(A), and not that it had "regularly purchased securities ... in the ordinary course of ... business," if it engaged in a U.S. trade or business.  *See supra* pp. 48-49.

In any event, petitioners (Br. 59-60 & nn.11-12) point only to examples of an airline that purchases futures to hedge against rising fuel prices and an international company that purchases derivatives to hedge foreign currency risk.  Based on those transactions alone, the regulations addressing the dealer-customer relationship (applicable to §475(c)(1)(B)) indicate that these hypothetical taxpayers would not be dealers in securities.  *See* Treas. Reg. §1.475(c)-1(a)(2)(ii), Ex. 3.  In any

-54-

event, under the record here, YA Global's business included, *inter alia*, regularly originating loans, *i.e.*, the purchase of securities. The Tax Court therefore properly treated the portfolio companies as YA Global's customers. *See, e.g.*, *Farr v. Commissioner*, 4 B.T.A. 683, 690 (1941) (the concept of "customers" is based on the taxpayer's activities and not the vendee's characteristics for purposes of §1221's statutory predecessor).

> ### 3. The mark-to-market exceptions do not apply because YA Global did not properly identify its securities under §475(b)(2)

A dealer in securities must use the mark-to-market accounting rules for all securities, subject to exceptions in §475(b)(1). A security is eligible for these exceptions if it is held for investment, a debt not held for sale, or a hedge of certain instruments. *See* I.R.C. §475(b)(1)(A)-(C). But the exception applies only if the security is clearly and timely identified in the dealer's records. I.R.C. §475(b)(2). The Tax Court correctly held that YA Global did not satisfy the identification requirement. (JA59-62.)

"A security shall not be treated as described in subparagraph (A), (B), or (C) of paragraph (1), as the case may be, unless such security is

-55-

clearly identified in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into," or other time provided in regulations. I.R.C. §475(b)(2).  On its face, §475(b)(2) requires that the identification explicitly refer to the relevant subparagraph of §475(b)(1).

Petitioners (Br. 61) erroneously claim that the identification requirement is satisfied where the security is described as held for investment, not held for resale, or a hedge, without referring to § 475. That interpretation renders the word "being" in §475(b)(2) superfluous. *Murrin v. Commissioner*, 158 F.4th 527, 533 (3d Cir. 2025) ("[W]e must give effect, if possible, to every clause and word of a statute.") (quotation and citation omitted).  If §475(b)(2) required only that the security be "clearly identified . . . as described in such subparagraph" of §475(b)(1)—*i.e.*, without the word "being" before "described"—then that phrase arguably could be read as requiring only that the security be "clearly identified" in the same or similar way it is "described" in §475(b)(1)(A), (B), or (C).  But the term "being" in the phrase "clearly identified ... as being described in such subparagraph" changes the phrase's meaning.  Section 475(b)(2) requires that identification of the

security point to something, specifically, to "such subparagraph" of §475(b)(1) where the relevant security is "being described."

The regulations are likewise clear that merely describing the purpose for which a dealer holds a security is insufficient under §475(b)(2). (JA60-61.) Specifically, the identification must "state whether the security is described in—(1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or (2) The third subparagraph thereof (identifying a security as a hedge)." Treas. Reg. §1.475(b)-2(a). The regulation thus explains that §475(b)(2) requires "an explicit statement that a security is described in either section 475(b)(1)(A) or (B) or section 475(b)(1)(C)." (JA61.) The court's interpretation of the regulation is entirely consistent with §475(b)(2)'s requirement that the security be "clearly identified in the dealer's records as being described in such subparagraph" of §475(b)(1). It also is consistent with administrative guidance instructing that "[t]he dealer's books and records must clearly indicate ... that [the identification] is being made for purposes of §475." Rev. Rul. 97-39, 1997-2 C.B. 62, 62-63. (JA55-56.)

-57-

Legislative history identified by petitioners (Br. 62-63) does not compel a different conclusion, as it largely restates the statutory requirement in §475(b)(2) that the security be "clearly identified in the dealer's records as being described in one of the exceptions listed" in §475(b)(1).  *See* H.R. Rep. No. 103-111, at 663-64. (1993).  It does state that a security may be identified for purposes of §475(b)(2) by showing a negative, that is, "[a] security is to be treated as clearly identified in a dealer's records as being described in one of the exceptions listed above [*i.e.*, in § 475(b)(1)] if all of [the] securities of the taxpayer that are *not* so described are clearly identified in the dealer's records as *not* being described in such exception."  *Id.* at 664 n.41 (emphasis added).  Although that explanation is inconsistent with the statutory language in §475(b)(2), neither does it help petitioners.  Whether a security is identified for purposes of §475(b)(2) by positively describing it as within the exception, or because other securities were "clearly identified as not being described in such exceptions," a dealer cannot satisfy §475(b)(2) without making specific reference to §475(b)(1) in its records.

Further, the requirement that an identification must specifically refer to §475 is consistent with the temporal requirement that the

security be identified "before the close of the day on which it is acquired, originated, or entered into," or as otherwise required by regulation. I.R.C. §475(b)(2). The temporal requirement prevents dealers from using hindsight to cherry-pick the timing and character of the income recognized from a security based on whether the security increases or decreases in value. Petitioners do not challenge that point. (Br. 60-63).

