No. 25-1766

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

YA GLOBAL INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP;
YORKVILLE ADVISORS, GP LLC, Tax Matters Partner; YA GLOBAL
INVESTMENTS, LP, f.k.a. Cornell Capital Partners, LP; Yorkville
Advisors, LLC, Tax Matters Partner,
*Appellants*

v.

COMMISSIONER OF INTERNAL REVENUE

On Appeal from the United States Tax Court

# APPELLANTS' REPLY BRIEF

HENRY CHENG
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2512

TAMARA L. SHEPARD
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-7959

*Counsel for YA Global Investments, LP, f/k/a Cornell Capital
Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and
YA Global Investments, LP, f/k/a Cornell Capital Partners, LP,
Yorkville Advisors, LLC, Tax Matters Partner*

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS ......................................................... iv

GLOSSARY ....................................................................... vii

INTRODUCTION ................................................................ 1

ARGUMENT ...................................................................... 3

I.   YA Global Had No USTB or ECI. ......................................... 3

   A.   The Commissioner's Statement of the Standard of Review Is Misleading. ................................................... 3

   B.   The Tax Court's Determination That Yorkville Provided Personal Services to Portfolio Companies Cannot Stand. ........................................... 4

      1.   All Relevant Evidence Shows Yorkville's Services Were Provided to YA Global, Not Portfolio Companies. ........................................... 7

      2.   The Commissioner's Efforts to Support the Tax Court's Conclusory Statements Fail ............. 8

      3.   The Commissioner's Responses to Petitioners' Discussion About Fees Miss the Point. ................................................................. 10

      4.   The Tax Court's Reliance on a Failure of Proof by Petitioners Highlights Its Legal Error in "Weighing" the Evidence. ..................... 12

         a.   Reliance on the New Theory ...................... 12

         b.   The Relevance of Prejudice ........................ 13

      5.   If Yorkville Provided Personal Services to Portfolio Companies, Such Activities Cannot Be Attributed to YA Global Under Agency Principles ............................................................. 14

   C.   The Fund Was an Investor. ......................................... 15

      1.   Cases. ................................................................. 15

      2.   Marketing Materials. ......................................... 17

i

## TABLE OF CONTENTS
(continued)

**Page**

D. The Trading Exceptions Apply. ................................... 20

    1. The Commissioner's "Waiver" Argument Is
        Unfounded. .......................................................... 20

    2. Section 864(b)(2)(A)(i) Applies. ........................... 21

    3. Section 864(b)(2)(A)(ii) Applies. .......................... 23

E. Under the Tax Court's View of YA Global's
    Purported USTB, None of the Fund's Income
    from Securities Trading Could Be ECI. ...................... 23

II. YA Global Was Not a Dealer Under Section 475. ............... 24

A. The Commissioner's Suggestion That This Court
    Owes Deference to the Tax Court's Interpretation
    of Statutes Is Wrong. ................................................ 24

B. The Commissioner Misstates Petitioners'
    Arguments About the Meaning of "Dealer." .............. 25

C. A Taxpayer Is Not a Dealer by Virtue of Buying
    and Selling Securities in the Ordinary Course of a
    Trade or Business Unless the Buying and Selling
    of Securities *Is* the Trade or Business. ....................... 27

D. YA Global's Securities Were Properly Identified ....... 27

III. The Tax Court's Reliance on the Malpractice Case to
Sustain Penalties Constitutes Legal Error. ........................ 29

A. The Commissioner's Brief Highlights the Flaws
    in the Tax Court's Reasoning. ..................................... 29

B. The Tax Court Erred by Dragging the
    Malpractice Suit into the Case When Neither
    Party Raised It. .......................................................... 31

IV. The Statute of Limitations Bars Assessment for 2006
and 2007. ........................................................................... 32

# TABLE OF CONTENTS
(continued)

**Page**

|     | A. | The Limitations Period Commenced When YA Global Filed Its Forms 1065. | 32 |

|     | B. | YA Global Did Not Consent to Extend the Limitations Period for Assessment of Section 1446 Liability. | 34 |

CONCLUSION ...................................................................................... 40

COMBINED CERTIFICATES OF COMPLIANCE ............................... 41

CERTIFICATE OF SERVICE ................................................................ 42

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Ashland Inc. v. Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011) ............................................................... 18

*Baird v. Comm'r*,
  438 F.2d 490 (3d Cir. 1970) ............................................................... 13

*Bates v. State Bar of Ariz.*,
  433 U.S. 350 (1977).............................................................................. 18

*Comm'r v. Groetzinger*,
  480 U.S. 23 (1987)............................................................................. 3, 4

*Comm'r v. Lane-Wells Co.*,
  321 U.S. 219 (1944)......................................................................... 32, 33

*Demkowicz v. Comm'r*,
  551 F.2d 929 (3d Cir. 1977) ................................................................. 8

*Evans v. Comm'r*,
  48 T.C. 704 (1967)............................................................................... 16

*Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*,
  152 F.4th 516 (3d Cir. 2025)......................................................... 10, 11

*Higgins v. Comm'r*,
  312 U.S. 212 (1941)......................................................................... 3, 17

*Holof v. Comm'r*,
  872 F.2d 50 (3d Cir. 1989) ................................................................. 35

*Hub City Foods Inc. v. Comm'r*,
  884 F.2d 320 (7th Cir. 1989)............................................................... 16

*InverWorld, Ltd. v. Comm'r*,
  98 T.C. 70 (1992)................................................................................. 37

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*Kelly v. RealPage Inc.*,
  47 F.4th 202 (3d Cir. 2022) ................................................................. 28

*Linen Thread Co. v. Comm'r*,
  14 T.C. 725 (1950) .............................................................................. 16

*Morales v. Apfel*,
  225 F.3d 310 (3d Cir. 2000) ................................................................ 19

*Mt. Mansfield Co. v. Comm'r*,
  50 T.C. 798 (1968) .............................................................................. 16

*Noel v. United Aircraft Corp.*,
  342 F.2d 232 (3d Cir. 1964) .................................................................. 8

*Panzarella v. Navient Sols., Inc.*,
  37 F.4th 867 (3d Cir. 2022) ................................................................. 31

*Pleasant Summit Land Corp. v. Comm'r*,
  863 F.2d 263 (3d Cir. 1988) ................................................................ 25

*S-K Liquidating Co. v. Comm'r*,
  64 T.C. 713 (1975) .............................................................................. 37

*Shea v. Comm'r*,
  112 T.C. 183 (1999) ...................................................................... 14, 15

