## No. 25-1766

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

YA GLOBAL INVESTMENTS, LP, *et al.*,

*Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Appellee*.

On Appeal from the United States Tax Court

## BRIEF OF AMERICAN INVESTMENT COUNCIL AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

Matthew M. Yelovich
CLEARY GOTTLIEB STEEN & HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, California 94304
Telephone: 650-815-4100
Facsimile: 650-815-4199
myelovich@cgsh.com

Rishi N. Zutshi
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
rzutshi@cgsh.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

FEDERAL RULE OF APPELLATE PROCEDURE 29 STATEMENT ...................1

CORPORATE DISCLOSURE STATEMENT ......................................................2

STATEMENT OF AMICUS CURIAE ................................................................3

SUMMARY OF ARGUMENT .............................................................................5

ARGUMENT ........................................................................................................9

I.      A taxpayer is not engaged in a trade or business merely because it structures and negotiates its acquisition of securities from issuers.................................9

      A.      The Tax Court ignored settled case and statutory law in its reasoning regarding YA Global's status. ...............................................................9

      B.      Adopting the Tax Court's suggestion regarding negotiation and structuring of investments would have significant negative consequences on investors and the U.S. economy. .............................14

II.     To be a securities dealer under Section 475, the taxpayer must be transacting with persons who are its customers. ...............................................................17

CONCLUSION ...................................................................................................26

CERTIFICATE OF BAR MEMBERSHIP ..........................................................27

CERTIFICATE OF SERVICE ............................................................................28

CERTIFICATE OF COMPLIANCE....................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Comm'r,*
 T.C.M. (RIA) 2009-080 ....................................................................................12

*Comm'r v. Stevens,*
 78 F.2d 713 (2d Cir. 1935) ..............................................................................19

*Davis v. Comm'r,*
 716 F.3d 560 (11th Cir. 2013) .........................................................................23

*Deely v. Comm'r,*
 73 T.C. 1081 (1980).........................................................................................11

*Higgins v. Comm'r,*
 312 U.S. 212 (1941).........................................................................................11

*Kemon v. Comm'r,*
 16 T.C. 1026 (1951).....................................................................................19, 24

*Schafer v. Helvering,*
 299 U.S. 171 (1936).........................................................................................19

*Stephens, Inc. v. United States,*
 464 F.2d 53 (8th Cir. 1972) .............................................................................19

*Townshend v. United States,*
 384 F.2d 1008 (Ct. Cl. 1967) ..........................................................................11

*United States v. Wood,*
 943 F.2d 1048 (9th Cir. 1991) .........................................................................19

*Whipple v. Comm'r,*
 373 U.S. 193 (1963)....................................................................................10, 11

**Statutes**

26 U.S.C. § 475(c)(1)(A) .......................................................................................18

26 U.S.C. § 475(c)(1)(B) ................................................................................20

26 U.S.C. § 864(b)(2)(A)(i) ...........................................................................12

26 U.S.C. § 864(b)(2)(A)(ii) ....................................................................12, 14

26 U.S.C. § 871(b) .......................................................................................9, 15

26 U.S.C. § 875(1) ..........................................................................................15

26 U.S.C. § 882 ..................................................................................................9

26 U.S.C. § 882(a) ..........................................................................................15

26 U.S.C. § 882(c)(2) ......................................................................................16

26 U.S.C. § 6110(k)(3) ....................................................................................23

26 U.S.C. § 6501(a) ........................................................................................16

Foreign Investors Tax Act of 1966, Pub. L. 89-809 § 102(d)(2) (1966) ................12

**Regulations and Regulatory Materials**

Treas. Reg. § 1.471-5(c) ..................................................................................23

Treas. Reg. § 1.475(c)-1(a) .............................................................................18

Treas. Reg. § 1.475(c)-1(a)(2) ...................................................................20, 22

Treas. Reg. § 1.864-2(c)(1) .............................................................................13

Treas. Reg. § 1.864-4(c)(3)(i) .........................................................................13

Treas. Reg. § 1.864-4(c)(5) .............................................................................14

Treas. Reg. § 1.6012-1(b)(1) ...........................................................................15

Treas. Reg. § 1.6012-2(g)(1)(i) ........................................................................15

**Other Authorities**

I.R.S. FSA 2000-16-002 (Jan. 13, 2000) ........................................................23

David S. Miller, *Everything Wrong With* YA Global, 186 Tax Notes
Fed. 2175 (Mar. 24, 2025) ...................................................................................6