Here, YA Global relies on its statements of purpose in the SEDAs that the securities were held for investment, and in the convertible debenture agreements that the securities were held for investment and not for resale, to try to satisfy the identification requirement of §475(b)(2), as interpreted by Treas. Reg. §1.475(b)-2(a). The Tax Court correctly held that these statements are inadequate. (JA61-62.)

## C.    All of YA Global's taxable income was effectively connected with its U.S. business and it therefore was liable for §1446 withholding tax

The Tax Court correctly held that YA Global's taxable income for 2006-2009 was effectively connected with its U.S. business. (JA63-75.) I.R.C. § 1446(a), (c). As the court explained, petitioners failed to carry their burden of showing that any portion of YA Global's taxable income was not effectively connected income because they "advance[d] no

explicit argument at all" regarding the extent to which YA Global's income was effectively connected. (JA74; *see generally* JA70-75; I.R.C. §864(c).) Indeed, petitioners made no argument on the issue below and did not object to the Commissioner's report "explaining in detail the calculations underlying his determinations" in the FPAAs. (JA63-64, JA74; *see* JA6447-48, JA6449-6517.) Petitioners therefore waived the matter in Tax Court. *Lloyd*, 369 F.3d at 272-73.

On appeal, petitioners assert that the Tax Court's "entire analysis" of the effectively related income issue rested on a "misreading" of §475 requirements, but make no argument challenging the substance of that analysis, waiving any such challenge. (Br. 50.) *Bradley*, 603 F.3d at 243 n.8.

## II.

### The FPAAs for 2006 and 2007 were timely issued

### Statement of the standard or scope of review

Interpretation of the I.R.C. §6501(a) assessment period is reviewed *de novo*. *Bachner v. Commissioner*, 81 F.3d 1274, 1277 (3d Cir. 1996).

## A.    The assessment limitations periods never commenced

Petitioners argue that the 2006 and 2007 FPAAs, issued in March 2015, were untimely.  As explained below, the Tax Court correctly held that assessment of YA Global's §1446 withholding tax liability for 2006 and 2007 was not time-barred because the limitations periods never commenced or, alternatively, because YA Global's tax matters partners consented to extend the assessment limitations periods.  (JA87-110.)[16]

"Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *Badaracco v. Commissioner*, 464 U.S. 386, 391 (1984) (quotation and citation omitted).  Section 6501(a) generally requires "any tax imposed by" Title 26 "be assessed within 3 years after the return was filed," including tax attributable to partnership items.  *See Bufferd v. Commissioner*, 506 U.S. 523, 526-27 (1993).  A "return" is "the return required to be filed by the taxpayer."  I.R.C. §6501(a).  Under I.R.C. §6229, the period for assessing tax attributable to a partnership item extends to three years after the later of the date on

---

[16] The parties agree that the statute of limitations defense is a partnership item that may be decided in this partnership-level proceeding.  (JA85-86.)

which the partnership return was filed or the last day for filing such

return, without regard to extension. *See Rhone-Poulenc Surfactants &*

*Specialties, L.P. v. Commissioner*, 114 T.C. 533, 542-43 (2000).

The assessment period commences upon the filing date of the

return. I.R.C. §6501(a). A taxpayer and the Commissioner may extend

the period for assessment through a written agreement. I.R.C.

§§6501(c)(4), 6229(b). If the required return is not filed, the tax may be

assessed at any time. I.R.C. §6501(c)(3).

Here, YA Global filed Forms 1065 for tax years 2006 and 2007 in

October 2007 and September 2008, respectively, but never filed Forms

8804 for those years. (JA102-03.) The Tax Court correctly held that

Form 8804, and not Form 1065, is "the return" to which §6501(a) refers.

(JA99-100.) *See Bufferd*, 506 U.S. at 527 ("Plainly, ... 'the' return

referred to in § 6501(a) is the return of the taxpayer against whom a

deficiency is assessed.") YA Global is a taxpayer for §6501 purposes

because it is liable for the §1446 withholding tax, and the "return

required to be filed by the taxpayer" in §6501(a) therefore is Form 8804.

Treas. Reg. §1.1446-3(d)(1)(iii). The court also correctly held that the

Form 8804 is not a "supplement" to Form 1065. (JA99-100.) Form 1065

-62-

is an information return, required by I.R.C. §6031(a), filed by a partnership as a pass-through entity, while Form 8804 is a tax return, required by I.R.C. §6011, to report §1446 withholding tax liability. Petitioners waived any challenge to those holdings by not addressing them in their opening brief. *Bradley*, 603 F.3d at 243 n.8.

Accordingly, the only issue on appeal is whether YA Global's 2006 and 2007 Forms 1065 were adequate substitutes for the Forms 8804 it did not file. As petitioners recognize (Br. 72), the Tax Court (JA88-93) correctly concluded that this issue is governed by *Commissioner v. Lane-Wells Co.*, 321 U.S. 219, 223 (1944), which held that filing one return does not commence the assessment period if the filed return is "insufficient to advise the Commissioner that any liability exist[s]" for the tax that should have been disclosed on a different, unfiled return. *See also Springfield vs. United States*, 88 F.3d 750, 752 (9th Cir. 1996); *Paschall v. Commissioner*, 137 T.C. 8, 16 (2011).