*State Police Ass'n of Mass. v. Comm'r*,
  125 F.3d 1 (1st Cir. 1997) ..................................................................... 4

*Trans-Atl. Co. v. Comm'r*,
  469 F.2d 1189 (3d Cir. 1972) .............................................................. 15

*United States v. Boyle*,
  469 U.S. 241 (1985) ............................................................................ 29

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*United States v. Hodgekins,*
 28 F.3d 610 (7th Cir. 1994)................................................................. 39

*United States v. Izaguirre-Losoya,*
 219 F.3d 437 (5th Cir. 2000).............................................................. 19

*United States v. Jackson,*
 120 F.4th 1210 (3d Cir. 2024)............................................................ 11

*United States v. Sineneng-Smith,*
 590 U.S. 371 (2020)........................................................................... 31

*Victaulic Co. v. Tieman,*
 499 F.3d 227 (3d Cir. 2007) .............................................................. 18

*Walsh v. Rigas,*
 2019 WL 294798 (S.D.N.Y. Jan. 23, 2019)........................................ 18

*White v. Samsung Elecs. Am., Inc.,*
 61 F.4th 334 (3d Cir. 2023)................................................................ 36

*YA Global Investments, LP v. Comm'r,*
 151 T.C. 11 (2018).............................................................................. 38

## Rules & Regulations

Tax Court Rule 142(a)............................................................................ 14

Treas. Reg. § 1.864-7(d)(2) ..................................................................... 22

# GLOSSARY

| | |
|---|---|
| AOB | Appellants' Opening Brief |
| CCA | IRS Chief Counsel Advice 201504013 (Jan. 2, 2015) |
| Commissioner | Commissioner of Internal Revenue |
| ECI | Effectively connected income (*i.e.*, income effectively connected with a USTB) |
| FPAA | Notices of Final Partnership Administrative Adjustment issued in this case on March 6, 2015 |
| I.R.C. or the Code | Internal Revenue Code, Title 26, U.S.C. |
| Petitioners | YA Global, together with Yorkville Advisors, LLC and Yorkville Advisors GP, LLC |
| RB | Appellee's Response Brief |
| RSM | RSM McGladrey |
| SEDA | Standby Equity Distribution Agreement |
| Treas. Reg. | Treasury Regulations, 26 C.F.R. |
| USTB | U.S. Trade or Business |
| YA Global or the Fund | YA Global Investments, LP, f.k.a. Cornell Capital Partners, LP |
| Yorkville | Yorkville Advisors, LLC |

## INTRODUCTION

Yorkville managed investments.  Its employees therefore engaged in many activities—looking for investment opportunities, negotiating and structuring deals, and trading securities.  YA Global invested its capital based on Yorkville's recommendations.

Yorkville filed returns and issued K-1s to its partners so they could pay income tax on the profits generated from Yorkville's investment management activities, and the Commissioner has never suggested that Yorkville's partners paid insufficient tax on those active profits.

YA Global also filed returns and issued K-1s to its partners so that they could pay taxes on their investment profits.  U.S. taxpayers generally owe tax on investment gains, and the Commissioner has not suggested that U.S. partners failed to pay tax here.  But the Commissioner *also* wants to collect tax on the income from foreign partners' capital.  To do that, the Commissioner claims that YA Global was not investing but instead had some sort of "trade or business."

The Commissioner determined that YA Global's transactions gave rise to a lending and/or underwriting business.  But analyses of the Fund's financial data and transaction documents show how it *actually*

1

made (and lost a lot of) money, and that evidence proves that YA Global's economics are unlike those of a lender or underwriter. Rather, YA Global risked its capital in portfolio companies as an investor.

The Tax Court completely ignored the evidence showing how YA Global generated returns. Instead, it focused on the fact that Yorkville was "doing" things. Because—and *only* because—the portfolio companies paid amounts labeled "fees," the court decided that whatever Yorkville was doing, it must have been as a service to the portfolio companies. But all the evidence shows that Yorkville's activities were for YA Global's benefit, not the portfolio companies'. In reaching its contrary conclusion, the Tax Court committed multiple legal errors.

Unsurprisingly, the Commissioner has been unable to defend the Tax Court's fundamental error and the additional logical gymnastics it had to perform to make the language of the Code fit its upside-down view. Instead, he repeatedly claims that Petitioners waived their arguments illustrating those errors. But Petitioners cannot have waived arguments responding to the many legal errors and absurd conclusion that no one could have predicted from the Tax Court.

2

Because the Tax Court committed legal error when it determined YA Global had a USTB providing negotiating services against itself, the rest of its opinion falls apart. And its conclusions about the meaning of Section 475, penalties and the statute of limitations are all contrary to law regardless of whether YA Global had a USTB.

## ARGUMENT

## I.   YA Global Had No USTB or ECI.

### A.   The Commissioner's Statement of the Standard of Review Is Misleading.

Citing *Comm'r v. Groetzinger*, 480 U.S. 23, 36 (1987), the Commissioner claims that "[w]hether a taxpayer is engaged in a trade or business is a question of fact reviewable for clear error." RB14. *Groetzinger* shows just the opposite. *Groetzinger* does say that "resolution of [whether a taxpayer has a trade or business] 'requires an examination of the facts in each case.'" *Id.* (quoting *Higgins v. Comm'r*, 312 U.S. 212, 217 (1941)). But there was "no dispute as to the facts" in *Groetzinger*, and no mention of clear error. *Id.* at 24. The Court gave no deference to the lower courts but rather determined that the taxpayer was engaged in a "trade or business" based on its own analysis of the

3

stipulated facts. *See id.* at 35-36 (stating the test and independently concluding that "Groetzinger satisfied that test"). *Groetzinger* thus makes clear that when, as here, the "trade or business" inquiry turns on what conclusions to draw from undisputed facts, that presents a *legal* question reviewed de novo. RB26-27; *see also, e.g.*, *State Police Ass'n of Mass. v. Comm'r*, 125 F.3d 1, 5 (1st Cir. 1997) ("[T]he Tax Court's ultimate conclusions (*e.g.*, whether the facts, as found, are legally sufficient to demonstrate that the Association engaged in a trade or business) are conclusions of law, and are...subject to de novo review").

In any case, the Tax Court's conclusion would not withstand even the deferential review the Commissioner prefers.