H.R. Rep. No. 89-1450 (1966).............................................................................12

Internal Revenue Service, Topic No. 429, *Traders in securities*,
https://www.irs.gov/taxtopics/tc429 (last visited Feb. 22, 2026) ..........................23

N.Y. State Bar Ass'n Tax Section, *Report on Final and Proposed
Regulations Under Section 892*, Rep. No. 1521 (Feb. 13, 2026),
https://www.regulations.gov/comment/IRS-2025-0532-0015 .................................6

N.Y. State Bar Ass'n Tax Section, *Report on the Tax Treatment of
Certain Fees*, Rep. No. 1500 (Sep. 13, 2024), https://nysba.org/wp-
content/uploads/2024/09/NYSBA-TS-report-on-certain-fees-1500.pdf .............6, 13

William L. McRae & Jonathan Gifford, YA Global*: Customers Come
First, Analytically*, 183 Tax Notes Fed. 305 (Apr. 10, 2024)...................................6

## FEDERAL RULE OF APPELLATE PROCEDURE 29 STATEMENT

This brief is submitted pursuant to Federal Rule of Appellate Procedure 29(a) with the consent of Appellants.  Appellee does not consent.

This brief was not authored in whole or in any part by counsel for any of the parties.  No party or party's counsel, or any person other than the *amicus curiae* and its members, contributed money intended to fund preparing or submitting this brief.

## CORPORATE DISCLOSURE STATEMENT

Counsel for *amicus curiae*, the American Investment Council, certifies that *amicus curiae* has no parent corporation and that no publicly held corporation owns 10% or more of any stock in *amicus curiae*.

## STATEMENT OF AMICUS CURIAE

The American Investment Council ("AIC") is an advocacy and research organization dedicated to the promotion of responsible long-term investment by the private equity and credit investors who comprise its membership.  Acting on this mission, AIC works to improve access to capital, create jobs, expand retirement security, generate innovation, and support economic growth throughout the United States.  AIC's mission is an important one considering the positive role that private equity and credit investors play in communities across America: supporting millions of jobs, helping thousands of small businesses, and delivering the strongest returns of any investment vehicle for public pensions.

In 2024, the U.S. private equity sector directly employed 13.3 million workers in the United States (including 917,000 in the Third Circuit), earning $1.1 trillion in wages and benefits ($112 billion in the Third Circuit), and generated $223 billion in federal taxes and $114 billion in state and local taxes ($8.2 billion of state and local taxes in the Third Circuit).  In a typical year, private equity invests over $1 trillion in the U.S. economy, a substantial portion of which is from foreign investors.

AIC has a significant interest in this case because the Tax Court's suggestion as to one issue and conclusion as to another, if allowed to stand, would upend decades of settled market expectations as to how investment firms are treated,

based on decades of caselaw and statutory text.  Indeed, the consequences of upholding these statements would extend beyond traditional "private equity" and would also touch venture capital firms, real estate funds, and any other investment entity that purchases stock or securities on a regular basis.

Because embracing these statements or allowing them to stand would risk significant consequences to AIC's members, the investing public, and the economy at large, and because the government has supported these positions on appeal, AIC respectfully presents this brief to provide the correct and governing legal framework and explain why this Court should not affirm the Tax Court's errors.

## SUMMARY OF ARGUMENT

Two aspects of the Tax Court's decision contravene decades of well-settled law, risk upending longstanding expectations of investors in the United States, and could, if endorsed by this Court, have significant adverse consequences on investors and the U.S. economy.

First, the parties framed the principal issue to the Tax Court as whether YA Global was an investor or, instead, was engaged in a financing business involving lending and/or underwriting. The Tax Court declined to address whether YA Global was engaged in a lending and/or underwriting business, and instead concluded that the taxpayer was engaged in a trade or business on entirely different grounds. In reaching that conclusion, the Tax Court suggested, and the government has argued on appeal,[1] that the mere acts of structuring investments and negotiating their terms can, standing alone, transform a person from an investor into a taxpayer engaged in a U.S. trade or business for purposes of Section 864 of the Internal Revenue Code of 1986, as amended (the "Code"). The Tax Court's suggestion is likely dicta and is unnecessary to affirm on any theory litigated below. Nevertheless, the government's new reliance on that suggestion,

---

[1]    Appellee's Answering Brief ("AAB") 23–24.

and its broad implications for common investment practices, warrant particular

caution.  This Court should not embrace it.