In *Lane-Wells*, the Supreme Court determined that Forms 1120 (U.S. Corporate Income Tax Return) did not commence the limitations period relating to a surtax liability required to be reported on a separate form, because they had not shown "the facts on which [the

surtax] liability would be predicated." 321 U.S. at 223. It found that "[s]uch liability was expressly denied by the return, and to obtain data on which corporations subject to the [sur]tax could be identified and assessed was the very purpose of requiring a separate return addressed to that liability." *Id.* at 223. The Supreme Court explained that "[t]he purpose [of the system of self-assessment] is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished." *Id.*

Applying *Lane-Wells*, the Tax Court correctly held that the Forms 1065 did not apprise the Commissioner of "the facts on which [withholding tax] liability would be predicated" and therefore did not commence the limitations period. (JA97-100.) Liability for the §1446 withholding tax requires that (1) the taxpayer be engaged in a U.S. trade or business, (2) taxable income at issue be effectively connected with that trade or business, and (3) some portion of that income be allocable to foreign partners. The Tax Court correctly concluded that merely indicating on Forms 1065 that YA Global was a partnership with foreign partners was "insufficient to advise the Commissioner of

-64-

YA Global's liability for §1446 withholding tax that it should have disclosed on Forms 8804." (JA97 (quotation and citation omitted); JA219 (Lines 1 and 6); JA601 (same).)

YA Global's "conduct of a trade or business is critical to its liability for the [§1446] withholding tax," and it did not disclose that "key fact" on the Forms 1065. (JA97-98). YA Global *denied* that that it was engaged in any trade or business on the Schedules K-1. *Lane-Wells*, 321 U.S. at 220, 223. (*See, e.g.*, JA240). It also did not report any ordinary business income on the Forms 1065 for 2006 and 2007 and did not indicate that any income was effectively connected with a U.S. trade or business or what portion was allocable to foreign partners. (JA97; JA218, JA600.) The Commissioner was only able to determine those facts after conducting an extensive examination. That the Commissioner was eventually able to compute YA Global's liability using information on the Forms 1065 (Br. 72) does not mean that verifying its §1446 withholding tax liability was "readily accomplished" from the forms. *Lane-Wells*, 321 U.S. at 223.

Petitioners (Br. 73) protest that if YA Global had filed a Form 8804 showing all zeros, it may not have been treated as valid. A tax

return is not, *ipso facto*, a frivolous return simply because it contains zeros. (JA101.) Zero returns may be frivolous where they are not honest attempts to satisfy the law, as in the tax protester cases cited by petitioners. (JA101.) *See Cabirac v. Commissioner*, 120 T.C. 163, 169 (2003), *aff'd*, No. 03-3157, 2004 WL 7318960 (3d Cir. Feb. 10, 2004). But a taxpayer may validly claim that he does not have particular income or owes zero tax. Here, because YA Global did not file Forms 8804 claiming no withholding liability, the Tax Court reasonably declined to resolve whether such filings could commence the limitations period. (JA101.)

## B. YA Global's tax matters partner agreed to extend assessment for tax years 2006 and 2007

Even if YA Global's filing of Form 1065 for 2006 and 2007 commenced the assessment limitations period for those years, the Tax Court correctly held that the assessment period for those years remained open when the Commissioner issued the FPAAs in March 2015 because the parties had executed Forms 872-P ("Consent to Extend Time to Assess Tax Attributable to Partnership Items") extending the applicable assessment period. (JA102-110.)

A consent to extend the limitations period "is essentially a voluntary, unilateral waiver of a defense by the taxpayer," not a contract. *Stange v. United States*, 282 U.S. 270, 276 (1931). "[I]n determining the validity of such a waiver, however, contract principles are important, because section 6229(b) requires a written agreement." *Amesbury Apartments, Ltd. v. Commissioner*, 95 T.C. 227, 241 (1990); *Pursell v. Commissioner*, 38 T.C. 263, 278 (1962) (§6501(c)(4) extension), *aff'd*, 315 F.2d 629 (3d Cir. 1963). Whether the parties reached an agreement depends on objective manifestation of assent demonstrated by the parties' overt acts, typically by signing a consent form. *Amesbury*, 95 T.C. at 241.

YA Global filed its 2006 and 2007 Forms 1065 in October 2007 and September 2008, respectively. (JA102-03.) The Forms were facially valid because YA Global's tax matters partners and the Commissioner signed a series of Forms 872-P before the assessment period expired, ultimately extending the period with respect to tax attributable to YA Global's partnership items for both tax years to March 31, 2015. (JA102-03; JA1515-28; JA1563-72.) The FPAAs were issued on March 6, 2015. (JA1178; JA1197.)

-67-

The Forms 872-P contain preprinted text stating that the parties agreed to permit the IRS to "assess any federal income tax attributable to the partnership items of the partnership ... against any partner" for the respective tax year at any time before an agreed end date. (*See, e.g.*, JA1515; JA103-04.) Beginning in February 2012, the forms for both tax years included additional language stating that the covered taxes "[i]nclud[ed] income and/or withholding tax required to be paid and/or withheld at source (under chapter 3 of the Internal Revenue Code) due on Form 8804 or Form 1042." (JA103; JA1523; JA1567.)