## B. The Tax Court's Determination That Yorkville Provided Personal Services to Portfolio Companies Cannot Stand.

As the Commissioner acknowledges (RB43), from the time he issued the CCA, the Commissioner argued that YA Global generated returns on its capital, not by risking it in the ventures of the companies it funded, but rather by virtue of using it in a lending business (to generate income from interest and fees) and/or an underwriting business (to generate spreads and fees). AOB16-19. His idea was that the Fund was not buying

4

stock in order to generate investment returns from putting its capital at risk, but rather as a conduit, so that portfolio companies could sell their stock into public markets. RB5-6, JA1770-1772, SA85. Under the Commissioner's view, Yorkville's activities were somehow related to this purported financial services business and were therefore "associated services." JA1665-1666 ¶1 (pre-trial stipulation). Although the Commissioner never specified what those associated services might be here, when investment banks assist clients in obtaining funding, they typically create research reports, assist with credit ratings, and market the companies' stock to potential institutional investors. JA1772 ¶10, JA2101-2103.

The Commissioner's idea that YA Global was in a relatively low-risk financial services business, *i.e.*, lending or underwriting with the "associated services" typically provided by investment banks, was (and is) belied by the evidence showing how YA Global actually generated its huge profits—and losses. AOB43-47. Nevertheless, the Tax Court determined that the fees paid by portfolio companies must be for *some* sort of service, and therefore that Yorkville must have been acting for the benefit of portfolio companies when it—

- Looked for investments for YA Global;
- Conducted due diligence on the portfolio companies to determine whether YA Global should invest in them;
- Negotiated against the portfolio companies to structure the investment deals; and
- Managed the deals to maximize YA Global's profits.

The Commissioner does not dispute that the Tax Court held YA Global had a USTB based solely on its conclusion that Yorkville provided these personal services[1] to portfolio companies.

The problem with the Tax Court's determination that portfolio companies paid Yorkville to seek them out, conduct due diligence into their businesses, and negotiate against them (in addition to the fact that it is absurd) is that all the relevant evidence shows otherwise. The record thus refutes the court's determination—regardless of whether the question was properly before it and regardless of which party had the burden of proof.

---

[1] Notwithstanding the unexplained quotes that he frequently places around the phrase "personal services," the Commissioner does not dispute that engaging in due diligence, negotiating and structuring deals, *etc*. are personal services. RB19-20.

6

### 1. All Relevant Evidence Shows Yorkville's Services Were Provided to YA Global, Not Portfolio Companies.

Multiple witnesses made clear that portfolio companies did not receive or pay for Yorkville to provide them with sourcing, negotiating, structuring or managing services. AOB36-37. Moreover, the funding documents themselves showed that portfolio companies hired their own lawyers and placement agents to act on their behalf in their dealings with the Fund. *E.g.*, JA4599, 4638 (last recital), 4658. In fact, if and when a portfolio company ultimately obtained funding, it explicitly acknowledged that neither Yorkville nor the Fund was acting as its financial advisor (JA4585-4586 (§3(j))) and that it had its own legal and investment advisors (JA4644 (§3.3)). This evidence demonstrates that portfolio companies paid only to obtain capital, nothing more. *See also,* SA7 (fees described to portfolio companies as "cost of capital").

In order to determine whether portfolio companies paid Yorkville and/or the Fund for something more than just capital, the Tax Court had to weigh the evidence demonstrating the companies <u>did not</u> pay for negotiating services, structuring services, or the like against evidence demonstrating they <u>did</u> pay for such services. But the only purported

7

evidence pointing in the latter direction is that the portfolio companies paid amounts labeled "fees," which cannot support the court's conclusion as a matter of law.  AOB37-40.

The Commissioner responds that the Tax Court "was not required to expressly discredit testimony before finding other evidence persuasive."  RB25.  That is debatable, *see Demkowicz v. Comm'r*, 551 F.2d 929, 931-932 (3d Cir. 1977) (suggesting otherwise), and more important, it misses the point: as the Commissioner implicitly admits, the Tax Court at least needed to "[find] other evidence persuasive."  Here, the Tax Court did not "find" any evidence at all that portfolio companies paid for something more than capital.  It merely stated its conclusion, which does not suffice.  *See Noel v. United Aircraft Corp.*, 342 F.2d 232, 239 (3d Cir. 1964) ("mere speculation [by the trial court] cannot be substituted for proof").

### 2. The Commissioner's Efforts to Support the Tax Court's Conclusory Statements Fail.

The Commissioner identifies no evidence (other than "fees") indicating portfolio companies paid Yorkville or the Fund for something more than capital.  Instead, he largely repeats the Tax Court's conclusory statements.  RB21-24.  Petitioners have discussed the illogic of these

8

conclusions (AOB36-42) and discuss here only points raised by the Commissioner that have not already been addressed.

The Commissioner notes that Yorkville explained—in agreements with YA Global and communications with potential investors—that fees from portfolio companies could be used to pay salaries of Yorkville employees. RB23. But he does not explain why that would support his position. YA Global was obligated to pay a portion of the returns generated on its capital—whether they were payments (including fees) from portfolio companies or gains/losses from selling stock—to Yorkville, its investment manager. Whether YA Global paid Yorkville directly from its own accounts or instead agreed to allow Yorkville to retain some or all of the fees paid by portfolio companies is immaterial.

Similarly, Yorkville's promotion of its "competitive edge" to investors (RB24) provides no basis for a conclusion that portfolio companies paid Yorkville to find them, conduct due diligence into their businesses, and negotiate against them. Yorkville's investors of course sought a manager that could find good investments for them.

### 3. The Commissioner's Responses to Petitioners' Discussion About Fees Miss the Point.

The Commissioner leans into the Tax Court's assertion that the portfolio companies' payment of fees "was sufficient to conclude that they paid to receive benefits beyond capital." RB27. But it was legally *insufficient*. AOB38. It is typical for fees of the sort included in YA Global's deals to be paid in exchange for capital. *See* AOB37-40.

The Commissioner responds by attempting to distinguish some of Petitioners' cited authorities. RB25-27. Several of those distinctions make no legal difference, but in any case, the Commissioner misses the point. Petitioners do not cite these authorities as directly on-point but rather to show that both courts and the Commissioner regularly treat these types of fees as fees for capital. The mere existence of the fees here cannot, therefore, demonstrate that Yorkville provided personal services to portfolio companies.

The Commissioner's claim that Petitioners "waived"[2] reliance on these authorities (RB26) strains credulity. As discussed in Section I.B.4.,

---

[2] The Commissioner presumably means "forfeited." *See Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 529 (3d Cir. 2025).