Second, the Tax Court misconstrued the definition of "dealer" as used in

Section 475 of the Code and ignored relevant caselaw, and on the basis of those

legal errors concluded that the taxpayer acted as a dealer in securities and was

subject to mark-to-market taxation.  The government supports this erroneous

conclusion before this Court.[2]

If endorsed by this Court, the Tax Court's views on those two issues could

dramatically change the long-settled taxation of both U.S. and foreign investors in

U.S. companies.[3]  As a result of the first issue, foreign investors in a broad range of

---

[2]    AAB 49–54.

[3]    The Tax Court's positions in this case on these and other issues have been
extensively criticized by tax professionals.  *See, e.g.,* David S. Miller,
"Everything Wrong With *YA Global*," 186 Tax Notes Fed. 2175 (Mar. 24,
2025) (arguing that the Tax Court's conclusions regarding, *inter alia,* agency,
services, Section 475, effectively connected income and penalties were fatally
flawed).  *See also* N.Y. State Bar Ass'n Tax Section, *Report on the Tax
Treatment of Certain Fees*, Rep. No. 1500 (Sep. 13, 2024) https://nysba.org/wp-
content/uploads/2024/09/NYSBA-TS-report-on-certain-fees-1500.pdf
(recommending guidance treating common transaction fees as paid in respect of
capital rather than for services provided to the borrower, in response to the
uncertainty created by the Tax Court's decision in *YA Global*); William L.
McRae and Jonathan Gifford, "*YA Global*: Customers Come First,
Analytically," 183 Tax Notes Fed. 305 (Apr. 10, 2024) (explaining why the Tax
Court's understanding of Section 475 is incorrect); N.Y. State Bar Ass'n Tax
Section, "Report on Final and Proposed Regulations Under Section 892," Rep.
No. 1521 (February 13, 2026), at 35–38
https://www.regulations.gov/comment/IRS-2025-0532-0015 (criticizing the Tax

investment funds could lose access to the exemption from U.S. tax that they have long been provided when investing into the United States for their own accounts. As a result of the second issue, U.S. taxable (as well as foreign) investors would be subject to tax as if the funds in which they invest hypothetically had sold (and immediately repurchased) all of their investments at the end of each year even though the funds continue to hold these investments and have not generated any cash proceeds with which to pay the tax. Moreover, their gains would be taxed as ordinary income rather than capital gains, which, for U.S. individuals, would increase the applicable tax rate. Collectively, these changes would jeopardize the ability of AIC's members to provide attractive returns to their investors and to provide capital necessary to fuel America's economic growth.

Endorsing the Tax Court's views on the first issue is not necessary to affirm its conclusion that the taxpayer in this case was engaged in a U.S. trade or business; the record contains other facts relevant to a determination regarding whether the taxpayer was engaged in a lending and/or underwriting business. Accordingly, AIC does not take a position as to whether or not this Court should affirm or reverse the Tax Court's conclusion that the taxpayer in this case was engaged in a U.S. trade or business. AIC respectfully urges this Court not to adopt

---

Court's interpretation of the agency standard as well as the government's "on behalf of" standard for attribution).

the view that routine investment structuring and negotiation, without more, constitutes a U.S. trade or business. With respect to the second issue, the Tax Court's conclusion that the taxpayer was a "dealer" in securities for purposes of Section 475 cannot be reconciled with the statutory text, the regulations, or longstanding caselaw, and directly affects the amount of tax due.  This Court therefore should reject that holding.

**ARGUMENT**

I.   **A taxpayer is not engaged in a trade or business merely because it structures and negotiates its acquisition of securities from issuers.**

A. *The Tax Court ignored settled case and statutory law in its reasoning regarding YA Global's status.*

The Tax Court concluded that YA Global was engaged in a trade or business in the United States, and was not acting as an investor or trader, for purposes of Section 864 of the Code.  That matters because a foreign person that is engaged in a U.S. trade or business, rather than acting as an investor or trader, is subject to U.S. federal income tax on the income that is "effectively connected with" that trade or business, and is required to file U.S. tax returns.  26 U.S.C. §§ 871(b), 882.  By contrast, pursuant to rules Congress designed to encourage foreign capital inflows into the United States, a foreign person that engages in mere investment and trading in U.S. stocks and securities generally is not subject to net income tax by the United States or required to file U.S. tax returns in respect of such activities.