The Tax Court correctly held that the Forms 872-P extended the assessment limitations periods. (JA108.) There is "no doubt" that §1446 withholding tax is an "income tax" because it falls within Title 26, Subtitle A, Chapter 3, and Chapter 3 taxes are income taxes. (JA109; *see* JA105-06.) Further, as the Tax Court held in the 2018 opinion—which petitioners did not appeal—the §1446 withholding tax is a "partnership item." (JA108; *see* JA1515.) Because §1446 withholding tax is an income tax and a partnership item, YA Global is a "partner" under I.R.C. §6231(a)(2) (2015), which defines a partner as "any ... person whose income tax liability under subtitle A is determined

in whole or in part by taking into account directly or indirectly partnership items of the partnership." (JA108-09.) Thus, the §1446(a) withholding tax is a "federal *income tax* attributable to the *partnership items* of the partnership … against any *partner*," and is covered by the Forms 872-P. This straightforward analysis flows directly from the statute and fully resolves the timeliness question.

Petitioners (Br. 74-76) make no argument challenging the Tax Court's analysis or holdings on that score and therefore waived any challenge to them. *Bradley*, 603 F.3d at 243 n.8. Although they claim (Br. 75) that the Form 872-P's text was ambiguous and suggest that the §1446 withholding tax was not an income tax, they offer no explanation how the Tax Court erred in holding otherwise and, thus, have waived any such challenge. (JA109.) *Penn*, 870 F.3d at 169.

Petitioners seek to avoid the court's analysis, asserting that the only "relevant question" is what the plain language of the Forms 872-P "would mean to a reasonable person under the circumstances." (Br. 75; *see also* Br. 25-26.) But none of their cases (Br. 74-76) applies a "reasonable person" standard. Indeed, that notion is in tension with the principles that a court analyzing a waiver "focuses on the actions of the

person who held the right," *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (Br. 74), and "is informed by the circumstances and context" of the case, *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 339-40 (3d Cir. 2023) (Br. 76).

Petitioners also fail to explain the "circumstances and context" in which the Forms 872-P were signed. *White*, 61 F.4th at 339-40. YA Global is a partnership subject to TEFRA (*see* Glossary), a "complex ... statutory scheme" providing unified audit and litigation procedures. *North Wall Holdings, LLC v. Commissioner*, 165 T.C. No. 9, 2025 WL 2985729, at *1 (2025); *see* I.R.C §§6221-6233 (2006). Unsurprisingly, YA Global engaged experienced counsel during the audit, which addressed whether YA Global was engaged in a U.S. trade or business for purposes of determining if it was liable for §1446 withholding tax. (SA2 ¶C.) Further, the parties agreed to extend the assessment period regarding "any income tax attributable to the partnership items of the partnership" (JA1515, JA1565), paralleling the language in §6229(a), which extends the general three-year assessment limitations period for purposes of assessing partnership items.

-70-

To be sure, the form's text governs because that is "the best indication of what the parties intended." *United States v. Hodgekins,* 28 F.3d 610, 614 (7th Cir. 1994). But the Forms 872-P do not exist in a vacuum. *See Holof v. Commissioner*, 872 F.2d 50, 53 (3d Cir. 1989) (examining Form 872-A within the "statutory framework in which [it] was designed to operate" and rejecting a "plain meaning" argument because "Form 872–A is an accessory intended to complement a complex statutory scheme"). Further, parties to an agreement extending the assessment period "are presumed to know what they were doing when th[e] waiver was executed." *Pursell*, 38 T.C. at 278. It is not credible that YA Global, represented by experienced counsel, did not understand that its potential §1446 withholding tax liability was at issue when it signed the forms.

Petitioners (Br. 75) contend that language expressly referring to withholding tax under Chapter 3—added to the Forms 872-P beginning in February 2012—shows that the earlier-signed forms did not cover the withholding tax. (*See, e.g.*, JA1523, JA 1567.) But the added language cannot change the meaning of the text on the earlier-signed forms, which covered any "income tax"—including §1446 withholding tax.

Finally, the fact that YA Global and the Commissioner also signed separate Forms 872 ("Consent to Extend the Time to Assess Tax") changes nothing.  (*See* JA1539-50; JA 1593-1602.)  The Forms 872 apply to assessment of withholding taxes specifically against YA Global (JA1539), while the Forms 872-P apply more broadly to the assessment of "any federal income tax attributable to the partnership items of the partnership ... against any partner of the partnership" (JA1515).  The Commissioner was entitled to procure the Forms 872 as a protective measure in case a court later determined that the withholding liability should be addressed through deficiency notices to YA Global .

## III.

### YA Global failed to satisfy its burden to establish reasonable cause for its failure to timely file required returns and timely pay taxes owed

### Statement of the standard or scope of review

Whether the elements constituting "reasonable cause" for purposes of I.R.C. §6651 are present is a question of fact reviewed for clear error, while what elements must be present to constitute "reasonable cause" is a question of law reviewed *de novo*.  *E. Wind Indus., Inc. v. United States*, 196 F.3d 499, 504 (3d Cir. 1999) (citing *United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985)).

-72-

### A.   YA Global's failures were not excused by reasonable cause

The Commissioner determined that YA Global is liable for additions to tax for failure to timely file a return, I.R.C. § 6651(a)(1), and to timely pay a tax, I.R.C. §6651(a)(2), for 2006-08.  (JA1188, JA1204, JA1222.)   The purpose of these penalties is to "ensure timely filing of tax returns to the end that tax liability will be ascertained and paid promptly." *Boyle*, 469 U.S. at 245.  It is undisputed that the Commissioner met his burden of production regarding the appropriateness of applying the penalties.  I.R.C. §7491(c).