10

*infra*, Petitioners had no reason to imagine that the Tax Court would base its entire opinion in this case on its view that the mere existence of fees proves that portfolio companies paid for something more than capital. Petitioners were not, therefore, untimely in raising their responsive arguments and did not forfeit them. *See Harbor Bus. Compliance Corp.* at 529 ("Forfeiture is the failure to make the timely assertion of a right") (internal citations omitted); *United States v. Jackson*, 120 F.4th 1210, 1224 n.4 (3d Cir. 2024) (no forfeiture where appellants made a new argument on appeal concerning issue that "only emerged during…[a] hearing" held after submission of district court briefing). Should the court have any doubts, Petitioners respectfully request that the Court exercise its discretion to consider these questions of law in the public interest and for the sake of fairness. *See id*.

Finally, the amount of fees generated by YA Global's investments (RB27-28) is of no consequence. Contrary to the Commissioner's assertion, Petitioners nowhere "claim that the fees reflected only the amount necessary to compensate YA Global 'for the costs of the activities to deploy its capital.'" RB27 (citing AOB41-42). Rather, as Petitioners explained, YA Global would of course only provide capital to portfolio

11

companies if its total expected returns (including any amounts labeled "fees") were sufficient to cover both its risks (of losing money) and its expenses (of paying Yorkville). AOB41-42. A portfolio company's cost to obtain capital from YA Global was just part of the total economics of the deal.

### 4. The Tax Court's Reliance on a Failure of Proof by Petitioners Highlights Its Legal Error in "Weighing" the Evidence.

The Tax Court's exclusive reliance on the existence of fees to support its opinion is legally deficient without regard to the burden of proof. Sections I.B.1-B.3, *supra*. It is even more glaring, however, in light of when the issue was raised. The Commissioner does not deny that he mentioned the *per se* rule for the first time in his pretrial memorandum, and efforts to downplay this problem fall short.

#### a. Reliance on the New Theory

The Commissioner claims that the Tax Court did not rely (or maybe just did not "explicitly" rely) on Section 864(b)'s *per se* rule regarding personal services. RB19, RB43. Rather, he says repeatedly, the Tax Court found that portfolio companies paid for more than capital. *E.g.*,

RB21, 23, 24, 29-30, 31, 36, 43.  But paying for more than capital *is* paying for personal services. *See* AOB29-30.

Separately, the Commissioner urges that his reference to personal services was not new because it was part and parcel of his contention that YA Global was engaged in lending and/or underwriting as a business. RB43.  The implication is that *even he* did not intend to argue that Yorkville was providing services to portfolio companies when it sourced investments for YA Global, negotiated and structured deals on YA Global's behalf and managed the deals to maximize YA Global's profits. The Commissioner's assertion only reinforces that Petitioners had no reason to be on notice about it.  Either the issue was newly raised by the Commissioner shortly before trial or the Tax Court crafted it sua sponte and in violation of the party presentation principle (*see* AOB69-70). Either way, Petitioners' purported failure to disprove it cannot be the basis of a decision in this case.  *See* AOB31-35.

### b. The Relevance of Prejudice

The Tax Court's declaration that Petitioners failed to disprove a theory of which they had insufficient notice was prejudicial for the reasons discussed in Petitioners' opening brief, and under *Baird v.*

*Comm'r*, 438 F.2d 490 (3d Cir. 1970), neither the Commissioner nor the Tax Court was entitled to rely on it.   AOB31-35.   The Commissioner's contrary argument (RB43-45) merits no additional discussion.

In any case, a showing of prejudice is not necessary to trigger a shift in the burden of proof under Tax Court Rule 142(a), which was certainly required here if the personal services theory was to be entertained at all. Rule 142(a) applies if the evidence required counter the Commissioner's original theory (here, that YA Global was an underwriter and/or a lender) is different from the evidence required to counter the new theory (here, that YA Global was, through Yorkville, engaged in a business negotiating deals against itself).   *See Shea v. Comm'r*, 112 T.C. 183, 191 (1999).   That Petitioners managed to elicit some testimony at trial and can identify some documentary evidence in the massive stipulated record *despite* inadequate notice is beside the point.

> **5.   If Yorkville Provided Personal Services to Portfolio Companies, Such Activities Cannot Be Attributed to YA Global Under Agency Principles.**

If Yorkville *were* providing sourcing, negotiating and deal management services, not to YA Global in accordance with the investment management agreements, but rather to portfolio companies,

it was certainly not doing so as YA Global's agent. AOB42-43. The agreement provisions cited by the Commissioner (RB20) do not say otherwise. To the contrary, they make clear that Yorkville was engaged to act for YA Global's benefit, not on behalf of its counterparties. Nor does the fact that the agreements "address" fees from portfolio companies (*id.*) suggest that they somehow authorized Yorkville to act against YA Global's interest, let alone against YA Global's interest but somehow simultaneously as its agent.

### C. The Fund Was an Investor.

#### 1. Cases.

YA Global's profits (and massive losses) from funding companies are from investing, not a trade or business. AOB43-47. The Commissioner's efforts to distinguish Petitioners' cases are unconvincing.

The Commissioner argues that "an entity that puts its capital at risk by making loans" can have a trade or business. RB29. Then, curiously, in the very next paragraph he dismisses Petitioners' discussion (AOB46-47) of *Trans-Atl. Co. v. Comm'r*, 469 F.2d 1189 (3d Cir. 1972) as irrelevant "as it addressed the distinction between equity investments

15

and debt." RB29.  The factors that determine the debt-equity distinction are relevant to showing how returns are generated from capital.

The Commissioner also tries to distinguish *Hub City Foods Inc. v. Comm'r*, 884 F.2d 320, 323 (7th Cir. 1989); *Mt. Mansfield Co. v. Comm'r*, 50 T.C. 798, 800-801 (1968), *aff'd*, 409 F.2d 845 (2d Cir. 1969); and *Evans v. Comm'r*, 48 T.C. 704, 708 (1967), *aff'd*, 413 F.2d 1047 (9th Cir. 1969), all discussed at AOB44, as involving "no dispute that the taxpayer was engaged in at least one trade or business—only whether certain activities were part of a distinct, separate trade or business."  RB32.  But the question there, as here, was whether the taxpayer's activities amounted to a trade or business; that those taxpayers also engaged in *other* activities that gave rise to a *separate* trade or business is immaterial.

Finally, the Commissioner observes that *Linen Thread Co. v. Comm'r*, 14 T.C. 725 (1950), emphasized "[t]he character of the activities" undertaken by the taxpayer's U.S. representative.  RB32-33. Understanding the character of Yorkville's activities is, indeed, critical here.  If Yorkville's sourcing, negotiating, structuring and managing deals were done in furtherance of managing YA Global's investments (as

all the evidence shows), then there can be no USTB here, no matter how extensive the activities were.  *Higgins*, 312 U.S. at 217.