In the course of its discussion, the Tax Court suggested that YA Global's activities went beyond simply providing capital because it also (through Yorkville Advisors) structured the transactions and negotiated their terms.  JA44–45 ("[W]hen the purchaser of a security goes beyond simply deciding whether to purchase a security on the terms offered and arranges and structures the transaction

9

in which the security is issued, the issuer realizes a benefit beyond the receipt of capital.").

The Tax Court's reasoning contradicts decades of well-settled caselaw.  In *Whipple v. Comm'r,* 373 U.S. 193 (1963), the Supreme Court held that significantly more extensive activities did not constitute a trade or business.  The taxpayer in *Whipple* formed at least fifteen corporations, plus partnerships and other ventures, within a few years, in multiple industries.  One of those corporations (Mission Orange Bottling Co.), in which the taxpayer owned 80 percent of the stock, produced, bottled, distributed, and sold beverages pursuant to a license that the taxpayer secured from an unrelated corporation (Mission Dry Corporation), using equipment that the taxpayer acquired, in a plant that he constructed and leased to the corporation.  In other words, the taxpayer organized and structured Mission Orange Bottling Co. and its business operations (in addition to other, more extensive involvement with those operations, such as building the company's manufacturing facilities).  He also assumed the management of the company when it encountered financial difficulties.  The taxpayer claimed a business bad debt deduction on loans he had made to the corporation, which the IRS denied on the grounds that it was a *non*business bad debt.  The Supreme Court held that Whipple was merely an investor, and not engaged in a trade or business:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or

> business of the person so engaged.  Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.

*Id.* at 202.[4]

Similarly, in *Higgins v. Comm'r*, 312 U.S. 212 (1941), the Supreme Court accepted the Commissioner's position that "'mere personal investment activities never constitute carrying on a trade or business, no matter how much of one's time or of one's employees' time they may occupy.'" *Id.* at 215.  Subsequent cases have repeatedly reaffirmed that a taxpayer is not engaged in a trade or business merely because it structures and negotiates investments.  *See, e.g.*, *Townshend v. United States*, 384 F.2d 1008 (Ct. Cl. 1967) (holding taxpayer not engaged in a trade or business despite organizing corporation, contributing capital to it, and subsequently assuming its debts in exchange for surrender of stock by all other shareholders, for purposes of bad debt deduction); *Deely v. Comm'r*, 73 T.C. 1081 (1980) (holding taxpayer not engaged in trade or business despite organizing and financing

---

[4]   The Supreme Court noted, on the other hand, that a taxpayer would be engaged in a trade or business if it (i) develops businesses for sale to customers in the ordinary course, for a fee or commission (i.e., acts as a promoter, dealer or underwriter) or (ii) is engaged in a lending or other financing business. *Whipple*, 373 U.S. at 202–03.  Those exceptions are reflected in the exceptions to the statutory safe harbor (discussed below) as well.

numerous corporations and business entities, for purposes of bad debt deduction); *Ackerman v. Comm'r*, T.C.M. (RIA) 2009-080 ("[T]hat Mr. Ackerman may have 'helped people create and structure transactions' in providing advisory services during the years at issue with respect to the major projects is not determinative of whether for each of those years he was engaged in a trade or business" for purposes of claiming deductions for business expenses).

That same principle has been codified into law by Congress, which in 1966 enacted two statutory safe harbors under Section 864(b)(2)(A) of the Code to encourage foreign investment in the United States.  26 U.S.C. § 864(b)(2)(A)(ii); *see* Foreign Investors Tax Act of 1966, Pub. L. 89-809 § 102(d)(2) (1966) (amending Section 864 to add subsections (b) and (c)); H.R. Rep. No. 89-1450, at 12 (1966) (describing safe harbors as intended to clarify ambiguity that "may have acted to deter some foreign investment in the United States").  Under those safe harbors, a taxpayer will not be treated as engaged in a U.S. trade or business either as a result of trading in stocks or securities through a U.S. broker or other independent agent, or as a result of trading in stocks or securities for its own account, however effected.  26 U.S.C. § 864(b)(2)(A)(i), (ii).  Of relevance here, the safe harbor for trading in stock and securities for the taxpayer's own account is broad:  It does not distinguish between stocks and securities that are publicly traded and those that are privately placed; it covers buying, selling, or trading in

stocks or securities "and any other activity closely related thereto" (which typically would include identifying, structuring, and negotiating the investments[5]); and it applies regardless of "the volume of stock or security transactions effected during the taxable year." Treas. Reg. § 1.864-2(c)(1).[6]  These provisions confirm that a