The Tax Court sustained the §6651 penalties because YA Global did not satisfy its obligation to file Forms 8804 and its failures were not excused by reasonable cause.  (JA110-45.)  On appeal, petitioners challenge only the court's holding on reasonable cause, waiving all other challenges regarding penalties. *Bradley*, 603 F.3d at 243 n.8.

A taxpayer can avoid §6651 penalties by establishing that its failure is "due to reasonable cause and not due to willful neglect." I.R.C. § 6651(a)(1)-(2).  "[T]he taxpayer bears the heavy burden of proving both" that the failure was due to reasonable cause and did not result from willful neglect. *Boyle*, 469 U.S. at 245.  To establish

reasonable cause, a taxpayer must demonstrate that he "'exercised ordinary business care and prudence' and was nevertheless 'unable to file the return within the prescribed time.'" *Id.* at 246 (citation omitted). Presuming that "a finding of reasonable cause rules out willful neglect," the Tax Court focused on reasonable cause. (JA142.)

A taxpayer's reliance on the advice of an advisor does not provide reasonable cause if the taxpayer was negligent in relying on that advice. *See Marprowear Profit-Sharing Tr. V. Commissioner*, 74 T.C. 1086, 1097 (1980), *aff'd*, 673 F.2d 1300 (3d Cir. 1981).

In May 2015 (approximately two months after the FPAAs were issued) YA Global filed a professional malpractice and negligence suit against its tax and accounting advisor, RSM McGladrey, regarding RSM's preparation of YA Global's tax returns for the years at issue. (JA137; JA2624-25, JA2627.) The Tax Court directed supplemental briefing addressing the implications of the lawsuit against RSM on YA Global's reasonable cause defense. (JA6404-07.)

The Tax Court found that RSM had provided advice to YA Global that it was not engaged in a U.S. trade or business before the filing of the Form 1065 for 2006. (JA137, JA139.) It found, however, that "[i]f

the partnership knew or had reason to know of th[e] facts
[underpinning the malpractice suit] before the due date of any of the
Forms 8804 that it should have filed but did not, RSM's advice could not
serve as the basis for a reasonable cause defense." (JA137.)

In their supplemental briefing, petitioners conceded that the
question "when the Fund became aware of the possibility that RSM
might be negligent" was "critical" to determining whether YA Global
had reasonable cause for failing to file Forms 8804 and pay §1446
withholding tax. (SA110.) Petitioners do not dispute that nothing in
the record establishes when YA Global became aware of the potential
negligence. Because the record is "silent in regard to a critical question
on which [petitioners] bear the burden of proof," the Tax Court correctly
concluded that petitioners effectively conceded that they had not met
their burden of showing that the §6651 penalties were excused by
reasonable cause. (JA137-38.).

Despite conceding the material elements of the Tax Court's
holding, petitioners argue (Br. 64-68) that the Tax Court ignored the
"obvious inference" from the filing of the suit in May 2015 that YA
Global had no reason to question RSM's advice until the FPAAs were

issued in March 2015.  The timing of the suit is not evidence, even inferentially, that YA Global had no basis for questioning RSM's advice when the Forms 8804 were due for each tax year.  But the filing of the negligence claim "does indicate that, *at some point*, YA Global came to believe that it had received negligent advice."  (JA138 (emphasis in original).)  Without affirmative evidence in the record regarding the "critical" (SA110) date when YA Global learned the relevant facts, the Tax Court did not clearly err in determining that petitioners failed to carry their burden.  (JA138.)

The Tax Court did not conclude that "the Fund's reliance on RSM's advice in 2006-2010 could not have been reasonable" in light of the suit, as petitioners claim.  (Br. 65.)  Nor did the court require petitioners to prove what YA Global "did _not_ know in 2006."  (Br. 68.)  The court simply held that petitioners failed to carry their burden.[17]

---

[17] The Commissioner raised other challenges to petitioners' claim of reasonable cause.  If this Court were to vacate the denial of reasonable cause, the Commissioner's other challenges should be addressed on remand.

-76-

## B.    The Tax Court did not violate the party-presentation principle

Petitioners incorrectly contend (Br. 68-70) that the Tax Court violated the party-presentation principle.  Under the party-presentation principle, courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quotation and citation omitted).  "Nevertheless, '[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'"  *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 877 n.11 (3d Cir. 2022) (citation omitted).  That is precisely the power properly exercised by the Tax Court here.

When directing supplemental briefing, the Tax Court reviewed relevant precedent and witness testimony and correctly concluded that if YA Global became aware of the relevant facts underpinning the malpractice action before the Forms 8804 were due, its "ability to rely on RSM's advice as the basis for a reasonable cause defense would be called into question."  (JA6407.)  The Tax Court did not inappropriately

-77-

"research the New Jersey filings" (Br. 69) in the malpractice suit but

cited two publicly-available opinions.  (JA6406-07.)  And petitioners

agreed below that the court could take judicial notice of the complaint..

(JA126 n.70; SA107 n.2.)

Finally, the opportunity to provide supplemental briefing

undermines any claim that the Tax Court violated the party-

presentation principle.  *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents

of Am., Inc.*, 508 U.S. 439, 446-48 (1993); *Trest v. Cain*, 522 U.S. 87, 92

(1997).