### 2. Marketing Materials.

Seeking to manufacture a factual question regarding YA Global's economic risks, the Commissioner claims that "the evidence regarding risk was not one-sided," and he cherry-picks snippets from various marketing materials used to introduce Yorkville's funds to potential investors.  RB30-31.  The Commissioner's expert similarly focused on marketing materials rather than economic analysis of the Fund's investments.  AOB32.  In fact, the CCA issued in 2014 suggests the Commissioner relied solely on marketing materials to issue the assessment in this case.[3]  *See* AOB15.

---

[3] Even now, the Commissioner continues to describe YA Global's investments based on oversimplified general statements.  For example, he describes SEDAs by stating that "YA Global purchased the stock at a discount, sold it to the public at market price, and generally earned a spread on each share sold, plus fees from the portfolio company."  RB5.  That sentence is highly misleading.  Under a SEDA, YA Global was required to purchase stock when a portfolio company demanded it.  JA26.  Because the stocks were thinly-traded penny stocks, selling them in bulk could depress their prices

17

Promotional materials are necessarily designed to attract inquiry; they are irrelevant to determining how the Fund generated returns. *Cf. Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) ("[A] company's website is a marketing tool.  Often, marketing material is full of imprecise puffery that no one should take at face value."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 374-375 (1977) (rejecting "assum[ption] that the public is not sophisticated enough to realize the limitations of advertising" as "underestimat[ing] … the public")  That is especially true where, as here, marketing materials are directed at sophisticated investors.  *Walsh v. Rigas*, No. 17 Civ. 4089 (NRB), 2019 WL 294798, at *8 (S.D.N.Y. Jan. 23, 2019) (an investor with knowledge, expertise, and experience in financial matters is precluded, as a matter of law, from relying on statements not made in the PPM, subscription agreement, or other governing documents in support of his claims). *See also, Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333 (2d Cir. 2011) (investor was

---

dramatically.  In fact, the Commissioner's own expert showed YA Global frequently held shares it acquired via a SEDA for weeks, months, and even years, bearing risk throughout.  *E.g.*, JA1846, JA1848, JA1856, JA1861.

not justified, as a matter of law, in relying on marketing statements in the face of SEC-mandated disclosures).

Had the Tax Court relied on marketing materials in the face of the detailed evidence showing how YA Global actually generated returns, it would have been clear error.[4]

---

[4] The Commissioner requests (RB19 n.7) remand so the Tax Court can determine whether YA Global was a lender or an underwriter. The record overwhelmingly shows that the Fund generated profits and losses as an investor, so a remand would waste time and judicial and party resources. *See United States v. Izaguirre-Losoya*, 219 F.3d 437, 442 (5th Cir. 2000) (finding, under the circumstances, that to remand would be "an empty formality and waste of judicial resources"); *cf. Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (reversing without remand where case had already taken more than ten years). Should the Court disagree, Petitioners respectfully request a clear directive to the Tax Court to consider *only* whether economic analysis shows that YA Global generated profits and losses as an investor/trader as opposed to a lender/underwriter. Continued litigation of other issues is unwarranted.

### D. The Trading Exceptions Apply.

#### 1. The Commissioner's "Waiver" Argument Is Unfounded.

The Commissioner points to the Tax Court's holding that YA Global was not a trader in securities because it purportedly, through Yorkville, provided personal services to portfolio companies, and he claims that "Petitioners d[id] not adequately address [this] threshold holding." RB33-34. Not so: Petitioners explained at length why the Tax Court's foundational holding is contrary to law. AOB26-51.

The Commissioner also suggests that Petitioners' reference to Treasury Regulation Section 1.864-2(c)(2)(i)(*c*) was insufficient to show that YA Global engaged in trading in stocks or securities. RB34. But Petitioners' Addendum sets forth the entire regulation (AOB88), which describes YA Global's activities by its terms. Specifically, the regulation provides that "the effecting of transactions in stocks or securities [*i.e.*, "trading"] includes—

> buying, selling (whether or not by entering into short sales), or trading in stocks, securities, or contracts or options to buy or sell stocks or securities, on margin or otherwise, for the account and risk of the taxpayer, and any other activity closely related thereto (such as obtaining credit for the purpose of effectuating such buying, selling, or trading)."

20

Treas. Reg. § 1.864-2(c)(2)(i)(*c*).   YA Global purchased securities from portfolio companies in the form of stocks and debentures; it entered into contracts to buy and sell stocks and debentures; and it sold securities in public markets.[5]   That is "effecting transactions" in securities, and the Commissioner does not suggest otherwise.

Finally, the Commissioner objects that Petitioners made no argument below that Yorkville's providing negotiating and structuring services *to portfolio companies* was "closely related" to trading in securities. RB37. True—because Yorkville did <u>*not*</u> provide those services to portfolio companies.  Instead, the services were provided to and for the benefit of YA Global.   With that understanding, it is plain that the activities, *i.e.*, finding, negotiating and managing deals for the Fund were "closely related" to the Fund's buying (and selling) of those securities.

### 2.   Section 864(b)(2)(A)(i) Applies.

The Commissioner's discussion of this issue (RB37-41) largely repeats the Tax Court's error in claiming that Yorkville was not an

---

[5]  The Commissioner does not dispute that all of YA Global's funding instruments were "securities" within the meaning of the regulation.

independent agent of YA Global as a result of exclusivity.[6]    The Commissioner is wrong (*see* AOB7-8; AOB47-50), and his denial that there is "evidence that Yorkville marketed investment management services to unrelated funds" (RB39), ignores his own exhibits. *E.g.*, SA41, SA62, SA66.

The Commissioner is also wrong in claiming (RB40-41) that YA Global effected securities transactions through an office in the United States.    The Commissioner has acknowledged that, having "no employees, YA Global itself could not perform any activities." JA19. *See also,* RB9. YA Global's securities trading, therefore, could only have been done by Yorkville, through Yorkville's office.   And an independent agent's office is not treated as his principal's.   Treas. Reg. § 1.864-7(d)(2).   In claiming that YA Global does not meet the requirements of Section 864(b)(2)(A)(i) even if Yorkville was an independent agent (RB41), the Commissioner has added a requirement to the statute that does not exist.

---

[6]  As discussed at AOB42-43 and in Section I.B.5., *supra*, Yorkville was not YA Global's agent at all with respect to providing any personal services to portfolio companies.