---

[5]   The Tax Court dismissed this straightforward reading of the Regulation on the grounds that "[t]axpayers engaged in merely trading and investment simply do not earn income designated as fees."  JA48 n.33 (quotation marks omitted).  That is factually incorrect, as investors routinely receive amounts denominated as fees, many of which are not treated as fees for U.S. federal income tax purposes because they are, in substance, not a service fee, but a cost associated with "making … capital available."  N.Y. State Bar Ass'n Tax Section, *Report on the Tax Treatment of Certain Fees*, Rep. No. 1500 (Sep. 13, 2024) https://nysba.org/wp-content/uploads/2024/09/NYSBA-TS-report-on-certain-fees-1500.pdf (identifying examples, summarizing relevant caselaw, and concluding that payments "must be characterized based on their substance rather than labels used by the parties").

It is also legally incorrect.  Under the Code and Treasury regulations, the receipt of fee income by a foreign investor or trader (as opposed to a lender or underwriter) as a result of services performed in the United States generally does not taint its status as an investor or trader that is eligible to have income and gains from stocks and securities exempt from U.S. taxation.  While the fee income itself would be subject to U.S. federal income tax (under the first sentence of Section 864(b)), gains and dividend and interest income from stock and securities generally would not be subject to U.S. federal income tax because they are not "effectively connected" to the fee income under the business activities test of Section 864(c)(2)(B).  Treas. Reg. § 1.864-4(c)(3)(i) (penultimate sentence; note that the "unless" clause in this sentence is now inoperative as a result of statutory changes made by the Taxpayer Relief Act of 1997).

[6]   The Code and Treasury regulations differentiate between (i) the securities trading safe harbor and (ii) activities giving rise to a U.S. trade or business—by excluding dealers and persons that are engaged in a banking, financing, or

13

foreign taxpayer does not lose the protection of the trading safe harbor merely because it, or its investment adviser, identifies investment opportunities, structures transactions, and negotiates economic terms as part of deploying capital for the taxpayer's own account.

In the many decades since *Whipple* and the enactment of the securities trading safe harbors, investment funds and other taxpayers have relied on those and similar authorities to make investments in companies without concern that doing so would somehow constitute engaging in a U.S. trade or business, even if the taxpayers (or their agents) actively identify, structure, and negotiate those investments.

This Court should avoid suggesting that the mere fact that a foreign investor (or its adviser) structures and negotiates its acquisitions of stock or securities is sufficient to treat the investor as engaged in a U.S. trade or business or to deny the protection of Section 864(b)(2).

      B. *Adopting the Tax Court's suggestion regarding negotiation and structuring of investments would have significant negative consequences on investors and the U.S. economy.*

---

similar business from the trading safe harbor.  26 U.S.C. § 864(b)(2)(A)(ii) (last sentence); Treas. Reg. § 1.864-4(c)(5).

If this Court were to adopt the Tax Court's suggestion, it would impose significant tax consequences on foreign investors that invest in the United States through a broad range of investment funds.

First, such foreign investors would be subject to U.S. federal income taxes on any income "effectively connected" with the funds' trade or business in the United States. 26 U.S.C. § 875(1) (treating a foreign person as engaged in a trade or business within the United States if it is a partner in a partnership that is so engaged); 26 U.S.C. § 871(b) (imposing tax on nonresident alien individuals engaged in a trade or business within the United States); 26 U.S.C. § 882(a) (same, for foreign corporations).

Second, foreign investors would be required to file U.S. tax returns. *See* Treas. Reg. § 1.6012-1(b)(1) (requiring return by nonresident alien individual engaged in a U.S. trade or business even if the individual has no income effectively connected with that business); Treas. Reg. § 1.6012-2(g)(1)(i) (requiring return by foreign corporation engaged in U.S. trade or business even if corporation has no income effectively connected with such trade or business). Beyond imposing a further administrative burden going forward, this would create a substantial problem for past years. Foreign investors in investment funds would be exposed to potential tax assessments (plus penalties and interest) for each of the past years for which the limitations period had not expired—and the limitations period would not

15

have even begun to run for *any* years for which they had not filed tax returns. *See, e.g.*, 26 U.S.C. § 6501(a) (specifying limitations period of three years "after the return was filed"). Accordingly, foreign investors that invested in the United States through investment funds and other vehicles could be subject to potential assessments going back decades, contrary to their expectations based on long-settled law. Furthermore, any foreign corporation deemed to be engaged in a U.S. trade or business that failed to file tax returns for the appropriate year would be unable to claim deductions against gross income generated by that business—in other words, what is normally a tax on net income would become a tax on gross income. 26 U.S.C. § 882(c)(2).