# CONCLUSION

The decision of the Tax Court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

/s/ *Kathleen E. Lyon*

JENNIFER M. RUBIN                    (202) 307-0524
  D.C. Bar No. 473602
KATHLEEN E. LYON                     (202) 307-6370
  Ohio Bar No. 0069517
  *Attorneys*
  *Tax Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

JANUARY 12, 2026

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), it is hereby certified that, because the attorneys on this brief represent the Federal Government, the requirement that at least one attorney must be a member of the Bar of this Court is waived.

/s/ *Kathleen E. Lyon*

KATHLEEN E. LYON
*Attorney for the Appellee*

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.   This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X]    this document contains <u>14,730</u> words, **or**

[ ]    this brief uses a monospaced typeface and contains _____ lines of text.

2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ with _____.

3.   The undersigned hereby further certifies that the foregoing brief filed electronically with the Court is in PDF searchable format, that the text of the PDF copy is identical to the text of the paper copy, that the PDF version has been electronically scanned for viruses with Microsoft Windows Defender (updated daily), and that, according to the program, no viruses were detected.

(s)    <u>/s/ *Kathleen E. Lyon*</u>

Attorney for  <u>Kathleen E. Lyon </u>

Dated: <u>      January 12, 2026      </u>

# STATUTORY ADDENDUM

**Page**

Internal Revenue Code (26 U.S.C.):

    § 475 ................................................................................. 82

    § 864 ................................................................................. 85

    § 1446 ................................................................................ 86

    § 1461 ................................................................................ 86

    § 6229 ................................................................................ 87

    § 6501 ................................................................................ 88

Treasury Regulations (26 C.F.R.):

    § 1.475(c)-1 ...................................................................... 88

    § 1.475(b)-2 ...................................................................... 90

    § 1.864-2 .......................................................................... 90

    § 1.864-7 .......................................................................... 93

-82-

**Internal Revenue Code of 1986 (26 U.S.C.)**

**§ 475      Mark to market accounting method for dealers in securities**

(a) **General rule.**--Notwithstanding any other provision of this subpart, the following rules shall apply to securities held by a dealer in securities:

(1) Any security which is inventory in the hands of the dealer shall be included in inventory at its fair market value.

(2) In the case of any security which is not inventory in the hands of the dealer and which is held at the close of any taxable year--

(A) the dealer shall recognize gain or loss as if such security were sold for its fair market value on the last business day of such taxable year, and

(B) any gain or loss shall be taken into account for such taxable year.

* * *

**(b) Exceptions.–**

**(1) In general.**--Subsection (a) shall not apply to--

(A) any security held for investment,

(B)(i) any security described in subsection (c)(2)(C) which is acquired (including originated) by the taxpayer in the ordinary course of a trade or business of the taxpayer and which is not held for sale, and (ii) any obligation to acquire a security described in clause (i) if such obligation is entered into in the ordinary

course of such trade or business and is not held for sale, and

(C) any security which is a hedge with respect to--

(i) a security to which subsection (a) does not apply, or

(ii) a position, right to income, or a liability which is not a security in the hands of the taxpayer.

To the extent provided in regulations, subparagraph (C) shall not apply to any security held by a person in its capacity as a dealer in securities.

(2) Identification required.--A security shall not be treated as described in subparagraph (A), (B), or (C) of paragraph (1), as the case may be, unless such security is clearly identified in the dealer's records as being described in such subparagraph before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe).
* * *

**(c) Definitions.**--For purposes of this section--

**(1) Dealer in securities defined.**--The term "dealer in securities" means a taxpayer who--

(A) regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or

(B) regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business.

**(2) Security defined.**--The term "security" means any--

(A) share of stock in a corporation;

(B) partnership or beneficial ownership interest in a widely held or publicly traded partnership or trust;

(C) note, bond, debenture, or other evidence of indebtedness;

(D) interest rate, currency, or equity notional principal contract;

(E) evidence of an interest in, or a derivative financial instrument in, any security described in subparagraph (A), (B), (C), or (D), or any currency, including any option, forward contract, short position, and any similar financial instrument in such a security or currency; and

(F) position which--

(i) is not a security described in subparagraph (A), (B), (C), (D), or (E),

(ii) is a hedge with respect to such a security, and

(iii) is clearly identified in the dealer's records as being described in this subparagraph before the close of the day on which it was acquired or entered into (or such other time as the Secretary may by regulations prescribe).

Subparagraph (E) shall not include any contract to which section 1256(a) applies.

**(d) Special rules.**--For purposes of this section—

 * * *

 **(3) Character of gain or loss.**—

  **(A) In general.**--Except as provided in subparagraph (B) or section 1236(b)--

   **(i) In general.**--Any gain or loss with respect to a security under subsection (a)(2) shall be treated as ordinary income or loss.

   * * *

## § 864 Definitions and special rules

 * * *

**(b) Trade or business within the United States.**--For purposes of this part, part II, and chapter 3, the term "trade or business within the United States" includes the performance of personal services within the United States at any time within the taxable year, but does not include--

 * * *

 **(2) Trading in securities or commodities.**--

  **(A) Stocks and securities.**--

   **(i) In general.**--Trading in stocks or securities through a resident broker, commission agent, custodian, or other independent agent.

   **(ii) Trading for taxpayer's own account.**--Trading in stocks or securities for the taxpayer's own account, whether by the taxpayer or his employees or through a resident broker, commission agent, custodian, or other agent, and whether or not any such employee or agent has discretionary authority to make decisions in effecting the transactions. This clause shall not apply in the case of a dealer in stocks or securities.