### 3. Section 864(b)(2)(A)(ii) Applies.

The Commissioner's assertion that Section 864(b)(2)(A)(ii) does not apply to YA Global's trading in securities turns on his argument that YA Global was a dealer. RB41-42. The Commissioner acknowledges, however, that in order to be a dealer for purposes of Section 864, a taxpayer must buy *and* sell securities to "customers." RB41. As Petitioners have explained (AOB52-57), the portfolio companies from whom YA Global bought securities were not its customers, nor were the anonymous market participants to whom it sold securities.

### E. Under the Tax Court's View of YA Global's Purported USTB, None of the Fund's Income from Securities Trading Could Be ECI.

Under Section 864(c)(2), income from the sale of capital assets (such as securities) is ECI if either (a) the income is derived from assets used in the trade or business, or (b) the activities of the trade or business were a material factor in the realization of the income. If the Tax Court were correct that YA Global had a USTB because Yorkville provided negotiating and structuring services to portfolio companies rather than YA Global, then those activities could have nothing to do with YA Global generating income from selling securities. In fact, to the extent Yorkville

was working to assist portfolio companies, its activities would, if anything, *hinder* YA Global's ability to generate income.

The Tax Court avoided this obvious problem by relying on its incorrect holding about Section 475 and making several logical leaps through different sections of the Code. AOB50-51. Doing so allowed it to analyze the ECI question under the wrong Code section and to conclude that all the Fund's income was ECI "without regard to the specific factual connection between the income and [the] business." *Id*. (citing JA72-73).

The Commissioner does not meaningfully respond, instead claiming that Petitioners did not challenge "the substance" of the Tax Court's analysis. RB59. But they did. *See* AOB50-52. He also claims that Petitioners forfeited the argument that YA Global's income was not ECI. RB58-59. Not so, for the same reasons they did not forfeit their argument about fees (*see* p.11, *supra*).

## II.    YA Global Was Not a Dealer Under Section 475.

### A.    The Commissioner's Suggestion That This Court Owes Deference to the Tax Court's Interpretation of Statutes Is Wrong.

The Tax Court patently misread Section 475 and the related regulations to determine that portfolio companies were YA Global's

"customers." AOB52-59. Notably, the Commissioner does not defend the Tax Court's construction as correct. Instead, he seeks to frame the Tax Court's interpretative undertaking as a fact-finding mission, claiming its conclusions about meaning were "reasonabl[e]." RB49-50. They were not, and in any case, this Court's review is plenary, not for reasonableness. *E.g.*, *Pleasant Summit Land Corp. v. Comm'r*, 863 F.2d 263, 268 (3d Cir. 1988).

### B. The Commissioner Misstates Petitioners' Arguments About the Meaning of "Dealer."

Petitioners do not contend "that a taxpayer is only a 'dealer in securities' with 'customers' when it is 'indifferent to which side of the transaction it is called upon to take.'" *Contra* RB50. Rather, Petitioners contend that defining a taxpayer's "customers" to be merely anyone with whom the taxpayer transacts (as the Tax Court did) may be the correct interpretation of Section 475 *only* in situations where the taxpayer is open to being on either side of the transaction, as the regulations make clear. *See* AOB55-57. In any other situation, the word "customers" must be given a narrower meaning, or else any business that happens to buy or sell securities, even if purely for investment or hedging purposes, would be a dealer. *See* AOB57-60.

Where a taxpayer is not open to taking either side of a transaction, it may have "customers"—and therefore be classified as a dealer—only if it generates profits by virtue of its role as a market maker. *See* AOB52-55 (collecting cases). The Commissioner's suggestion (RB51) that these cases are not applicable is puzzling as the IRS Chief Counsel has said they are. *E.g.*, CCA 201423019 (Jan. 22, 2014), https://www.irs.gov/pub/irs-wd/201423019.pdf.

The Commissioner is correct (RB51) that a "dealer" is defined more broadly for purposes of the Section 475 accounting method (which requires only that a taxpayer buy *or* sell to customers) than for Section 1221 or the trade or business rules (which require that a taxpayer both buy *and* sell to customers).[7] Nevertheless, a taxpayer's status as a dealer must be determined with regard to the nature of its profits, even for purposes of determining whether it must mark its securities to market under Section 475. For the reasons Petitioners have explained, YA Global does not fit the bill.

---

[7] In fact, this distinction is one of many reasons that YA Global qualified for the exception for trading in Section 864(b)(2)(A)(ii). *See* Section I.D.3., *supra*.

26

**C.    A Taxpayer Is Not a Dealer by Virtue of Buying and Selling Securities in the Ordinary Course of a Trade or Business Unless the Buying and Selling of Securities _Is_ the Trade or Business.**

The Commissioner does not even attempt to defend the Tax Court's interpretation of Section 475 as applying to any taxpayer who has *some* kind of business and *also* regularly trades securities.  *See* AOB57-60. Instead, he asserts forfeiture again (RB53).  And he is wrong again.  *See* p.11, *supra.*

Moreover, by referencing Example three in Section 1.475(c)-1(a)(2)(ii) of the regulations (RB53), the Commissioner only highlights that the Tax Court's flawed interpretation is contrary to his own.

**D.    YA Global's Securities Were Properly Identified**

Petitioners do not, as the Commissioner points out (RB58), challenge the point that the temporal requirement in Section 475(b)(2) prevents dealers from cherry-picking with hindsight.  In fact, Petitioners do not challenge the statute's temporal requirement at all.   They challenge only the Commissioner's suggestion that the identification must include the words "for purposes of Section 475," which is unrelated to *when* the identification must be made.

27

The Commissioner's reliance on the word "being" in Section 475(b)(2) is misplaced. RB55-56. The word simply connects the subject in the sentence ("[a] security") to the descriptive content of the relevant subparagraph ("(A), (B) or (C)"), and the Commissioner's suggestion that striking it would change the statute's meaning makes no sense. Had Congress intended to require an identification to include the words "Section 475," it would have said so, using language such as "identified by reference to such subparagraph of Section 475" or "identified as a Section 475 security." The idea that the word "being" does the work of an entire phrase should be rejected. More fundamentally, if Congress intended to require a taxpayer to use magic words to trigger a statute, Congress would have said so. *Cf. Kelly v. RealPage Inc.*, 47 F.4th 202, 219-220 (3d Cir. 2022) (no "magic words" are required for a consumer to make a request under the Fair Credit Reporting Act).