Collectively, those results would largely nullify the judicial and statutory safe harbors for investment activities and make investing in the United States significantly less attractive to foreign investors. Such a dramatic shift in U.S. tax rules, with an extensive retroactive impact, would make the United States a less welcoming investment environment, and the cost of capital to U.S. companies would increase. It would be one thing if Congress had explicitly adopted such a change, but that is not the case here.

This Court can avoid the destabilizing consequences described above by resolving this appeal narrowly. The Court does not need to decide the outer bounds of what level of activity might constitute a U.S. trade or business for

16

foreign investors.  In particular, the Court can decide this appeal without endorsing the Tax Court's suggestion that non-U.S. persons may be engaged in a U.S. trade or business merely because they or their agents actively identify, structure, and negotiate their investments.  Doing so would preserve Congress's chosen safe harbors and the government's own longstanding guidance, while leaving undisturbed other theories the government may advance based on different facts and legal standards.

## II.　To be a securities dealer under Section 475, the taxpayer must be transacting with persons who are its customers.

The Tax Court erred as a matter of law in concluding that YA Global was a dealer in securities within the meaning of Section 475(c)(1).  The court effectively eliminated the statutory requirement that a dealer must transact with *customers*.  As discussed below, the court achieved that result by misinterpreting the Code and Treasury regulations and ignoring relevant cases.

Dealers in financial markets are unlike investors or traders in that dealers as a general matter stand ready to transact with their counterparties *on either side of the market* (i.e., to buy or sell) based on the counterparties' interest, rather than the dealer's own interest.  An investor generally seeks to make money based on a prediction that the market value of the instrument it is purchasing will increase.  A dealer, in contrast, seeks to make money by charging a markup or spread (i.e., buying at a discount and selling at a premium to the current "market" price).  As a

17

result, a dealer is generally willing to transact on either side of the market at a market price, plus (or minus) a markup, to compensate it for the service of standing ready to transact. The persons with whom the dealer transacts are its customers—rather than mere counterparties—because they are availing themselves of that service. The core distinction, reflected in the Code and the cases, is that a dealer's income arises from providing an intermediation service to customers, standing ready to buy or sell at their convenience, whereas an investor or trader earns returns from changes in the value of positions held for its own account.

The Code reflects those principles by defining a dealer in securities to mean a taxpayer that "regularly purchases securities from or sells securities *to customers* in the ordinary course of a trade or business." 26 U.S.C. § 475(c)(1)(A) (emphasis added). While the Treasury regulations under Section 475 do not define "customer" or elaborate on the definition of a dealer for purposes of Section 475(c)(1)(A), they set out the general rule: "**Dealer-customer relationship**. Whether a taxpayer is transacting business with customers is determined on the basis of all of the facts and circumstances." Treas. Reg. § 1.475(c)-1(a).

Long-settled caselaw makes clear that a counterparty is a taxpayer's "customer" if the taxpayer is transacting at the counterparty's convenience and for its benefit. As the Tax Court itself explained in its often-cited 1951 decision in *Kemon v. Commissioner*, a dealer stands ready to buy and sell securities to and

from customers as a service to them, and expects to profit from earning the spread

between the prices at which it is willing to buy or sell, rather than from

appreciation in value of the security. *Kemon v. Comm'r*, 16 T.C. 1026, 1032

(1951). Taxpayers that transact with "customers," the Tax Court explained,

"purchase their stock in trade . . . with the expectation of reselling at a profit, not

because of a rise in value during the interval of time between purchase and resale,"

but because they intend to charge a markup as compensation for acting as

middlemen between buyers and sellers. *Id.* Thus, a taxpayer that is acting as a

dealer transacts at its customers' convenience rather than upon its own initiative.

Those principles have been reaffirmed in a long line of cases.[7]

---

[7] *See, e.g.*, *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) (contrasting dealers in securities, who transact with customers as merchants, with investors or traders who buy in expectation of sale "to anyone at a profit" after appreciation in value); *Comm'r v. Stevens*, 78 F.2d 713, 713 (2d Cir. 1935) (concluding taxpayer acted as a dealer because it "bought stock to keep on sale for its customers' supply and demand"); *United States v. Wood*, 943 F.2d 1048, 1051 (9th Cir. 1991) ("A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost.") (citation omitted); *Stephens, Inc. v. United States*, 464 F.2d 53, 57 (8th Cir. 1972) ("[T]he economic advantage which a dealer seeks to attain through his handling of a security is derived from the markup which he charges his 'customers' above the original purchase price of the security, not from any anticipated rise in the market value of the shares.").