* * *

**(C) Limitation.**--Subparagraphs (A)(i) and (B)(i) shall apply only if, at no time during the taxable year, the taxpayer has an office or other fixed place of business in the United States through which or by the direction of which the transactions in stocks or securities, or in commodities, as the case may be, are effected.

## § 1446  Withholding of tax on foreign partners' share of effectively connected income

**(a) General rule.**--If--

(1) a partnership has effectively connected taxable income for any taxable year, and

(2) any portion of such income is allocable under section 704 to a foreign partner,

such partnership shall pay a withholding tax under this section at such time and in such manner as the Secretary shall by regulations prescribe.
* * *
**(c) Effectively connected taxable income.**--For purposes of this section, the term "effectively connected taxable income" means the taxable income of the partnership which is effectively connected (or treated as effectively connected) with the conduct of a trade or business in the United States computed with [certain adjustments not relevant here]
* * *

## § 1461  Liability for withheld tax

Every person required to deduct and withhold any tax under this chapter is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this chapter.

-87-

## § 6229    Period of limitations for making assessments

**(a) General rule.**—Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of—

> (1) the date on which the partnership return for such taxable year was filed, or

> (2) the last day for filing such return for such year (determined without regard to extensions).

**(b) Extension by agreement.**—

> **(1) In general**.—The period described in subsection (a) (including an extension period under this subsection) may be extended—

>> (A) with respect to any partner, by an agreement entered into by the Secretary and such partner, and

>> (B) with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner (or any other person authorized by the partnership in writing to enter into such an agreement),

before the expiration of such period.

\* \* \*

**(3) Coordination with section 6501(c)(4)**.—Any agreement under section 6501(c)(4) shall apply with respect to the period described in subsection (a) only if the agreement expressly provides that such agreement applies to tax attributable to partnership items.

## § 6501    Limitations on assessment and collection

(a) **General rule.**—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *. For purposes of this chapter, the term "return" means the return required to be filed by the taxpayer (and does not include a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit).
* * *

(c) **Exceptions.**
    * * *

(3) **No return**.—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

(4) **Extension by agreement.**--
        (A) In general.--Where, before the expiration of the time prescribed for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

## Treasury Regulations (26 C.F.R.)

## § 1.475(c)–1    Definitions—dealer in securities.

(a) **Dealer-customer relationship.** Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances.

(1) [Reserved]

**(2) Transactions described in section 475(c)(1)(B)**—(i) In general. For purposes of section 475(c)(1)(B), the term dealer in securities includes, but is not limited to, a taxpayer that, in the ordinary course of the taxpayer's trade or business, regularly holds itself out as being willing and able to enter into either side of a transaction enumerated in section 475(c)(1)(B).

> **(ii) Examples**. The following examples illustrate the rules of this paragraph (a)(2). In the following examples, B is a bank and is not a member of a consolidated group:
>
> > \* \* \*
> >
> > **Example 3.** B engages in frequent transactions in a foreign currency in the interbank market. Unlike the facts in Example 2, however, B does not regularly hold itself out as being willing and able to enter into either side of positions in the foreign currency, and all of B's transactions are driven by its internal need to adjust its position in the currency.  No other circumstances are present to suggest that B is a dealer in securities for purposes of section 475(c)(1)(B).  B's activity in the foreign currency does not qualify it as a dealer in securities for purposes of section 475(c)(1)(B), and its transactions in the interbank market are not transactions with customers.

\* \* \*

**(c) Taxpayers that purchase securities from customers but engage in no more than negligible sales of the securities—(1) Exemption from dealer status—(i) General rule**. A taxpayer that regularly purchases securities from customers in the ordinary course of a trade or business (including regularly making loans to customers in the ordinary course of a trade or business of making loans) but engages in no more than negligible sales of the securities so acquired is not a dealer in securities

within the meaning of section 475(c)(1) unless the taxpayer elects to be so treated or, for purposes of section 471, the taxpayer accounts for any security (as defined in section 475(c)(2)) as inventory.

## § 1.475(b)–2    Exemptions—identification requirements

**(a) Identification of the basis for exemption.** An identification of a security as exempt from mark to market does not satisfy section 475(b)(2) if it fails to state whether the security is described in—

> (1) Either of the first two subparagraphs of section 475(b)(1) (identifying a security as held for investment or not held for sale); or

> (2) The third subparagraph thereof (identifying a security as a hedge).

\* \* \*

## § 1.864-2    Trade or business within the United States.

**(a) In general.** As used in part I (section 861 and following) …  and chapter 3 (section 1441 and following) of the Code, and the regulations thereunder, the term "engaged in trade or business within the United States" does not include the activities described in paragraphs (c) and (d) of this section, but includes the performance of personal services within the United States at any time within the taxable year except to the extent otherwise provided in this section.

\* \* \*

**(c) Trading in stocks or securities.** For purposes of paragraph (a) of this section—

> **(1) In general.** The term "engaged in trade or business within the United States" does not include the effecting of transactions in the United States in stocks or securities through a resident broker, commission agent, custodian, or

-91-

other independent agent. This subparagraph shall apply to any taxpayer, including a broker or dealer in stocks or securities, except that it shall not apply if at any time during the taxable year the taxpayer has an office or other fixed place of business in the United States through which, or by the direction of which, the transactions in stocks or securities are effected. The volume of stock or security transactions effected during the taxable year shall not be taken into account in determining under this subparagraph whether the taxpayer is engaged in trade or business within the United States.