Nor do the relevant regulations indicate that taxpayers must identify securities using the words "section 475." The Commissioner's statement to the contrary is misleading. After quoting Section 1.475(b)-2(a), the Commissioner says—

28

> The regulation thus explains that § 475(b)(2) requires "an explicit statement that a security is described in either section 475(b)(1)(A) or (B) or section 475(b)(1)(C)." JA61.

RB56. But the "explicit statement" phrase he quotes is from the Tax Court's opinion—not the regulation, which largely mirrors the statute, and therefore adds no weight to the Commissioner's argument.

## III. The Tax Court's Reliance on the Malpractice Case to Sustain Penalties Constitutes Legal Error.

### A. The Commissioner's Brief Highlights the Flaws in the Tax Court's Reasoning.

The Tax Court concluded that RSM provided timely advice to YA Global that it was not engaged in a USTB (JA137), that YA Global provided it with the necessary and accurate information to make that determination (JA139), and that the legal issue was "fraught with uncertainty" (JA143). Those undisputed findings (RB73-75) establish that YA Global had reasonable cause for not filing Forms 8804 and not paying Section 1446 withholding tax. *See*, *e.g.*, *United States v. Boyle*, 469 U.S. 241, 246 (1985). This Court thus can and should hold that the Tax Court erred in concluding otherwise.[8]

---

[8] The Commissioner indicates (RB75 n.17) that he raised "other challenges" to Petitioners' reasonable cause claim but does not identify

The Commissioner defends the Tax Court's refusal to apply the reasonable cause exception merely by repeating the court's flawed reasoning, *i.e.*, that YA Global's filing of a malpractice case against RSM in 2015 somehow suggests that the Fund knew the advice was negligent when it was provided nearly a decade earlier.  As Petitioners explained (AOB66), the Fund filed a malpractice suit against RSM just two months after receiving the FPAAs, and for the express purpose of preserving a *potential* claim against the statute of limitations.  The Commissioner reiterates the Tax Court's conclusion that the lawsuit is evidence that YA Global "at some point" came to believe RSM's advice was negligent, but he simultaneously insists that the "timing of the suit is not evidence" of anything.  RB74-75.  The Commissioner does not explain why the lawsuit would be evidence of facts helpful to his position but not evidence of facts that are unhelpful.  Indeed, the Commissioner cites no legal authority at all in response to Petitioners' cited cases (AOB67).

---

any such challenge that the Tax Court has not already addressed in its findings.

## B.    The Tax Court Erred by Dragging the Malpractice Suit into the Case When Neither Party Raised It.

The Tax Court violated the party-presentation principle.  AOB68-70.  The Commissioner responds by insisting that a court "retains the independent power to identify and apply the proper construction of governing law."  RB76 (quoting *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 877 n.11 (3d Cir. 2022)).  But the Tax Court did not correct any error or oversight of *law*; it injected *facts* into the case that neither party had presented.  This case is unlike *Panzarella*, where this Court reached its own answer to a pure question of law—the interpretation of a statute—that the parties had placed squarely before the Court.  *Id.* at 876-77.  The Commissioner cites no authority that would allow a *trial* court to overhaul the *factual* case the parties presented.

This case is more like *United States v. Sineneng-Smith*, 590 U.S. 371 (2020), where, as here, the lower court neglected "the party-presented controversy" in favor of a "radical transformation of [the] case." *Id.* at 380.  The Commissioner responds only that the Tax Court gave the parties "the opportunity to provide supplemental briefing."  RB77.  But supplemental briefing did not cure the party-presentation problem in *Sineneng-Smith* (590 U.S. at 379), and it does not here, particularly given

31

that the Tax Court ultimately advanced and adopted an argument that the Commissioner did not pursue even in his supplemental brief. JA6408-6442.

## IV. The Statute of Limitations Bars Assessment for 2006 and 2007.

### A. The Limitations Period Commenced When YA Global Filed Its Forms 1065.

In defending the Tax Court's conclusion that the limitations period under Section 6501(a) never commenced in this case, the Commissioner acknowledges that "the only issue on appeal is whether YA Global's 2006 and 2007 Forms 1065 were adequate substitutes for the Forms 8804 it did not file." RB62. Although he concedes that *Comm'r v. Lane-Wells Co.*, 321 U.S. 219 (1944), controls the issue, he claims that case supports his (and the Tax Court's) position because the Fund's Forms 1065 did not show the facts upon which Section 1446 withholding tax liability would be predicated. RB63-64. His argument is specious.

In *Lane-Wells*, the taxpayer argued that the Form 1120 that he filed was sufficient as a stand-in for the Form 1120H that he did not file because the information called for on Form 1120H "***could have*** been called for by Form 1120." *Lane-Wells,* 321 U.S. at 223 (emphasis added).

32

The Supreme Court rejected the taxpayer's argument and held that the Form 1120 did not trigger the statute of limitations because it was "insufficient to advise the Commissioner that any liability existed" for the tax reportable on Form 1120H. *Id*.

Here, the Commissioner has not pointed to any information on Form 8804 that is not also included as part of Form 1065. Form 8804 is a two-page document requiring only that a taxpayer make computations using numbers coming directly from its Form 1065 and the attached Schedules K-1. *See* AOB73. Petitioners do not argue that the information sought by Form 8804 *could have* been sought on Form 1065. Rather, Petitioners explain—and the Commissioner does not deny—that all information sought by Form 8804 *was* sought on Form 1065 and was reported by YA Global. Thus, the Commissioner could not have learned any more relevant facts from Forms 8804 than from Forms 1065. Indeed, the Commissioner admits that he "was only able to determine those facts after conducting an extensive examination." RB64.

The Commissioner suggests no mechanism by which YA Global could have commenced the statute of limitations here. On the one hand, he echoes the Tax Court's suggestion (JA101) that YA Global *may* have

33

been able to trigger the statute if it had filed Forms 8804 showing all zeros. RB65. On the other, he claims that the Forms 1065 were inadequate to initiate the limitations period because YA Global "denied" that it had a USTB on its Schedules K-1 (RB64), just as it would have done by filing Forms 8804 with zeroes. Although it would be within the Commissioner's prerogative to do so, he has not prescribed any form, return, or procedure that would allow a partnership to commence the statute of limitations for purposes of Section 1446 withholding tax without asserting, contrary to its reasonably held belief, that it has a USTB.[9] The Commissioner's failure to provide any mechanism for partnerships to get repose should not accrue to his benefit.