Taken together, the applicable Code provision, Treasury regulations, and relevant caselaw make clear that, to be a "dealer," a taxpayer must transact with "customers" and that such a finding must be "determined on the basis of all of the facts and circumstances," including whether the taxpayer is standing ready to transact based on the counterparty's interest.

The Tax Court's analysis, however, incorrectly eliminated the "customer" requirement altogether and thereby misapplied Section 475. Ignoring both the relevant guidance in the Treasury regulations and the caselaw cited above, the Tax Court instead focused exclusively on a subsidiary portion of the Treasury regulation that addresses Section 475(c)(1)(B), the definition of a dealer in derivatives.[8] That sub-provision states that, "[f]or purposes of Section 475(c)(1)(B)" a dealer in securities includes "a taxpayer that, in the ordinary course of the taxpayer's trade or business, regularly holds itself out as being willing and able to enter into either side of a transaction enumerated in Section 475(c)(1)(B)." Treas. Reg. § 1.475(c)-1(a)(2). Because that sub-provision of the Treasury

---

[8]   Section 475(c)(1)(B) defines a derivatives dealer to mean a taxpayer "regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities *with customers* in the ordinary course of a trade or business." 26 U.S.C. § 475(c)(1)(B) (emphasis added). While Section 475(c)(1)(A) refers to purchases or sales of securities, this section refers to "enter[ing] into . . . positions in securities" because derivatives typically are structured as contracts between the dealer and its customer. Entering into or terminating such contracts does not necessarily involve a purchase or sale.

regulations does not expressly mention "customers," the Tax Court inferred that anyone with whom the taxpayer "does what it 'regularly holds itself out' to do" must be the taxpayer's "customer."  JA58.

That is error for several reasons.  First, the Tax Court's reasoning fails to give effect to the "customer" requirement in the Code, effectively deleting the word "customers" from Sections 475(c)(1)(A) and (B).  Second, the Tax Court's ruling also fails to follow the rule set out in the directly applicable Treasury regulation, which requires a finding that "all of the facts and circumstances" showed that YA Global transacted with companies as its "customers" when it invested capital in them in exchange for stock or other securities.  The Tax Court made no such finding.[9]  Third, the Tax Court also failed to address whether the facts and circumstances satisfied criteria articulated in the long line of cases summarized above—namely whether the taxpayer stood ready to transact with its counterparties based on their convenience and for their benefit.

---

[9]    The government argued to the Tax Court that, based on the government's position that YA Global was a lender and/or underwriter, YA Global was also a dealer in securities under Section 475 because it acted as a market intermediary or middleman and therefore it had customers.  *See* JA1734–36.  This position is consistent with the interpretation of Section 475 reflected in this *amicus* brief.  The Tax Court, however, made no findings as to whether YA Global was engaged in a financing or underwriting business, choosing instead to conclude that YA Global was a dealer in securities based on its misreading of the Code and Treasury regulations discussed above.

21

Moreover, the Tax Court's analysis misunderstands even the sub-provision of the Treasury regulation on which it purports to rely.  That sub-provision acknowledges the "customer" requirement by expressly requiring not only that the taxpayer hold itself out as willing and able to enter into transactions, but also that it be willing and able to enter into "either side" of the transactions.  Treas. Reg. § 1.475(c)-1(a)(2).  Standing ready to enter into "either side" of a transaction necessarily means that the taxpayer would be transacting at its counterparty's convenience rather than out of its own desire to take a position in the transaction. The dealer would be buying or selling depending on the counterparty's investment goals, rather than its own—and therefore would be transacting with the counterparty as its customer.

Finally, the Tax Court's conclusions are inconsistent with positions that the IRS and Treasury have long articulated.  An IRS webpage addressing the distinctions between investors, traders, and dealers provides:

> Dealers in securities within the meaning of section 475(c)(1) ("section 475 dealers") may be individuals or business entities.  Section 475 dealers regularly purchase or sell securities to their customers in the ordinary course of their trade or business, or regularly offer to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of the trade or business.  Sometimes section 475 dealers maintain an inventory.  Section 475 dealers are distinguished from investors and traders because they have customers and derive their income from marketing securities for sale to customers or from being

compensated for services provided as an intermediary or market-maker.[10]

Similarly, Treasury Regulations Section 1.471-5, which addressed the accounting methods for dealers before Section 475 took effect, provides: "Taxpayers who buy and sell or hold securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business . . . are not dealers in securities within the meaning of this section." Treas. Reg. § 1.471-5(c).