**(2) Trading for taxpayer's own account—(i) In general.** The term "engaged in trade or business within the United States" does not include the effecting of transactions in the United States in stocks or securities for the taxpayer's own account, irrespective of whether such transactions are effected by or through—

> (a) The taxpayer himself while present in the United States,

> (b) Employees of the taxpayer, whether or not such employees are present in the United States while effecting the transactions, or

> (c) A broker, commission agent, custodian, or other agent of the taxpayer, whether or not such agent while effecting the transactions is (1) dependent or independent, or (2) resident, nonresident, or present, in the United States, and irrespective of whether any such employee or agent has discretionary authority to make decisions in effecting such transactions. For purposes of this paragraph, the term "securities" means any note, bond, debenture, or other evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase

any of the foregoing; and the effecting of transactions in stocks or securities includes buying, selling (whether or not by entering into short sales), or trading in stocks, securities, or contracts or options to buy or sell stocks or securities, on margin or otherwise, for the account and risk of the taxpayer, and any other activity closely related thereto (such as obtaining credit for the purpose of effectuating such buying, selling, or trading). The volume of stock of security transactions effected during the taxable year shall not be taken into account in determining under this subparagraph whether the taxpayer is engaged in trade or business within the United States. * * *

* * *

**(iv) Definition of dealer in stocks or securities— (a) In general.** For purposes of this subparagraph, a dealer in stocks or securities is a merchant of stocks or securities, with an established place of business, regularly engaged as a merchant in purchasing stocks or securities and selling them to customers with a view to the gains and profits that may be derived therefrom. Persons who buy and sell, or hold, stocks or securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business, and officers of corporations, members of partnerships, or fiduciaries, who in their individual capacities buy and sell, or hold, stocks or securities for investment or speculation are not dealers in stocks or securities within the meaning of this subparagraph solely by reason of that activity. In determining under this subdivision whether a person is a dealer in stocks or securities such person's transactions in stocks or securities effected both in and outside the United States shall be taken into account.

* * *

**(e) Other rules.** The fact that a person is not determined by reason of this section to be not engaged in trade or business with the United States is not to be considered a determination that such person is engaged in trade or business within the United States. Whether or not such person is engaged in trade or business within the United States shall be determined on the basis of the facts and circumstances in each case. For other rules relating to the determination of whether a taxpayer is engaged in trade or business in the United States see section 875 and the regulations thereunder.

## § 1.864-7 Definition of office or other fixed place of business

**(a) In general.** (1) This section applies for purposes of determining whether a nonresident alien individual or a foreign corporation that is engaged in a trade or business in the United States at some time during a taxable year beginning after December 31, 1966, has an office or other fixed place of business in the United States for purposes of applying section 864(c)(4)(B) and § 1.864–6 to income, gain, or loss specified in paragraph (b) of § 1.864–5 from sources without the United States or has an office or other fixed place of business outside the United States for purposes of applying section 864(c)(4)(B)(iii) and paragraph (b)(3)(i) of § 1.864–6 to sales of goods or merchandise for use, consumption, or disposition outside the United States.

(2) In making a determination under this section due regard shall be given to the facts and circumstances of each case, particularly to the nature of the taxpayer's trade or business and the physical facilities actually required by the taxpayer in the ordinary course of the conduct of his trade or business.

**(d) Agent activity—(1) Dependent agents—(i) In general.** In determining whether a nonresident alien individual or a foreign corporation has an office or other fixed place of business, the office or other fixed place of business of an agent who is not an independent agent, as defined in subparagraph (3) of this paragraph, shall be disregarded unless such agent (a) has the

authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation, and regularly exercises that authority, or (b) has a stock of merchandise belonging to the nonresident alien individual or foreign corporation from which orders are regularly filed on behalf of such alien individual or foreign corporation. * * * * * *

**(3) Definition of independent agent—(i) In general.** For purposes of this paragraph, the term "independent agent" means a general commission agent, broker, or other agent of an independent status acting in the ordinary course of his business in that capacity. Thus, for example, an agent who, in pursuance of his usual trade or business, and for compensation, sells goods or merchandise consigned or entrusted to his possession, management, and control for that purpose by or for the owner of such goods or merchandise is an independent agent.

**(ii) Related persons.** The determination of whether an agent is an independent agent for purposes of this paragraph shall be made without regard to facts indicating that either the agent or the principal owns or controls directly or indirectly the other or that a third person or persons own or control directly or indirectly both. For example, a wholly owned domestic subsidiary corporation of a foreign corporation which acts as an agent for the foreign parent corporation may be treated as acting in the capacity of independent agent for the foreign parent corporation. The facts and circumstances of a specific case shall determine whether the agent, while acting for his principal, is acting in pursuance of his usual trade or business and in such manner as to constitute him an independent agent in his relations with the nonresident alien individual or foreign corporation.

**(iii) Exclusive agents.** Where an agent who is otherwise an independent agent within the meaning of

subdivision (i) of this subparagraph acts in such capacity exclusively, or almost exclusively, for one principal who is a nonresident alien individual or a foreign corporation, the facts and circumstances of a particular case shall be taken into account in determining whether the agent, while acting in that capacity, may be classified as an independent agent.

* * *