## B. YA Global Did Not Consent to Extend the Limitations Period for Assessment of Section 1446 Liability.

YA Global filed its 2006 and 2007 Forms 1065 in October 2007 and September 2008, respectively. RB66. Thus, under the normal three-year limitations period, the Commissioner would have been barred from

---

[9] In contrast, there *is* a procedure by which foreign corporations can file protective returns (Forms 1120-F) to protect their rights to claim deductions in the event they are found to have a USTB. In fact, YA Global's offshore feeder did precisely that. *See* SA2.

34

assessing additional tax for those years by October 2010 (for 2006) and September 2011 (for 2007).  The Commissioner sought extension after extension, however, and the Fund granted him additional time to assess income tax on seven different Forms 872-P.   JA203-204.   As the Commissioner points out (RB67), beginning in February 2012, he added an asterisk to the Forms 872-P with language permitting him to also assess any withholding tax due on Form 8804.  *E.g.*, JA1523.  What he neglects to mention is that, by February 2012, the normal assessment periods for 2006 and 2007 had already expired.

Citing *Holof v. Comm'r*, 872 F.2d 50, 53 (3d Cir. 1989), the Commissioner claims that the plain language of the Forms 872-P, which applied only to the <u>*income*</u> tax liability of YA Global's <u>*partners*</u>, should be rejected and must, instead, be interpreted against the "statutory framework in which [it] was designed to operate."  RB70.  But the issue in *Holof* was not whether the taxpayers relied on the plain language of an extension form when they signed it.  There was no dispute that the taxpayers had intentionally and knowingly waived the statute of limitations.  Moreover, as this Court pointed out, "[they] acknowledged understanding of the statutory scheme."  *Id.* at 54 n.12.  In contrast, the

critical question here is whether YA Global "intentional[ly] relinquish[ed] or abandon[ed]" its right to rely on the statute of limitations. *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 339 (3d Cir. 2023) (internal citations omitted). The key here, then, is whether YA Global understood the Forms 872-P to mean what they said, not whether there is a hypertechnical reading of the Code that turns a withholding tax into an income tax and a partnership into a partner of itself.

The Commissioner also notes that YA Global engaged experienced counsel to advise it during the audit, which, he claims, "addressed whether YA Global was engaged in a U.S. trade or business for purposes of determining if it was liable for § 1446 withholding tax." RB69. In support of his contention, the Commissioner references a letter sent by the Fund's foreign feeder fund ("YA Offshore") in February 2012 in which it explained that it had been notified that the IRS believed YA Offshore "may have engaged" in a USTB. *Id.* citing SA2. If the Commissioner is suggesting that the letter is evidence that YA Global knew that Section 1446 withholding tax was at issue at any time prior to the Commissioner's sending the February 2012 Forms 872-P, altered with asterisks, he misleads the Court. There is neither any mention of Section

36

1446 withholding tax in the letter nor any indication that YA Global considered withholding tax to be in issue.  To the contrary, the letter served as YA Offshore's request for permission to file an untimely protective Form 1120-F in order to preserve *its own* right to claim deductions in the event *it* was assessed with *income* tax as a result of having a USTB.  *See* n.11, *supra*.  If anything, the letter reinforces that YA Global had no indication from the Commissioner that he would seek to collect the tax as a withholding tax from YA Global itself rather than from YA Global's foreign partners directly.

Finally, the Commissioner's statement that "[i]t is not credible that YA Global, represented by experienced counsel, did not understand that its potential § 1446 withholding tax liability was at issue when it signed the forms" (RB70) is completely unwarranted.  The Tax Court itself has found that withholding tax and income tax are separate and distinct liabilities.  *See InverWorld, Ltd. v. Comm'r*, 98 T.C. 70, 80-81 (1992), *aff'd*, 979 F.2d 868 (D.C. Cir. 1992) (concluding that a determination of deficiencies in withholding tax is not a determination of deficiencies in income tax); *S-K Liquidating Co. v. Comm'r*, 64 T.C. 713, 717 (1975) (the liabilities are "separate and distinct, arise from different states of fact

37

and are based upon entirely different theories") (internal citation omitted). Moreover, whether Section 1446 withholding tax is a "partnership item," which the Commissioner argues (RB69) is evidence that it was included within the language of the Form 872-P, was an issue of first impression when the Tax Court decided it in 2018. *YA Global Investments, LP v. Comm'r*, 151 T.C. 11, 15-16 (2018). The Commissioner's suggestion that YA Global's counsel should have known what even the Tax Court did not is unpersuasive.

Indeed, when the first sets of Forms 872-P were executed, even the Commissioner's exam team had doubts as to whether withholding tax was a partnership item, prompting them to solicit Forms 872 "as a protective measure in case a court later determined that the withholding liability should be addressed through deficiency notices to YA Global" (*i.e.*, as opposed to through a partnership proceeding as a partnership item). RB71. And the fact that the Commissioner did not include Section 1446 when he listed "sections 1441-1442" as the only withholding taxes covered by the Forms 872 (AOB14) indicates that even he did not consider Section 1446 to be in issue until February 2012, when it was added to the forms.

As the Commissioner says, this Court must consider "the 'circumstances and context' in which the Forms 827-P were signed." RB69 (citation omitted). Here, the circumstances and context show that Petitioners had no reason to expect Section 1446 to be part of the statute extensions based on the forms prepared by the Commissioner. The ordinary meaning of the forms' text, rather than the Tax Court's tortured exercise in interpreting the Code, governs the agreements' scope. *See United States v. Hodgekins*, 28 F.3d 610, 614 (7th Cir. 1994).

## CONCLUSION

The Court should reverse.

Dated: February 24, 2026          Respectfully submitted,

s/ Tamara L. Shepard

TAMARA L. SHEPARD
  MA BAR NO. 568785
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-7959

HENRY CHENG
  CA BAR NO. 267578
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2512

*Counsel for YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner*

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of the Court's Order dated February 18, 2026 (Dkt. No. 47) because it contains 7,445 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: February 24, 2026          s/ Tamara L. Shepard
                                  TAMARA L. SHEPARD

41

## CERTIFICATE OF SERVICE

I, Tamara L. Shepard, counsel for YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, GP LLC, Tax Matters Partner, and YA Global Investments, LP, f/k/a Cornell Capital Partners, LP, Yorkville Advisors, LLC, Tax Matters Partner, certify that, on February 24, 2026, I electronically filed the foregoing Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Pursuant to Local Appellate Rule 31.1, as amended by the Order, dated April 29, 2013, 7 copies of this brief were sent to the Clerk of the Court for delivery.


Dated: February 24, 2026         s/ Tamara L. Shepard
                                 TAMARA L. SHEPARD