As the IRS itself has explained::

> The most important factor in determining if a person is a dealer is whether that person, as a principal, purchases securities and resells them to customers. . . . A person who purchases and sells securities, but does not transact business with customers, is not a dealer. Customers are important because dealers are viewed as profiting from bringing sellers and buyers together and not from changes in the value of securities. Without customers a person cannot act as a middleman and, therefore, cannot be a dealer.

I.R.S. FSA 2000-16-002 (January 13, 2000).[11]

---

[10] Internal Revenue Service, Topic No. 429, *Traders in securities* https://www.irs.gov/taxtopics/tc429 (last visited Feb. 22, 2026)

[11] Internal IRS guidance may not be used or cited as precedential authority. *See* 26 U.S.C. § 6110(k)(3). Nevertheless, courts can and do consider such guidance insofar as it reveals how the agency tasked with administering the revenue laws interprets the underlying statutes. *See Davis v. Comm'r*, 716 F.3d 560, 569 n.26 (11th Cir. 2013).

For all of these reasons, this Court should hold that Section 475 requires transactions with "customers" in the traditional sense described in *Kemon*, and that the Tax Court's reasoning did not give effect to that requirement. If this Court were to adopt the Tax Court's erroneous interpretation of Section 475, there would be significant adverse impacts for a broad range of investors that have not historically been treated as dealers. Mutual funds, exchange-traded funds (ETFs), venture capital funds, private equity funds, and other investment funds regularly hold themselves out as willing and able to purchase securities, or provide capital to companies, on terms that they consider to be attractive. Under the Tax Court's mistaken interpretation of Section 475, those entities could be classified as securities dealers and subject, along with their investors, to mark-to-market taxation under Section 475, notwithstanding that they are not securities dealers under the clear, longstanding definition of that term.

As a result, these investors would owe taxes on the appreciation in their investments each year, even though they continue to own those securities and have not received any cash proceeds with which to pay the tax. The investors would be subject to current taxation on their unrealized gains, and might be forced to sell assets in order to raise cash to fund tax liabilities, putting downward pressure on the market. Their gains also would be taxed at ordinary income rates, rather than at the beneficial rates applicable to long-term capital gains (for individuals).

Moreover, foreign investors would be subject to U.S. tax on their gains, and would no longer be able to benefit from the judicial or statutory safe harbors for investing in securities for their own accounts.  Consequently, they would not invest in the United States or would demand higher returns to compensate them for their increased taxes, thereby increasing the cost of capital for U.S. companies.  None of these consequences are justified by statute, regulation, or caselaw.

This Court should reject the Tax Court's erroneous interpretation of Section 475.

## CONCLUSION

For the foregoing reasons, the Court (i) should not endorse the Tax Court's suggestion that non-U.S. persons may be engaged in a U.S. trade or business merely because they (or their agents) actively identify, structure, and negotiate their investments; and (ii) should reject the Tax Court's erroneous interpretation of Section 475.

Dated: March 9, 2026

Respectfully submitted,

*/s/ Matthew M. Yelovich*
Matthew M. Yelovich
CLEARY GOTTLIEB STEEN & HAMILTON LLP
1841 Page Mill Road, Suite 250
Palo Alto, California 94304
Telephone: 650-815-4100
Facsimile: 650-815-4199
myelovich@cgsh.com

Rishi N. Zutshi
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
rzutshi@cgsh.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I a member of the Bar of this Court.


Date: March 9, 2026                      */s/ Matthew M. Yelovich*
                                         Matthew M. Yelovich

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2026, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: March 9, 2026

*/s/ Matthew M. Yelovich*
Matthew M. Yelovich

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,437 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in size 14 Times New Roman font.

3.      In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellee's Brief, as electronically filed on March 9, 2026, is identical to the text of the Brief to be submitted in paper copy.

4.      Pursuant to Third Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that the virus detection program CrowdStrike has been run on the electronic file, and that no virus was detected.

Date: March 9, 2026                                    */s/ Matthew M. Yelovich*
                                                              Matthew M. Yelovich